**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

GUN OWNERS OF AMERICA, INC.,
GUN OWNERS FOUNDATION, and
RICHARD HUGHES,

      Plaintiffs,

v.                                                        Civil Action No. _____ _ _

SHERIFF KEITH PEARSON, in his official
capacity as Sheriff of St. Lucie County, the
ST. LUCIE COUNTY SHERIFF'S OFFICE,
THOMAS BAKKEDAHL, in his official capacity
as the State Attorney for the 19th Judicial Circuit of
Florida, and the STATE ATTORNEY'S OFFICE
for the 19th Judicial Circuit of Florida,

      Defendants.

---

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Gun Owners of America, Inc., Gun Owners Foundation, and Richard Hughes ("Plaintiffs"), by and through undersigned counsel, file this Complaint against Sheriff Keith Pearson in his official capacity as the Sheriff of St. Lucie County, the St. Lucie County Sheriff's Office, Thomas Bakkedahl in his official capacity as the State Attorney for the 19th Judicial Circuit of Florida, and the State Attorney's Office for the 19th Judicial Circuit of Florida ("Defendants"), alleging violations of the right to keep and bear arms guaranteed by the Second and Fourteenth Amendments to the United States Constitution. Plaintiffs seek a declaration that Fla. Stat. § 790.053(1) is unconstitutional, and injunctive relief enjoining Defendants from enforcing it. In support thereof, Plaintiffs allege as follows:

## **INTRODUCTION**

1. Despite its reputation as a largely gun-friendly state, Florida inexplicably continues to prohibit the peaceable carrying of firearms in an open and unconcealed manner. This blatant infringement of the Second Amendment right to "bear arms" runs counter to this nation's historical tradition and would have criminalized the very colonists who openly carried their muskets and mustered on the greens at Lexington and Concord to fight for their independence. Indeed, Florida's first experiment regulating the carrying of firearms in public did not begin until 1893, *decades* after Reconstruction and more than a *century* after the Second Amendment was ratified. To make matters worse, that 1893 carry ban openly targeted only a disfavored subset of the population – newly freed blacks – while whites enjoyed de facto immunity from enforcement.

2. Even though Florida recently joined the majority of other U.S. states, becoming a "constitutional carry" jurisdiction where no government permission slip is needed to exercise the enumerated right to bear arms, the 2023 statutory change extends only to *concealed* carry, while Florida continues to infringe the right of Floridians to *openly* carry firearms. That is hardly a "tradition" to be proud of, nor does it carry the day under *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).

3. In addition to being a *historical* outlier, Florida's onerous open carry ban makes it an extreme outlier among the *present*-day laws of the 50 states. In fact, just *three* other states – the notoriously anti-gun California, Illinois, and New York, along with the District of Columbia – entirely ban the open carry of firearms. In contrast, the vast majority of states permit the open carry of all manner of firearms (both handguns and long guns), by any law-abiding adult and without any sort of permit at all.

2

4. According to the United States Supreme Court, the only way Florida can justify such an extreme restriction is to show a broad and enduring Founding-era historical tradition of governments banning the peaceable open carry of firearms by law-abiding persons, such that demonstrates that the Founders never understood the Second Amendment to protect open carry in the first place. That is an absurd proposition, and a hurdle that Florida simply cannot clear.

5. For starters, the Second Amendment's plain text contradicts the notion that an open carry ban is permissible – after all, the Amendment was designed to guarantee the ability of the body politic to form a "well regulated Militia" – meaning well-trained, armed to the teeth, and competent to resist oppression from foreign aggressors or domestic tyrants. No conventional military force in history ever has been confined to covert carry of concealable firearms (*i.e.*, small handguns), and thus the Second Amendment was designed to secure something far more substantial than carrying a snub-nosed revolver in one's pocket while grocery shopping.

6. Second, there is absolutely no timely historical example – *none* – of restricting the right of Americans to peaceably carry firearms in public. At best, Founding-era statutes regulated using arms for "affrays" or to the "terror" of the populace, akin to modern-day brandishing statutes[1] or prohibitions on drunken celebrations firing guns into the air.[2] And, by the time *concealed* carry restrictions did emerge decades (or in Florida's case, over a century) after the Founding, they almost universally did not prohibit *open* carry. When they did, courts were quick to strike them down.[3]

---

[1] *See, e.g.*, Fla. Stat. § 790.10, "Improper exhibition of dangerous weapons or firearms."

[2] *See United States v. Rahimi*, 219 L. Ed. 2d 351, 364 (2024) (recounting "provisions barring people from misusing weapons to harm or menace others"); *id.* at 363 (recounting "restrictions on gun use by drunken New Year's Eve revelers").

[3] *Rahimi*, 219 L. Ed. 2d at 363 ("Some jurisdictions … forbade carrying concealed firearms." (citing *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008))).

7. Finally, far from justifying the Florida statute challenged here, the historical record proves the opposite – that, since the beginning of the Republic, Americans carried their firearms with them, wherever they went, open for all to see. As St. George Tucker described, "[i]n many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than a European fine gentleman without his sword by his side."[4]

8. To that end, Plaintiffs seek preliminary followed by permanent injunctive relief, as well as declaratory and other relief, to rectify Florida's infringement of an enumerated right that "shall not be infringed."

**PARTIES**

9. Plaintiff Gun Owners of America, Inc. ("GOA") is a California non-stock corporation with its principal place of business in Springfield, Virginia. GOA is organized and operated as a non-profit membership organization that is exempt from federal income taxes under Section 501(c)(4) of the U.S. Internal Revenue Code. GOA was formed in 1976 to preserve and defend the Second Amendment rights of gun owners. GOA has more than 2 million members and supporters across the country, including residents throughout the state of Florida and within St. Lucie County. Many of these gun owners, like the individual Plaintiff, wish to openly carry a firearm, and would do so but for the challenged statute. *See* Declaration of Luis Valdes, Exhibit A ("Valdes Dec.") at ¶4.

10. Plaintiff Gun Owners Foundation ("GOF") is a Virginia not-for-profit, non-stock corporation, with its principal place of business in Springfield, Virginia. GOF is organized and operated as a non-profit legal defense and educational foundation that is exempt from federal income taxes under Section 501(c)(3) of the U.S. Internal Revenue Code. GOF is supported by gun owners across the country, including residents throughout the state of Florida and within St.

---

[4] 5 William Blackstone, <u>Commentaries</u> App. n.B, at 19 (St. George Tucker ed., 1803).

Lucie County, whose Second Amendment rights are being infringed by the continued enforcement of Florida's atextual and ahistorical open carry ban. *See* Valdes Dec. at ¶6.

11. Together, Plaintiffs GOA and GOF (collectively "Organizational Plaintiffs") represent the interests of thousands of members and supporters who are being irreparably harmed by Defendants' unconstitutional ban on open carry. This includes young adults aged 18 to 20, who are altogether precluded from exercising their right to public carry by operation of Florida's concurrent ban on concealed carry for those under 21 years of age. Defendants' continued enforcement of Fla. Stat. § 790.053(1) causes the Organizational Plaintiffs' members and supporters irreparable harm by denying their exercise of the constitutional right to openly carry firearms for self-defense. Each of these persons would have standing to challenge Fla. Stat. § 790.053(1) individually. Moreover, protection of these persons' rights and interests is germane to the Organizational Plaintiffs' mission, which is to preserve and protect the Second Amendment and the rights of Americans to keep and bear arms, including against overreach by anti-gun politicians. Litigation of the challenge raised herein does not require participation of each of these individual members and supporters. The Organizational Plaintiffs are capable of fully and faithfully representing the interests of their members and supporters without participation by each of these individuals. Indeed, the Organizational Plaintiffs routinely litigate cases on behalf of their members and supporters throughout the country. *See* Valdes Dec. at ¶12.

12. The members and supporters of the Organizational Plaintiffs represent a diverse group of gun owners across Florida, including those within the jurisdiction of St. Lucie County and across this district, who desire to exercise their Second Amendment right to openly bear arms in public, but are prohibited from doing so under Fla. Stat. § 790.053(1).

13. Plaintiff Richard Hughes ("Hughes") is a natural person, a citizen of the United States and of the State of Florida, and a resident of Palm Beach County. *See* Declaration of Richard Hughes, Exhibit B ("Hughes Dec.") at ¶1. Hughes is a member of Plaintiff Gun Owners of America, Inc. and a supporter of Plaintiff Gun Owners Foundation. *Id.* at ¶3. Hughes is a law-abiding person who is eligible to possess firearms under federal and Florida law. *Id.* Hughes carries a concealed handgun in public on a daily basis, and has a valid Florida Concealed Weapon License. *Id.* at ¶¶3-4. However, at times, Hughes wishes to openly carry a handgun, in part, as a preventative measure to dissuade would-be attackers. *Id.* at ¶22. Hughes wishes to openly carry a handgun in locations and during activities that are not excepted from Florida's general prohibition on open carry. *Id.* at ¶6. For example, if Hughes were to leave his home – a place where he may openly carry his handgun under Fla. Stat. § 790.25(2)(n) – and simply go for a walk down the street without concealing his handgun first, then he would be in violation of Fla. Stat. § 790.053(1) while on the street and subject to detention, arrest, and prosecution. Additionally, Hughes often finds that Florida's hot and humid climate makes carrying a concealed handgun uncomfortable, if not impractical or altogether pointless. *Id.* at ¶5. For example, during the summer months, Hughes would wear lighter and different-style clothing – which would cause his handgun to be openly visible – but for Florida's ban on open carry. *Id.* Moreover, having practiced drawing a handgun both from concealment and from an open-carry holster while at the range, Hughes consistently achieves a quicker draw when openly carrying because he does not have to move clothing out of the way. *Id.* at ¶11. When milliseconds count in a dire self-defense situation, Florida's ban on open carry therefore forces Hughes into a dangerous disadvantage against criminal attackers, who uniformly get to act first, and do not obey the law (including Florida's open carry ban). Finally, even if Hughes is in compliance with the limited statutory exceptions set forth in Fla. Stat.

§ 790.25(2), he understands these exceptions merely to be affirmative defenses to prosecution and not assurances that his general right to carry a handgun "shall not be infringed" in the first place.[5] *Id.* at ¶13.

14. Hughes explains that he visits Oxbow Eco-Center in Port St. Lucie, Florida with his dogs at least once a month as it is dog friendly, and that he would carry a full-size firearm openly to protect himself. *Id.* at ¶¶16-18. He also regularly attends the Great American Port St. Lucie Gun Show, and intends to attend the September 21st through the 22nd, 2024 gun show, but he will not be able to openly carry a firearm, as he desires. *Id.* at ¶ 19. Hughes also often stops for gas on the Florida Turnpike at the Port St. Lucie Fort Pierce Service Plaza, and would openly carry his firearm while pumping gas or using those facilities, but cannot due to Florida law. *Id.* at ¶20. Hughes would carry a handgun openly in public, in other locations where concealed carry is lawful but open carry is not, but for the challenged statute. *Id.* at ¶22.

15. Plaintiffs GOA and GOF also have described several of their members and supporters who are irreparable harmed by the challenged Florida statute. For example, Jon Leggett is a GOA Life Member and a resident of Volusia County, Florida. As the Declaration of Luis Valdes explains, Mr. Leggett responded to a neighbor's pit bull that had entered onto his property, endangering his six-year-old daughter. *See* Valdes Dec. at ¶18. Mr. Leggett had a holstered pistol on his hip, while in his own front yard, and yet nevertheless was arrested by an overbearing and uninformed Florida law enforcement agent for the non-crime of openly carrying a firearm *within the curtilage of his own home. Id.* at ¶21. Even when another responding officer stated during Mr. Leggett's arrest

---

[5] Take, for example, the unconstitutional detention and arrest of GOA member John Leggett for openly carrying a handgun on his own front yard, notwithstanding express statutory protection under Fla. Stat. § 790.25(2)(n). The Armed Fisherman, *Arrested for Lawfully Carrying on His Property. Open Carry Florida*, YouTube (Sept. 1, 2023), https://tinyurl.com/hzvpv57a. *See also* Valdes Dec. at ¶¶17-35.

that "he's on his own property," the arresting officer said, "It doesn't matter...." *Id.* at ¶26.  As a result of being arrested for openly carrying a firearm in his own yard, Mr. Leggett, his wife, and his young daughter were economically and emotionally harmed – not to mention the blatant infringement of Leggett's Second Amendment rights. *Id.* at ¶31.

16. Another GOA Member, Jak McDuffie, is an 18-year-old Eagle Scout who lives in Hillsborough County, Florida. *See* Valdes Dec. at ¶36. Mr. McDuffie wants to be able to carry a firearm, however, Florida law prevents him from obtaining a Concealed Weapon License because he is not 21 yet. *Id.* at ¶36. As such, Mr. McDuffie cannot carry a concealed firearm due to his age, nor can he openly carry a firearm because of Florida's ban on open carry. *Id.* at ¶37. If McDuffie were allowed to carry a firearm openly, he would "do so everywhere he is able to do so...." *Id.*

17. Yet another GOA member, Lamarre Notargiacomo, who lives in Indian River County, Florida, explained that she does not possess a Concealed Weapon License, but owns firearms and wants to be able to openly carry a firearm in public. *See* Valdes Dec. at ¶40. Ms. Notargiacomo stated that she is active outdoors, including hiking and biking, and would carry a firearm openly while hiking and biking as it is more comfortable than carrying concealed. *Id.* at ¶41. Ms. Notargiacomo explained that the extreme Florida heat makes it difficult for her to carry a firearm concealed during her outdoor activities, and that carrying concealed while bicycling would mean she has to wear additional clothing to ensure her firearm was concealed to comply with Florida law. *Id.* If Florida did not criminalize open carry, Notargiacomo would openly carry her firearm while outdoors, but refrains from doing so as she fears arrest and prosecution. *Id.* at ¶42.

18. Even GOA's Florida state director, declarant Luis Valdes, is no stranger to Florida's open carry ban. *See* Valdes Dec. at ¶¶17-35. *See also Id.* at ¶43 (explaining that Mr. Valdes was almost

arrested – at gun point – for riding his motorcycle while carrying concealed and his t-shirt being blown by the wind to expose his firearm. Luckily for Valdes, his law enforcement credentials saved him from the gun-wielding officer intent on arresting him for exercising an enumerated constitutional right.

19. Plaintiffs reasonably fear detention, arrest, and criminal prosecution under Fla. Stat. § 790.053(1) should they openly carry a handgun in public. Indeed, Florida's ban on open carry is regularly enforced throughout the state,[6] and numerous police departments and sheriff's offices have publicly stated their intention to enforce Fla. Stat. § 790.053(1). For example, following passage of Florida's limited "constitutional carry" law for concealed carry only, the Kissimmee Police Department posted on social media the following: "Myth: [Constitutional carry] authorizes open carry. Fact: Open carry is still illegal in Florida under most circumstances."[7] The Jacksonville Sheriff's Office likewise addressed "misinformation," stating that "[o]pen carry is

---

[6] *See, e.g., Florida Gun Owners Still Face Arrest and Prosecution for Innocent Exposure of Handguns*, Fla. Carry, https://tinyurl.com/yj87c9us (last visited July 23, 2024) ("When [Hueris Mora] raised his hands above his head, his shirt rode up exposing his properly holstered handgun. The gun was only exposed because he raised his hands to surrender to the officer and inform him that he was armed. He was arrested and prosecuted [by the Miami-Dade State Attorney's Office] months after SB234 was passed clarifying that 'brief' exposure is not illegal."); Florida Carry, *Law Abiding FL Carry Members Assaulted by Miami Beach Police*, YouTube (June 25, 2018), https://tinyurl.com/644f683w (documenting the arrest of individuals engaged in lawful open carry in Miami-Dade County irrespective of their protection under the Fla. Stat. § 790.25(2)(h) fishing exception); Summer Poole, *Commissioner Candidate Arrested in Pensacola for Open Carry on July 4*, WKRG News 5 (July 11, 2022), https://tinyurl.com/2k5enn8w ("When officers approached McDaniels [in Escambia County], they saw that he had a black gun in the waistband of his pants. ... Officers noticed that McDaniels was holding a pamphlet and, when asked what it was, McDaniels told officers it was the Constitution.").

[7] *Myth 1 of 5*, Kissimmee Police (@kissimmeepolice), X (Oct. 12, 2023), https://tinyurl.com/58hkexez.

still illegal" and "[y]ou may openly carry a firearm if you are engaged in or traveling to/from fishing, camping, hunting, or test/target shooting."[8]

20. Defendant Sheriff Keith Pearson ("Sheriff Pearson") is being sued in his official capacity as Sheriff of St. Lucie County, Florida. In that capacity, Sheriff Pearson is responsible for enforcing Florida's laws within his county, including Fla. Stat. § 790.053(1). Sheriff Pearson's enforcement of the ban on open carry within St. Lucie County places Plaintiffs under imminent threat of arrest and prosecution should they violate the ban on open carry. Indeed, Sheriff Pearson's office has made clear that, following passage of Florida's limited "constitutional" carry law in 2023, "[t]he law is not open carry; open carry is still illegal in Florida under most circumstances."[9] In other words, Sheriff Pearson's office is particularly focused on the crime of open carry, representing a credible threat of enforcement to Plaintiff Hughes, and others.[10] Sheriff Pearson's principal office is located at 4700 West Midway Road, Fort Pierce, FL 34981.

21. Defendant St. Lucie County Sheriff's Office ("St. Lucie CSO") is a separate and distinct legal entity established by the Florida Constitution and Florida statutes, and is a duly organized police organization within St. Lucie County tasked with enforcing Florida's laws, including Fla. Stat. § 790.053(1). St. Lucie CSO's ongoing enforcement of the ban on open carry places Plaintiffs under imminent threat of arrest and prosecution should they violate the ban on open carry. Indeed, St. Lucie CSO has made clear that, following passage of Florida's limited "constitutional" carry law in 2023, "[t]he law is not open carry; open carry is still illegal in Florida under most

---

[8] *Constitutional (Permitless) Carry of Concealed Weapons*, <u>Jacksonville Sheriff's Off.</u>, https://tinyurl.com/3wxux75x (last visited July 23, 2024).

[9] St. Lucie County Sheriff's Office, *Permitless Concealed Carry Takes Effect in Florida July 1st*, <u>Facebook</u> (June 30, 2023), https://tinyurl.com/4wacpx55.

[10] *See also Antonyuk v. Hochul*, 639 F. Supp. 3d 232, 265 (N.D.N.Y. 2022) (finding police announcements on social media to constitute a credible threat of enforcement).

circumstances."[11]  St. Lucie CSO's principal office is located at 4700 West Midway Road, Fort Pierce, FL 34981.

22.  Sheriff Pearson and St. Lucie CSO are referred to collectively/interchangeably as Sheriff Pearson/Sheriff/Sheriff's Office.

23.  Defendant Thomas Bakkedahl ("State Attorney") is being sued in his official capacity as State Attorney for the 19th Judicial Circuit of Florida.  As the elected State Attorney for the 19th Judicial Circuit of Florida, he is tasked with prosecuting individuals who commit crimes against the State of Florida, including violations of Fla. Stat. § 790.053(1), in the counties making up the 19th Judicial Circuit.  The State Attorney's ongoing enforcement of the ban on open carry across the 19th Judicial Circuit places Plaintiffs under imminent threat of arrest and prosecution should they violate the ban on open carry.  The State Attorney maintains a St. Lucie County office located at 411 South 2nd Street, Fort Pierce, FL 34950.

24.  Defendant State Attorney's Office for the 19th Judicial Circuit of Florida ("SAO") is a distinct legal entity established by the Florida Constitution and Florida statutes, and is tasked with prosecuting those who commit crimes against the State of Florida, including violations of Fla. Stat. § 790.053(1), within the 19th Judicial Circuit.  The SAO's ongoing enforcement of the ban on open carry against residents of the counties making up the 19th Judicial Circuit places Plaintiffs under imminent threat of arrest and prosecution should they violate the ban on open carry.  In fact, one of the SAO's prior open carry prosecutions led to the decision in *Norman v. State*, 215 So. 3d 18 (Fla. 2017).[12]  The SAO maintains a St. Lucie County office located at 411 South 2nd Street, Fort Pierce, FL 34950.

---

[11] St. Lucie County Sheriff's Office, *supra* note 9.

[12] E. Bohatch, "Supreme Court declines to hear Fort Pierce Second Amendment case," Treasure Coast Newspapers, (Nov. 28, 2017), https://www.tcpalm.com/story/news/crime/st-lucie-

25. The State Attorney and SAO are referred to collectively/interchangeably as the State Attorney/SAO/State.

## JURISDICTION AND VENUE

26. This Court has original subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 1651, 2201, 2202 and 42 U.S.C. §§ 1983 and 1988.

27. Venue lies in this Court pursuant to 28 U.S.C. § 1391.

## STATEMENT OF FACTS

**a. The Second Amendment.**

28. The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

29. The unqualified and unyielding phrase "shall not be infringed" is found nowhere in the United States Constitution but the Second Amendment.

30. In its landmark decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), the United States Supreme Court rejected the nearly uniform opinions reached by the courts of appeals, which for years had claimed that the Second Amendment protects only a communal right of a state to maintain an organized militia. *Id.* at 581. Setting the record straight, the *Heller* Court explained that the Second Amendment recognizes, enumerates, and guarantees to individuals the preexisting right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation. *Id.* at 592.

---

county/2017/11/28/supreme-court-declines-hear-fort-pierce-second-amendment-case/901508001/.

31. Then, in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the U.S. Supreme Court explained that the Second Amendment is fully applicable to the states through operation of the Fourteenth Amendment. *Id.* at 791.

32. In *Caetano v. Massachusetts*, 577 U.S. 411 (2016), the U.S. Supreme Court reaffirmed its conclusion in *Heller* that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding," and that this "Second Amendment right is fully applicable to the States." *Id.* at 411.

33. More recently, the Court recognized that the Second Amendment's guarantees do not end at one's doorstep. Rather, in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the Court held that the Second and Fourteenth Amendments together guarantee individual Americans not only the right to "keep" (*i.e.*, possess or own) firearms in their homes but also the right to "bear" (*i.e.*, wear or carry) firearms in public for self-defense. *Id.* at 10. Based on an analysis of the Second Amendment's "unqualified" text, the Court described this right as a "general right to public carry," one that applies broadly and with narrow, rare exception. *Id.* at 24, 33.

34. Importantly, in addition to clearly recognizing the right of "'law-abiding, responsible citizens' … to public carry" (597 U.S. at 38 n.9),[13] *Bruen* also rejected outright the methodology many circuits had used when considering Second Amendment challenges – a test which

---

[13] To be sure, the Court's previous usage of "law-abiding, responsible" terminology is not a limitation on who may exercise the general right to public carry – any such limitation must be supported by historical tradition. *United States v. Rahimi*, 219 L. Ed. 2d 351, 369-70 (2024) ("reject[ing] the Government's contention that [one] may be disarmed simply because he is not 'responsible'" and acknowledging that "'[r]esponsible' is a vague term"); *see also id.* at 416 (Thomas, J., dissenting) ("The government … argues that the Second Amendment allows Congress to disarm anyone who is not 'responsible' and 'law-abiding.' Not a single Member of the Court adopts the Government's theory.").

purportedly looked to text and history, but then elevated the policy preferences of the government and federal judges over the intent of the Founders.

35. Repudiating the widespread atextual, "judge-empowering" (597 U.S. at 22) interest-balancing approach that the lower courts had employed to uphold all manner of infringements post-*Heller*, *Bruen* directed the courts back to first principles – to assess the text of the Second Amendment, as informed by historical tradition – and to proceed no further. *Id.* at 19.

36. In reaching this conclusion, the *Bruen* Court "decline[d] to adopt that two-part approach" because it was "one step too many," and reiterated that, "[i]n keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17, 19, 17.

37. Next, the Court held that, "[t]o justify [a] regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. ***Only if*** a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen*, 597 U.S. at 17 (emphasis added); *see also id.* at 24 (emphasis added) (reiterating once more that "[***o***]***nly then***" – should the government bear its burden – can a court uphold a firearm regulation).

38. In other words, according to the Second Amendment's text, as elucidated by the Court in *Bruen*, if a member of "the people" wishes to "keep" or "bear" an "Arm," then the ability to do so "shall not be infringed," and a challenged regulation affecting such conduct will be *presumed unconstitutional*, rebuttable only by a strong historical showing, demonstrating that the Founders never considered such conduct to be protected in the first place.

39. Lest there be any doubt, the U.S. Supreme Court already has described the scope of the protected persons, arms, and activities covered by the Second Amendment.

40. First, *Heller* explained that, "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset." 554 U.S. at 580. Consequently, "[w]e start ... with a strong presumption that the Second Amendment right ... belongs to *all Americans*." *Id.* at 581 (emphasis added).

41. Second, *Heller* turned to the "substance of the right: 'to keep and bear Arms.'" 554 U.S. at 581. The Court explained that "'[k]eep arms' was simply a common way of referring to possessing arms, for militiamen and everyone else." *Id.* at 583 (emphasis removed). Next, the Court instructed that the "natural meaning" of "bear arms" was "'wear, bear, or carry ... upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person.'" *Id.* at 584. And, "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" *Id.* *Bruen* was even more explicit, explaining that the "definition of 'bear' naturally encompasses public carry." 597 U.S. at 32.

42. Third, with respect to the term "Arms," the Court explained that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding," *Heller*, 554 U.S. at 582, and "that general definition covers modern instruments that" so much as "facilitate armed self-defense." *Bruen*, 597 U.S. at 28. As for particular types of "Arms," the Court already has held handguns to be conclusively protected because, as a matter of historical practice, "[f]ew laws in the history of our Nation have come close to the severe restriction of the District's handgun ban." *Heller*, 554 U.S. at 629; *see also id.* (alternatively observing that "handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid").

43. Applying these precedents, Plaintiffs easily meet *Bruen*'s textual qualifier so as to gain a presumption of constitutional protection in their desired course of conduct.

44. First, being law-abiding, adult American citizens, Plaintiffs undoubtedly belong to "the people." *See Bruen*, 597 U.S. at 31-32 ("It is undisputed that petitioners Koch and Nash – two ordinary, law-abiding, adult citizens – are part of 'the people' whom the Second Amendment protects.").

45. Second, Plaintiffs seek to "bear Arms" because they wish to "wear, bear, or carry" handguns "upon the person" for self-defense in public. *Id.* at 32. And much like how "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms," nothing in the Second Amendment's text distinguishes between open or concealed carry, so the Amendment presumptively protects both. *Id.* In fact, the U.S. Supreme Court's textual analysis of "bear[ing] Arms" already concluded as much, having defined "to bear" broadly and disjunctively to mean "to 'wear, bear, or carry ... *upon the person or in the clothing or in a pocket....*'" *Id.* (emphasis added).

46. Third and finally, Plaintiffs wish to carry handguns. As "instruments that constitute bearable arms," handguns are not just presumptively protected, but already conclusively so. *Heller*, 554 U.S. at 629; *see also Bruen*, 597 U.S. at 32 ("Nor does any party dispute that handguns are weapons 'in common use' today for self-defense.").

47. Having established Plaintiffs' presumption of constitutional protection in openly carrying handguns for self-defense in public, Fla. Stat. § 790.053(1) may be upheld "[o]nly if" Defendants prove it is consistent with "this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.

48. In reviewing the government's historical evidence, the *Bruen* Court cabined review of relevant history to a narrow time period, because "not all history is created equal," focusing on the period around and immediately after the ratification of the Second Amendment. *Bruen*, 597 U.S. at 34. The majority noted that "postratification" interpretations "cannot overcome or alter th[e] text," and "we have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.* at 36, 37; *see also id.* at 35 ("guard[ing] against giving postenactment history more weight than it can rightly bear"); *id.* at 36 (noting that, "because post-Civil War discussions of the right to keep and bear arms took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources"); *id.* at 37 ("19th-century evidence [i]s 'treated as mere confirmation of what the Court thought had already been established.'").

49. Founding-era primacy, with 19th-century and subsequent history playing a secondary, merely confirmatory role, is no new concept. Indeed, the Court has employed this methodology in interpreting all manner of enumerated rights. *See, e.g.*, *Lynch v. Donnelly*, 465 U.S. 668, 674 (1984) (First Amendment Establishment Clause); *Virginia v. Moore*, 553 U.S. 164, 168 (2008) (Fourth Amendment); *Timbs v. Indiana*, 139 S. Ct. 682, 688 (2019) (Eighth Amendment); *Gamble v. United States*, 139 S. Ct. 1960, 1965-66 (2019) (Fifth Amendment); *Ramos v. Louisiana*, 140 S. Ct. 1390, 1396 (2020) (Sixth Amendment); *see also Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2258-59 (2020) (emphasis added) ("[A] tradition [that] arose in the second half of the 19th century ... **cannot by itself establish an early American tradition**.").

50. But temporal relevance is not all. As the U.S. Supreme Court explained while applying *Bruen* in *United States v. Rahimi*, 219 L. Ed. 2d 351, 363 (2024), a challenged regulation must be

"consistent with the principles that underpin our regulatory tradition," and "[a] court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit...." Accordingly, the "how and why" (*i.e.*, mechanisms and motivations) of purported historical analogues must align with the challenged regulation if they are to offer any support. *Bruen*, 597 U.S. at 29; *see also id.* at 29 (citation omitted) ("For instance, a green truck and a green hat are relevantly similar if one's metric is 'things that are green.' They are not relevantly similar if the applicable metric is 'things you can wear.'"). But even so, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 26; *see also Rahimi*, 219 L. Ed. 2d at 364 (emphasis added) ("Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so *to an extent beyond what was done at the founding.*").

51. Finally, the government's relevant historical record must be "*well-established and representative*," as the challenged regulation must comport with the "*Nation's* historical tradition," and not with mere "outliers" from a smattering of jurisdictions. *Bruen*, 597 U.S. at 30, 24, 65 (emphases added). In other words, historical evidence must be widespread enough to constitute a national and lasting tradition, rather than a local or transient one. *See also id.* at 69 (discounting "short lived" restrictions as "deserv[ing] little weight").

52. Thus, Defendants cannot bear their burden by pointing to all manner of disparate and anachronistic firearm regulations – like Founding-era gunpowder storage laws or Reconstruction-era dealer licensing laws – to support a ban on *open carry*. Rather, Defendants' task is simple, and

the inquiry pointed: they must show a Founding-era tradition of banning *open carry* across the nation. And they cannot.

**b. Florida's Prohibition on Openly Carrying Firearms in Public.**

*1. The Racist History of Florida's Open Carry Ban.*

53. Florida's open carry ban was not in place at statehood. It similarly was nowhere to be found during adoption of the Fourteenth Amendment. Rather, it would take some 50 years into statehood – and over 20 years into Reconstruction – for Florida to first place restrictions on public carry.[14]

54. Dating to 1893, as amended in 1901, Florida's precursor to Fla. Stat. § 790.053(1) read:

> **3267. Penalty for carrying pistol or repeating rifle without first obtaining license.** – Whoever shall carry around with him, or have in his manual possession, in any county in this State, any pistol, Winchester rifle or other repeating rifle, without having a license from the county commissioners of the respective counties of this State, shall, upon conviction thereof, be punished by fine not exceeding one hundred dollars, or imprisonment in the county jail not exceeding thirty days: Provided, This section shall not apply to sheriffs, deputy sheriffs, city or town marshals, policemen, constables or United States marshals or their deputies as to the carrying of concealed weapons. [The General Statutes of the State of Florida § 3267, div. 5, part I, tit. 2, at 1236 (1906).[15]]

55. This 1893 law then provided for issuance of licenses to carry as follows:

> **3268. How license procured.** – The county commissioners of the respective counties of this State may at any regular or special meeting grant a license to carry a pistol, Winchester or other repeating rifle, only to such persons as are over the age of twenty-one years and of good moral character, for a period of two years, upon such person giving a bond payable to the Governor of the State of Florida in the sum of one hundred dollars,[16] conditioned for the proper and legitimate use of

---

[14] *But see Bruen*, 597 U.S. at 63 n.27 (citing an 1867 congressional report recounting enforcement of a concealed-carry ordinance against blacks in Saint Augustine, FL). Thus, it would appear that some local restrictions existed prior to statewide passage of the 1893 law.

[15] https://babel.hathitrust.org/cgi/pt?id=mdp.35112105428496&seq=1254.

[16] In other words, the fee for obtaining a license was equal to or greater than the penalty for not having one in the first place. *See also Heller*, 554 U.S. at 634 (discounting a historical "5-shilling fine" as being unlikely to "have prevented a person in the founding era from using a gun to protect

> said weapons, with sureties to be approved by the said county commissioners. And the said commissioners shall keep a record of the names of the persons taking out such a license, the name of the maker of the firearm so licensed to be carried, and the caliber and number of the same. [The General Statutes of the State of Florida § 3268, div. 5, part I, tit. 2, at 1236-37 (1906).[17]]

56. Perhaps unsurprisingly, the prevailing social attitudes of the time, coupled with the requirement that license applicants demonstrate their "good moral character" to the satisfaction of licensing officials, created ideal conditions for abuse.

57. As the Florida Supreme Court has acknowledged on at least two occasions – once in 1941, and once again in 2017 – there is no doubt that Florida's ban on open carry was "enacted with a racial motivation in mind." *Norman v. State*, 215 So. 3d 18, 34 (Fla. 2017). Citing Justice Buford's explanation in *Watson v. Stone*, 4 So. 2d 700, 703 (Fla. 1941), the Florida Supreme Court observed:

> The original Act of 1893 was passed when there was a great influx of negro laborers in this State drawn here for the purpose of working in turpentine and lumber camps. The same condition existed when the Act was amended in 1901 and **the Act was passed for the purpose of disarming the negro laborers** and to thereby reduce the unlawful homicides that were prevalent in turpentine and saw-mill camps and to give the white citizens in sparsely settled areas a better feeling of security. **The statute was never intended to be applied to the white population and in practice has never been so applied**. We have no statistics available, but it is a safe guess to assume that more than 80% of the white men living in the rural sections of Florida have violated this statute. It is also a safe guess to say that not more than 5% of the men in Florida who own pistols and repeating rifles have ever applied to the Board of County Commissioners for a permit to have the same in their possession and **there had never been, within my knowledge, any effort to enforce the provisions of this statute as to white people, because it has been generally conceded to be in contravention of the Constitution** and non-enforceable if contested. [*Norman*, 215 So. 3d at 34 (original emphasis removed, new emphases added).]

58. The racist pedigree of Floridian gun control was not lost on the *Bruen* Court, which cited the remarks of one lieutenant observing disparate local enforcement as follows: "Why is this poor

---

himself or his family from violence"); *Rahimi*, 219 L. Ed. 2d at 368 (describing "the penalty" as "another relevant aspect of the burden").

[17] https://babel.hathitrust.org/cgi/pt?id=mdp.35112105428496&seq=1255.

fellow fined for an offence which is committed hourly by every other white man I meet in the streets?" *Bruen*, 597 U.S. at 63 n.27.

59. Discriminatory enforcement continued into the early 1900s, when Florida's public carry regime set its sights on a new disfavored group: Italians. In 1909, the Florida Supreme Court affirmed the denial of one Giocomo Russo's application for a permit to carry a pistol. In so doing, the court explained that the denial was warranted because Russo had been "unknown" to the issuing authorities, and the affidavits of Lorenzo Fucarino and Nicolo Arcuri – also "unknown" to the authorities – could not establish Russo's "good moral character." *State ex rel. Russo v. Parker*, 49 So. 124, 125 (Fla. 1909).

60. Unfortunately, the *Russo* decision was a product of its time – when Italians suffered widespread suspicion, discrimination, and even mob violence, especially in the southern states. Indeed, in 1891, "[t]he largest mass lynching in US history killed 11 Italians in New Orleans,"[18] where "a mob of 10,000 people" broke into a jail and "dragged 11 Sicilians from their cells and lynched them" after the locals had become enraged at their acquittal at trial.[19] And in Tampa in 1910 – the very same jurisdiction that had denied Giocomo Russo his permit to carry – "Angelo Albana and Castenge Piccarrotta, two Italians who had been arrested late [in the] afternoon, were seized by a mob from the Sheriff's Deputies … and lynched."[20]

61. Against this historical backdrop, the only 'tradition' associated with Florida's ban on open carry is one of rampant constitutional abuse.

   *2. Florida's Modern Open Carry Ban.*

---

[18] Ryan Prior, *128 Years Later, New Orleans Is Apologizing for Lynching 11 Italians*, <u>CNN</u> (Apr. 1, 2019), https://tinyurl.com/4vjc3t9m.

[19] *Under Attack*, <u>Libr. of Cong.</u>, https://tinyurl.com/96tenjpa (last visited July 19, 2024).

[20] *Italians Lynched in a Tampa Street; Accused of Shooting Employe of Cigarmakers, They Are Taken from Officers.*, <u>N.Y. Times</u> (Sept. 21, 1910), https://nyti.ms/3AcuHsR.

62. Today, Florida law generally prohibits the open carry of a firearm except in highly limited circumstances. Consequently, ordinary gun owners may only exercise their general right to public carry under Florida's *concealed* carry scheme.[21]

63. Dating to 1987 and codified at Fla. Stat. § 790.053(1), the current iteration of Florida's open carry ban now reads:

> Except as otherwise provided by law and in subsection (2), **it is unlawful for any person to openly carry on or about his or her person any firearm** or electric weapon or device. It is not a violation of this section for a person who carries a concealed firearm as authorized in s. 790.01(1) to briefly and openly display the firearm to the ordinary sight of another person, unless the firearm is intentionally displayed in an angry or threatening manner, not in necessary self-defense.

64. Anyone who violates Fla. Stat. § 790.053(1) commits a second-degree misdemeanor, punishable as provided in Fla. Stat. § 775.082 or Fla. Stat. § 775.083.

65. Fla. Stat. § 790.25(2) provides a series of narrow exceptions to the general prohibition on openly carrying a firearm. Many of these exceptions apply to agents of the government, active military, and those whose employment necessitates the open carry of a firearm such as guards, messengers of common carriers, and those in banking-related professions. Because these exceptions do not apply to the vast majority of ordinary Americans, they are not listed below.

66. As relevant here, Fla. Stat. § 790.25(2) allows ordinary gun owners to openly carry only if they are:

> **(g)** Regularly enrolled members of any organization duly authorized to purchase or receive weapons or firearms from the United States or from this state, or regularly enrolled members of clubs organized for target, skeet, or trap shooting, while at or going to or from shooting practice; or regularly enrolled members of clubs

---

[21] Florida law authorizes any person "to carry a concealed weapon or concealed firearm, as that term is defined in s. 790.06(1), if he or she: (a) Is licensed under s. 790.06; or (b) Is not licensed under s. 790.06, but otherwise satisfies the criteria for receiving and maintaining such a license under s. 790.06(2)(a)-(f) and (i)-(n), (3), and (10)." Fla. Stat. § 790.01(1). Florida law defines a "concealed weapon or concealed firearm" to mean "a handgun, electric weapon or device, tear gas gun, knife, or billie." Fla. Stat. § 790.06(1)(a).

organized for modern or antique firearms collecting, while such members are at or going to or from their collectors' gun shows, conventions, or exhibits;

**(h)** A person engaged in fishing, camping, or lawful hunting or going to or returning from a fishing, camping, or lawful hunting expedition;

**(i)** A person engaged in the business of manufacturing, repairing, or dealing in firearms, or the agent or representative of any such person while engaged in the lawful course of such business;

**(j)** A person discharging a weapon or firearm for testing or target practice under safe conditions and in a safe place not prohibited by law or going to or from such place;

**(k)** A person discharging a weapon or firearm in a safe and secure indoor range for testing and target practice;

....

**(m)** A person while carrying a handgun unloaded and in a secure wrapper, concealed or otherwise, from the place of purchase to his or her home or place of business or to a place of repair or back to his or her home or place of business;

**(n)** A person possessing weapons or firearms at his or her home or place of business....

67. Making matters worse, all the exceptions listed in Fla. Stat. § 790.25(2) "are merely affirmative defenses to the open carry offense" codified at Fla. Stat. § 790.053(1). *Fla. Carry, Inc. v. City of Miami Beach*, 564 F. Supp. 3d 1213, 1228 (S.D. Fla. 2021). In other words, Florida has reduced an enumerated, preexisting right to an act of legislative grace, creating limited statutory rights to open carry to be asserted not by the free citizen, but by the criminal defendant.

68. Moreover, it is worth noting that, by banning open carry, Florida has deprived young adults aged 18 to 20 of their general right to public carry *altogether*. Indeed, Florida conditions eligibility for *concealed* carry – whether licensed or not – on satisfaction of the statutory licensing requirements. Fla. Stat. § 790.01(1)(b) ("A person is authorized to carry a ... concealed firearm ... if he or she is: Is not licensed under s. 790.06, but otherwise satisfies the criteria for receiving and maintaining such a license...."). Because Fla. Stat. § 790.06(2)(b) requires applicants for a Concealed Weapon or Firearm License to be "21 years of age or older," young adults are ineligible to carry concealed and, of course, ineligible to carry openly. Together with Fla. Stat. § 790.053(1), state law therefore "eviscerate[s] the general right to publicly carry arms for self-defense" for these

members of "the people" entirely. *Bruen*, 597 U.S. at 31; *see also id.* at 70 ("The Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public...."); *Lara v. Comm'r Pa. State Police*, 91 F.4th 122, 127 (3d Cir.) ("The words 'the people' in the Second Amendment presumptively encompass all adult Americans, including 18-to-20-year-olds, and we are aware of no founding-era law that supports disarming people in that age group."), *reh'g en banc denied*, 97 F.4th 156 (3d Cir. 2024), *petition for writ of certiorari filed sub nom. Paris v. Lara*, No. 23A980 (U.S. July 25, 2024).

69. It is without dispute that the open carry of firearms is not *malum in se*, as law enforcement officers across the country, including members of the Florida Highway Patrol and local police departments, routinely carry firearms openly and in full view of the public. Rather, for the rest of "the people," open carry simply is a *malum prohibitum* offense – 'illegal because we said so.'[22]

70. Of course, quite unlike the exceptions in Fla. Stat. § 790.25(2), the Second Amendment does not apply only to law enforcement, nor does it apply only from 'time to time' by government diktat, or only in the narrow context of hunting or target shooting in certain carefully circumscribed scenarios identified by the legislature.

71. Rather, the U.S. Supreme Court has made clear that "the inherent right of self-defense has been central to the Second Amendment right," it "belongs to all Americans," and this right "naturally encompasses public carry." *Heller*, 554 U.S. at 628, 581; *Bruen*, 597 U.S. at 32.

**c. Florida's Open Carry Ban Is Unconstitutional.**

*1. Norman v. State Is No Longer Good Law.*

---

[22] *Malum Prohibitum*, <u>Black's Law Dictionary</u> (11th ed. 2019) ("An act that is a crime merely because it is prohibited by statute, although the act itself is not necessarily immoral.").

72. This is not the first time Fla. Stat. § 790.053(1) has been challenged on Second Amendment grounds.[23] In *Norman v. State*, 215 So. 3d 18 (Fla. 2017), the Florida Supreme Court upheld the statute's ban on open carry, but it did so under a deferential interest-balancing test which *Heller* never endorsed and which *Bruen* ultimately rejected. Accordingly, the *Norman* holding not only does not control the outcome of the appropriate textual and historical analysis post-*Bruen*, but it also violates several key precepts of the U.S. Supreme Court's *Heller*, *Bruen*, and *Rahimi* decisions.

73. First, *Norman* failed to conduct a textual analysis à la *Heller* or *Bruen*, not once consulting contemporaneous authorities to discern the meaning of the Second Amendment's text. *Compare Norman*, 215 So. 3d 18, *with Heller*, 554 U.S. at 584 ("At the time of the founding, as now, to 'bear' meant to 'carry.'"), *and Bruen*, 597 U.S. at 32 ("Nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms."). To the *Norman* Court's credit, the majority presciently took the general right to public carry as a *given*, declining to suggest, as other pre-*Bruen* courts had, that the Second Amendment did not extend outside the home. *See Norman*, 215 So. 3d at 28, 25 (emphasis added) (noting that "Florida's 'shall-issue' licensing scheme provides *almost*[24] every individual the ability to carry a concealed weapon," and that that was "[n]otable for our purposes here"); *see also id.* at 37 ("Indeed, under Florida's permissive 'shall-issue' licensing scheme, most individuals are not prevented from carrying a

---

[23] In 2012, Dale Lee Norman, a Florida Concealed Weapon or Firearm License holder, was prosecuted for openly carrying a handgun while walking on a public sidewalk near his home. At all times, his conduct was peaceful – at no point did he threaten anyone with violence or unholster his handgun, much less point it at anyone. His only crime was that his legally possessed and holstered handgun was visible. Dashcam footage of his arrest at officer gunpoint is available here: FLOpenCarry, *Arrested for Accidental Exposure of Lawfully Carried Handgun in Florida*, YouTube (June 4, 2012), https://tinyurl.com/2s3mx4a7.

[24] Not 18-to-20-year-old adults, of course.

firearm in public for self-defense."). However, despite this acknowledgement, *Norman* simply failed to conclude that, based on *Heller*'s existing textual analysis, the Second Amendment's plain text covers the open carry of firearms. *See Heller*, 554 U.S. at 584 (emphasis added) (observing that "to bear" meant to "wear, bear, or carry ... *upon the person __or__ in the clothing or in a pocket*").

74. Second, *Norman* failed to conduct a historical analysis of the nation's early tradition as to open carry – or any tradition, for that matter. In fact, the majority's section entitled "History and Scope of the Right Provided by the Second Amendment to the United States Constitution" discussed no history at all, instead focusing exclusively on modern *judicial* precedents. *See Norman*, 215 So. 3d at 28-33. Ultimately, *Norman* cited just *one law review article in a footnote* to dispute that the Second Amendment historically protected open carry. *Id.* at 30 n.11. At no point did the *Norman* Court discuss Founding-era or later statutes, whether those statutes were relevantly or distinctly similar to Florida's modern ban, or whether they established a representative national tradition.[25]

75. Third, *Norman* applied the very "two-step analysis" that *Bruen* declared contained "one step too many." *Norman*, 215 So. 3d at 35; *Bruen*, 597 U.S. at 19. Purporting to apply a textual and historical approach in 'step one,' *Norman* once again failed to engage with the Second Amendment's plain text or history, simply concluding that "the first prong is met" in just three short sentences. *Norman*, 215 So. 3d at 36. Proceeding to 'step two,' *Norman* then selected "the appropriate level of scrutiny" as "intermediate." *Id.*

---

[25] The majority also mistakenly claimed that *Heller* had "thoroughly analyzed the history of th[e] constitutional guarantee" of the Second Amendment. *Norman*, 215 So. 3d at 29. But the *Heller* Court stated precisely the *opposite*, expressly warning that "we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment" and even inviting future challenges "to expound ... if and when" they arrive before the Court. *Heller*, 554 U.S. at 626, 635.

Case 2:24-cv-14250-JEM   Document 1   Entered on FLSD Docket 08/06/2024   Page 27 of 40

76. Fourth, having selected "intermediate scrutiny" to apply, *Norman* engaged in the very "judge-empowering 'interest-balancing inquiry'" that *Heller* "expressly rejected" and *Bruen* once again forbade. *Bruen*, 597 U.S. at 22. By "ask[ing] whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests," *Norman* disrupted the existing Founding-era "balance – struck by the traditions of the American people – that demands our unqualified deference." *Id.* at 22, 26.

77. Fifth and finally, *Norman* erroneously assumed that only the most onerous restrictions – total prohibitions which *destroy* the right to keep and bear arms – could violate the Second Amendment. This misunderstanding permeated the majority opinion, setting the tone from the start that only a flat ban on all forms of public carry would fail constitutional muster. *See, e.g.*, *Norman*, 215 So. 3d at 21 (citation omitted) ("Florida's Open Carry Law is a provision … still allowing the possession of firearms in most instances. Chapter 790 permits individuals to carry firearms in public, so long as the firearm is carried in a concealed manner."); *id.* at 22 (noting "we review the constitutionality of Florida's Open Carry Law within th[at] context"); *id.* at 25-26 ("Notable for our purposes here, Florida's 'shall-issue' permitting scheme leaves no discretion to the State...."); *id.* at 27-28 ("Florida's Open Carry Law does not diminish an individual's ability to carry a firearm for self-defense, so long as the firearm is carried in a concealed manner...."); *id.* at 31 (contrasting laws "prohibiting entirely" with laws "requiring a demonstration of 'good cause' or a 'justifiable need'"); *id.* at 37 (claiming that "if the law leaves open an alternative outlet to exercise the right … then the law is 'less likely to place a severe burden on the Second Amendment'"); *id.* ("Florida's Open Carry Law is not so close to the 'core' of this right as to prevent people from defending themselves."); *id.* at 37-38 ("Because this law does not amount to

an entire ban on a class of guns or completely prohibit the bearing of firearms in public ... we conclude that Florida's Open Carry Law does not severely burden the right.").

78. But *Heller* already rejected the notion that the Second Amendment only has something to say when *no* other 'alternatives' to its exercise exist. Indeed, the Court warned that "[i]t is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed." *Heller*, 554 U.S. at 629; *see also Jackson v. City & County of San Francisco*, 576 U.S. 1013, 1016 (2015) (Thomas, J., dissenting from denial of certiorari) ("[N]othing in our decision in *Heller* suggested that a law must rise to the level of the absolute prohibition....").

79. So too is it "no answer to say" that a ban on open carry is permissible so long as concealed carry remains available. In other words, the government does not get to decide *just how* the people exercise their rights. No court would uphold a ban on written communication just because oral communication would remain legal, or a mandate that all defense attorneys be court-appointed. 'You still get to speak *somehow*' and 'you still get *some* lawyer' are not constitutional arguments, and the Second Amendment is no different. *See Bruen*, 597 U.S. at 70 ("The constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'").

80. The U.S. Supreme Court's subsequent precedents only confirm that the Second Amendment's "unqualified command" extends well beyond total bans. Indeed, *Bruen* invalidated precisely the "proper cause" standard which the *Norman* Court had contrasted with laws "prohibiting entirely" certain conduct. *Bruen*, 597 U.S. at 71; *Norman*, 215 So. 3d at 31. And most recently, *Rahimi* applied the Court's textual and historical standard to a law which imposed only "temporary disarmament" – *i.e.*, not a total ban. *Rahimi*, 219 L. Ed. 2d at 368. Although the

Court ultimately upheld the law challenged in *Rahimi*, it did so only by finding a Founding-era, national tradition of relevantly similar regulation, and not merely *because* of the law's short-lived prohibition. Finally, *Bruen* repeatedly reiterated that its test would apply to all "regulation" of firearms – not just 'total prohibitions' or 'bans.' *See, e.g., Bruen*, 597 U.S. at 17, 18, 19, 22, 24, 26, 27 (describing the test as applying to firearm "regulation"); *see also id.* at 27 (describing the "flat ban" in *Heller* as one type of "regulation"). Certainly, if the Court had intended to limit the Second Amendment's protections to "flat bans" only, it knew how to employ such terminology, which would have dispositively decided *Rahimi* without resort to the historical analysis that the Court actually conducted.

81. To be sure, *Norman*'s clearly erroneous Second Amendment analysis has no binding effect on this Court. But for the reasons above, neither is it persuasive. Based on these federal precedents' clear instructions, *Norman* was wrongly decided and has no bearing on the constitutionality of Fla. Stat. § 790.053(1) under the Second Amendment's purely textual and historical standard, as explicated in *Bruen* and *Rahimi*.

> 2. *Applying Heller, Bruen, and Rahimi, Florida's Open Carry Ban Is Unconstitutional.*

82. As explained above, any firearm regulation which restricts members of "the people" from keeping or bearing arms is *presumptively unconstitutional*. *Bruen*, 597 U.S. at 17, 24. In order to be upheld, the government must prove that such restriction comports with the nation's historical tradition of firearm regulation via demonstration of a broad and enduring series of highly similar Founding-era enactments, demonstrating that certain persons, arms, or activities were never considered to be within the scope of the Second Amendment in the first place. *Id.*; *see also id.* at 34 (observing that, "when it comes to interpreting the Constitution, not all history is created equal").

83. Although the U.S. Supreme Court has yet to decide an open carry case, its decisions nevertheless guide and control the inquiry here, and demonstrate conclusively that the challenged statute is unconstitutional.

      a.   <u>Florida's Open Carry Ban Violates the Plain Text of the Second Amendment.</u>

84. For starters, the U.S. Supreme Court *already* has provided significant textual analysis of the right to bear arms, explaining in no uncertain terms that a ban on the open carry of firearms violates the Second Amendment.

85. First, as *Bruen* explained, "law-abiding, responsible citizens" have the right "to public carry." 597 U.S. at 38 n.9. In other words, the act of "bear[ing]" arms when out and about is naturally distinguished from the act of "keep[ing]" firearms in one's home or property. *See id.* at 32 ("Most gun owners do not wear a holstered pistol at their hip in their bedroom or while sitting at the dinner table. Although individuals often 'keep' firearms in their home, at the ready for self-defense, most do not 'bear' (*i.e.*, carry) them in the home beyond moments of actual confrontation.").

86. Second, *Heller* explained that to "bear Arms" includes to "wear, bear, or carry ... *upon* the person *or in* the clothing *or in* a pocket...." 554 U.S. at 584 (emphases added). In other words, the simple term "bear" on its face encompasses both open carry *upon* (meaning "on the surface"[26]) the person and concealment *in* (meaning "within a particular place"[27]) the clothing. *See also Suarez v. Paris*, 2024 U.S. Dist. LEXIS 130327, at *28 (M.D. Pa. July 24, 2024) (emphasis added) (citations omitted) (another district court recently "find[ing] that plaintiffs' desired conduct – carrying loaded, operable firearms on their person, '*whether concealed or openly*,' in public for

---

[26] *Upon*, <u>Merriam-Webster</u>, https://tinyurl.com/4uf4n72y (last visited July 19, 2024).
[27] *In*, <u>Merriam-Webster</u>, https://tinyurl.com/37y39pjd (last visited July 29, 2024).

lawful purposes including self-defense[] – plainly is covered by the Second Amendment"); *see also id.* ("To be clear, the protected conduct at issue is *public* carry. The constitutionality of a restriction upon ... the *manner of public carry*, depends upon whether it comports with history and tradition....").

87.  Third, because the open carry of arms is necessary to effectuate the Second Amendment's prefatory Militia Clause, a ban on open carry fails at the text, and this Court need not resort to any historical analysis beyond that which already exists in binding precedent. As the Court observed in *Heller*, the prefatory Militia Clause announces that "[a] well regulated Militia" is "necessary to the security of a free State." U.S. Const. amend. II. Of course, the Militia Clause "does not limit the [operative clause] grammatically, but rather announces a purpose." *Heller*, 554 U.S. at 577. While the Founders also understood the Second Amendment to protect "self-defense and hunting," *id.* at 599, the purpose of the Militia Clause was to ensure the people could "repel[] invasions and suppress[] insurrections," "render[] large standing armies unnecessary," and ultimately "resist tyranny." *Id.* at 597-98. In other words, the Second Amendment's operative clause must protect *at least* that which is necessary to effectuate the prefatory clause.[28]

---

[28] To be sure, Florida law contains an exception for members of the state militia to carry firearms openly. Fla. Stat. §§ 790.25(2)(a), 250.02. However, this exception only applies when the *state* militia is "on duty, when training or preparing themselves for military duty, or while subject to recall or mobilization" – *i.e.*, mobilized by the government to serve a *government function.* Fla. Stat. § 790.25(2)(a). But as *Heller* made clear, that is *not* the "well regulated Militia" the Founders contemplated. Rather, "[i]t was understood across the political spectrum that the right helped to secure the ideal of a citizen militia, which might be necessary to oppose an oppressive military force if the constitutional order broke down." *Heller*, 554 U.S. at 599; *see also id.* at 600 ("If ... the organized militia is the sole institutional beneficiary of the Second Amendment's guarantee – it does not assure the existence of a 'citizens' militia' as a safeguard against tyranny."). Thus, the *citizens'* militia protected by the Second Amendment does not function only when called into formal service by the government – an institution which itself may become tyrannical, as *Heller* acknowledged, and therefore disincentivized from formally activating its own opposition. The statutory "militia" subject to the Fla. Stat. § 790.25(2)(a) exception is therefore narrower in scope than the "Militia" described in the Second Amendment.

88. Just as is the case today, no military force in the world ever carried its weapons concealed, and during the Founding era "the people" were expected to bear their arms openly. Indeed, in *United States v. Miller*, 307 U.S. 174 (1939), the Court identified numerous statutes requiring every able-bodied man to "provide himself, at his own Expense, with a good Musket or Firelock," and attend "a private muster of every company once in two months." *Id.* at 181. One of these statutory exemplars required anyone appearing "at his respective muster-field on the day appointed" to come "armed, equipped, and accoutred" with "a good, clean musket carrying an ounce ball, and three feet eight inches long in the barrel, with a good bayonet and iron ramrod well fitted thereto, a cartridge box properly made, to contain and secure twenty cartridges fitted to his musket, [and] a good knapsack and canteen...." *Id.* It is difficult to imagine how the militia could *conceal* arms required to be "*three feet eight inches long in the barrel*," or for that matter hide "a good bayonet and iron ramrod well fitted thereto, a cartridge box properly made, … [and] a good *knapsack* and canteen" *under their clothing. Id.* (emphasis added).

89. Rather, the purpose of the muster was to train and be inspected – outside, in public, and while carrying openly. Certainly, the colonists who mustered on the greens at Lexington and Concord were not carrying *concealed* muskets.

90. The Second Amendment therefore protects open carry as a necessary predicate act to ensuring "the security of a free State." *See also Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment) ("Constitutional rights thus implicitly protect those closely related acts necessary to their exercise."). It would be quite something indeed if the Second Amendment was designed to guarantee the people the ability to bear military arms in a conflict against a foreign force or tyrannical domestic government, but then failed to protect the ability to

bear those *non-concealable* weapons openly. *See Rahimi*, 219 L. Ed. 2d at 362 ("'Take away their weapons of defense and you take away the inalienable right of defending liberty.'").

      b.   <u>In Addition to Being Atextual, Florida's Open Carry Ban Is Ahistorical.</u>

91. Even if this Court were to proceed beyond the plain text to an analysis of history, the U.S. Supreme Court has failed to identify ***any*** Founding-era statute that restricted the ability of ordinary persons to bear arms in public. As the Court noted in *Bruen*, the only pre-Founding laws that existed did not regulate the peaceable *carrying of* arms, but only *certain conduct with* arms – "to breach the peace" or "to terrify the King's subjects." 597 U.S. at 41, 44. A few examples of laws prohibiting these sorts of "affrays" were also present at the Founding, providing for the arrest of a "'all affrayers, rioters, disturbers, or breakers of the peace'" which, "[f]ar from banning the carrying of any class of firearms, … merely codified the existing common-law offense of bearing arms *to terrorize the people*...." *Id.* at 49, 47 (emphasis added). As the Court then noted, "a by-now-familiar thread runs through these … statutes: They prohibit bearing arms in a way that spreads 'fear' or 'terror' among the people," which the Court noted "do[es] little to support restrictions on the public carry of handguns *today*." *Id.* at 50, 47.

92. The open carry of firearms – on its own – did not and does not suffice to 'terrorize' the people.[29] As the *Rahimi* Court observed, the "going armed" laws prohibiting affrays only punished conduct which "disrupted the 'public order' and 'le[d] almost necessarily to actual violence.'" 219 L. Ed. 2d at 367. Setting aside the utter dearth of historical laws expressly prohibiting open carry, logic dictates that, if the mere open carry of firearms constituted an affray, then the historical norm for public carry would have been to carry concealed. But, as the *Bruen* Court noted, "[o]nly after

---

[29] It would be quite something to conclude that merely wearing a handgun in a holster on one's belt while going about daily life – *i.e.*, what thousands of ordinary Americans in other states (and hundreds of thousands of police) do every day – somehow terrorizes the public.

the ratification of the Second Amendment in 1791 did public-carry restrictions proliferate," 597 U.S. at 50,[30] and these laws almost exclusively restricted *concealed carry*, forcing the people to carry openly if they were to exercise their right to public carry at all. *See id.* at 52 (emphasis added) ("In the early to mid-19th century, some States began enacting laws that proscribed the *concealed carry* of pistols and other small weapons."). And, in the rare occasion that these laws also reached open carry such that no public carry was legal, courts were quick to strike these prohibitions down. *Id.* at 53-54, 59.[31]

93. A closer examination of these late-coming enactments only further confirms the unconstitutionality of Fla. Stat. § 790.053(1). *See Bruen*, 597 U.S. at 37 ("19th-century evidence [i]s 'treated as mere confirmation of what the Court thought had already been established.'"). Indeed, they near-universally show that *governments may not ban the open carry of firearms*. *See Heller*, 554 U.S. at 612 ("In *Nunn v. State*, 1 Ga. 243, 251 (1846), the Georgia Supreme Court construed the Second Amendment as protecting the 'natural right of self-defence' and therefore struck down a ban on carrying pistols openly."); *id.* at 613 ("Likewise, in *State v. Chandler*, 5 La. Ann. 489, 490 (1850), the Louisiana Supreme Court held that citizens had a right to carry arms openly"); *id.* at 629 ("In *Andrews v. State*, the Tennessee Supreme Court likewise held that a statute

---

[30] As already explained, such late-coming historical sources cannot provide insight into what the Second Amendment meant *when it was ratified*. *See, e.g., Bruen*, 597 U.S. at 34 ("Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.").
[31] Plaintiffs deny that a *post*-Founding historical record suffices to establish a national tradition even as to regulating concealed carry. Indeed, *Bruen* identified only eight states that cumulatively restricted concealed carry between 1813 and 1859 – all *decades* after the Founding. *Bruen*, 597 U.S. at 52 n.16 (KY, LA, IN, AR, VA, AL, GA, OH). In 1813, the year that began this trend, only *two states* passed these restrictions, representing a minority of the 18 states in the Union at the time. *See id.* (KY, LA). By 1859, the eight states restricting concealed carry still represented *only a quarter* of the 33 total states in the Union. *See id.* That is hardly a "well-established" historical tradition that is "representative" of the "Nation[]." *Id.* at 30, 24. Rather, historical restrictions on concealed carry represent a minority view which does not shed light on the original meaning of the Second Amendment.

that forbade openly carrying a pistol ... violated the state constitutional provision (which the court equated with the Second Amendment)."); *see also Bruen*, 597 U.S. at 52 n.16 (referencing *Nunn*); *id.* at 53 n.19 (citing *Chandler*); *id.* at 54 n.21 (citing *Andrews*); *id.* at 47, 48 (citing a law from "East New Jersey in 1686" which "prohibited the concealed carry of 'pocket pistol[s]'" but not "the open carry of larger, presumably more common pistols"); *id.* at 53 ("Kentucky ... went one step further – the State Supreme Court *invalidated* a concealed-carry prohibition. *See Bliss v. Commonwealth*, 12 Ky. 90 (1822)."); *id.* at 64, 65 ("[I]n *State v. Duke*, 42 Tex. 455 (1875), the Texas Supreme Court modified its analysis," noting that "the 1871 statute 'appear[ed] to have respected the right to carry a pistol openly when needed for self-defense.'").

94.   Other courts were even more explicit, not only holding that the right to keep and bear arms protected open carry, but explaining that open carry is necessary to effectuate one of the right's animating purposes. *See, e.g., Aymette v. State*, 21 Tenn. 154, 160-61 (1840) ("To bear arms in defence of the State, is to employ them in war, as arms are usually employed by civilized nations. The arms, consisting of swords, muskets, rifles, &c., must necessarily be borne openly; so that a prohibition to bear them openly, would be a denial of the right altogether."); *State v. Reid*, 1 Ala. 612, 619 (1840) ("Under the provision of our constitution, we incline to the opinion that the Legislature cannot inhibit the citizen from bearing arms openly, because it authorizes him to bear them for the purposes of defending himself and the State, and it is only when carried openly, that they can be efficiently used for defence."); *see also State v. Smith*, 11 La. Ann. 633, 633 (1856) ("The arms ... spoken of [in the Second Amendment] are such as are borne by a people in war, or at least carried openly.   The article explains itself.   It is in these words: 'A well regulated militia....'").

  c.   <u>Like the Flat Ban on a Manner of Keeping in *Heller*, a Flat Ban on a Manner of Bearing Is Per Se Invalid.</u>

95. Moreover, a flat ban on a manner of *bearing* arms is subject to the same "*Heller*-style per se invalidation" that *Heller* levied upon a flat ban on a manner of *keeping* arms. *Peruta v. County of San Diego*, 742 F.3d 1144, 1170 (9th Cir. 2014). Indeed, just as how it is not "permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed," so too is it not permissible to ban open carry so long as concealed carry is allowed. *Heller*, 554 U.S. at 629.[32]

96. Simply put, the U.S. Supreme Court's teachings foreclose the statute challenged here.

**COUNT I**
**U.S. CONST. AMENDS. II, XIV, 42 U.S.C. § 1983**
**AGAINST ALL DEFENDANTS**

97. The foregoing paragraphs are hereby incorporated herein as if set forth in full.

98. The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

99. The Second Amendment is fully applicable to the states through operation of the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010).

100.    The Second and Fourteenth Amendments together guarantee individuals the right to "bear arms," which includes "all instruments that constitute bearable arms" and which

---

[32] *But see Bruen*, 597 U.S. at 59 ("The historical evidence from antebellum America does demonstrate that .... States could lawfully eliminate one kind of public carry – concealed carry – so long as they left open the option to carry openly."). However, as explained *supra*, these post-Founding enactments represented a minority view and not the national tradition. Moreover, this observation of an antebellum trend was not part of *Bruen*'s holding and does not necessarily support the converse at issue here (*i.e.*, it does not follow that the government could ban open carry but allow concealed carry).

necessarily includes the right to "self-defense outside the home," free from infringement by either federal or state governments. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 28, 33 (2022).

101.    The *Heller* Court further explained that the Second Amendment recognizes, enumerates, and guarantees to individuals the preexisting right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation. *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). Furthermore, this right extends beyond mere self-defense. *Bruen*, 597 U.S. at 29; *Heller*, 554 U.S. at 599.

102.    Fla. Stat. § 790.053(1) generally prohibits the open carry of firearms.

103.    Defendants' ongoing enforcement of Fla. Stat. § 790.053(1) places Plaintiffs at risk of detention, arrest, and prosecution, should they carry firearms openly outside the home, even if Plaintiffs are openly carrying pursuant to a statutory exception. Indeed, John Leggett, a member and supporter of Plaintiffs GOA and GOF, was arrested and prosecuted for openly carrying a handgun *on his own property* in June of 2023, irrespective of express statutory protection. *See* Valdes Dec. at ¶¶17-35.

104.    Moreover, for young adult members and supporters of Plaintiffs GOA and GOF who are under age 21, Defendants' ongoing enforcement of Fla. Stat. § 790.053(1) prevents the exercise of the right to public carry altogether. Because Florida law prohibits those under age 21 from carrying concealed, Fla. Stat. § 790.053(1) operates to deprive these young adults of their only remaining option for public carry – open carry. *See* Valdes Dec. at ¶¶36-37.

105.    Fla. Stat. § 790.053(1) violates the Second Amendment by infringing on an individual's right to "bear arms" outside of the home.

106.    Recognizing the historical importance of the right to bear arms, *Bruen* explained that, "when the Second Amendment's plain text covers an individual's conduct, the Constitution

presumptively protects that conduct.  To justify its regulation, the government may not simply posit that the regulation promotes an important interest.  Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.  Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"  *Bruen*, 597 U.S. at 17.

107.     Plaintiffs' proposed course of conduct – openly carrying their handguns in public for self-defense – is covered by the Second Amendment's plain text.  First, as law-abiding adult American citizens, Plaintiffs belong to "the people."  Second, Plaintiffs wish to wear or carry handguns openly, and the Second Amendment makes no distinction as to open or concealed carry in much the same way as it makes no distinction between the home and public places.  In fact, *Heller*'s existing textual analysis of "bear[ing] Arms" already incorporated both open and concealed carry within its definition.  And third, handguns are protected "Arms."  Indeed, Plaintiffs' proposed course of conduct is as "plain text" as one can get.  *See also Norman*, 215 So. 3d at 36 (finding that the open carry of firearms is "conduct falling within the scope of the Second Amendment" and "implicating the 'central component' of the Second Amendment – the right of self-defense"); *Suarez v. Paris*, 2024 U.S. Dist. LEXIS 130327, at *28 (M.D. Pa. July 24, 2024) (emphasis added) (citations omitted) (another district court recently "find[ing] that plaintiffs' desired conduct – carrying loaded, operable firearms on their person, '*whether concealed or openly*,' in public for lawful purposes including self-defense[] – plainly is covered by the Second Amendment").

108.     Therefore, Fla. Stat. § 790.053(1) is *presumed unconstitutional* and Defendants bear the burden of proving that the statute's prohibition on open carry is consistent with this nation's historical tradition of firearm regulation.

109.     Defendants cannot meet their burden.  First, Fla. Stat. § 790.053(1) violates the plain text of the Second Amendment by prohibiting plainly definitional conduct which is also necessary to fulfill its purpose.  Second, there is no Founding-era historical tradition of prohibiting open carry, and subsequent enactments cannot overcome contrary prior practice.  And third, the statute warrants *Heller*-style per se invalidation because it amounts to a flat ban on a manner of carry.

110.     Moreover, rather than evincing an early tradition of prohibiting open carry, the historical record clearly establishes a broad and enduring tradition of widespread open carry.

111.     Fla. Stat. § 790.053(1) therefore violates the Second and Fourteenth Amendments to the U.S. Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request this Honorable Court to enter a judgment in their favor against Defendants as follows:

    a. Declare that Fla. Stat. § 790.053(1) violates the Second and Fourteenth Amendments to the United States Constitution and therefore is unconstitutional;

    b. Preliminarily and permanently enjoin Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them from enforcing Fla. Stat. § 790.053(1);

    c. Award Plaintiffs nominal damages;

d. Award Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action under any/all applicable laws, including 42 U.S.C. § 1988; and

e. Grant such other and further relief as this Honorable Court deems just and proper.

 **KATZ & PHILLIPS, P.A.**

Attorneys for the Plaintiffs
509 W. Colonial Drive
Orlando, Florida 32804
Tel./Fax: 321.332.6864
Email: jphillips@thefirearmfirm.com

**JAMES D. PHILLIPS, JR., ESQUIRE**
Florida Bar No.: 22846

Stephen D. Stamboulieh
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS 38654
601-852-3440 (T)
stephen@sdslaw.us
Mississippi Bar No. 102784
*Pro Hac Vice Application Forthcoming*