IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| GUN OWNERS OF AMERICA, INC., ) <br> GUN OWNERS FOUNDATION, and ) <br> RICHARD HUGHES, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> SHERIFF KEITH PEARSON, in his official ) <br> capacity as Sheriff of St. Lucie County, the ) <br> ST. LUCIE COUNTY SHERIFF'S OFFICE, ) <br> THOMAS BAKKEDAHL, in his official capacity ) <br> as the State Attorney for the 19th Judicial Circuit of ) <br> Florida, and the STATE ATTORNEY'S OFFICE ) <br> for the 19th Judicial Circuit of Florida, ) <br> ) <br> Defendants. ) <br> ) | Civil Action No. _____ |

## DECLARATION OF LUIS VALDES

1. My name is Luis Valdes. I am a U.S. citizen and resident of Florida. I make this declaration in support of Plaintiffs' Complaint for Declaratory and Injunctive Relief. Unless otherwise stated, I make this declaration based on personal knowledge. If called as a witness, I can testify to the truth of the statements contained herein.

2. I am the Florida State Director for Plaintiff Gun Owners of America, Inc. ("GOA"). I also serve as GOA's Puerto Rico & U.S. Virgin Islands Director of Outreach, and also am a spokesman for Gun Owners Foundation ("GOF").

3. In my capacity as Florida State Director, I am in daily contact with GOA and GOF members and supporters regarding their concerns, questions, requests, and suggestions on how GOA and GOF can best represent their interests.

4. Gun Owners of America, Inc. is a California non-stock corporation with its principal place of business in Springfield, Virginia. GOA is organized and operated as a nonprofit membership organization that is exempt from federal income taxes under Section 501(c)(4) of the U.S. Internal Revenue Code. GOA was formed in 1976 to preserve and defend the Second Amendment rights of gun owners. GOA has more than 2 million members and supporters across the country, including residents of this district, many of whom are irreparably harmed by Florida's ban on the open carry of firearms. Additionally, Florida's ban on open carry infringes upon our members and supporters' constitutional right to keep and bear arms, deciding for *them* just how they can exercise their right to public carry.

5. Individuals can visit https://www.gunowners.org/ to read about GOA's mission and be kept informed on a vast number of topics, including a congressional "scorecard" of how their congressmen vote. We have created state-specific legislative alerts that we send out to keep our members and supporters informed. We also keep our members and supporters up to date on our litigation across the United States. *See* https://www.gunowners.org/press-center/. Interested individuals can join GOA by going to https://donate.gunowners.org/join/.

6. Gun Owners Foundation is a Virginia non-stock corporation with its principal place of business in Springfield, Virginia. GOF is organized and operated as a nonprofit legal defense and educational foundation that is exempt from federal income taxes under Section 501(c)(3) of the U.S. Internal Revenue Code. GOF is supported by gun owners across the country, including residents of this district, many of whom are irreparably harmed by Florida's ban on open carry. Additionally, Florida's ban on open carry infringes upon our supporters' constitutional right to keep and bear arms, including their right to public carry.

7. GOF funds its litigation efforts, in part, by way of individual contributions, along with contributions received from individuals through the Combined Federal Campaign. GOF's supporters provide the funds directly used to support GOF's litigation efforts, which efforts would be impossible without contributions from our supporters. Our supporters contribute to GOF specifically so that we can bring litigation like this.

8. And, as part of keeping its supporters up to date on this and other litigation, and various other Second Amendment topics, GOF provides its supporters with a newsletter which provides updates directly to them, keeping them advised of what GOF is doing.[1] GOF's supporters desire that GOF be involved in this case as it directly impacts protected Second Amendment conduct.

9. GOF supporters have a significant organizational attachment to GOF, as demonstrated by their voluntary decision to fund GOF, their receipt of information about GOF activities through a quarterly GOF newsletter and regular emails about its activities, and their communication of their views to GOF about issues on which GOF should focus. The reason that GOF exists is to advocate and defend the Second Amendment rights of gun owners, and many such individuals fund GOF's activities.

10. Traditionally, law-abiding Americans have been able to bear arms, both openly and concealed, in all manner of public and private places, free from criminalization and without the need to resort to narrow, statutory affirmative defenses. The Founders simply never accepted that the public bearing of arms could be generally restricted in any way.

11. GOA and GOF's members and supporters in Florida desire and overwhelmingly support GOA and GOF's involvement in litigation to protect their right to open carry, a right that is being unconstitutionally infringed by the Florida statute challenged in this lawsuit.

---

[1] *See, e.g.*, https://tinyurl.com/mr465htx.

12. Further, GOA and GOF routinely hear from their members and supporters on various topics, including anti-gun and anti-Second Amendment statutes such as Florida's ban on open carry, which allows us to direct our resources (including litigation) where it is needed most. By way of example, GOA members in New York reached out to us after the Supreme Court issued its opinion in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), which had triggered a response from the Governor and legislature of New York, culminating in the inaptly named "Concealed Carry Improvement Act," which made the carry of firearms illegal almost everywhere across New York. GOA and GOF immediately filed suit, leading to the reinstatement of the Second Amendment across wide swaths of previously off-limits places to carry. *See Antonyuk v. Hochul*, 639 F. Supp. 3d 232 (N.D.N.Y. 2022) (granting and denying preliminary injunctive relief), *rev'd in part sub nom. Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023), *granted, vacated, remanded sub nom. Antonyuk v. James*, 2024 U.S. LEXIS 2929 (July 2, 2024).

13. As noted, GOA and GOF together have more than two million members and supporters nationwide, including across the Southern District of Florida.

14. Many of GOA and GOF's members and supporters have been and are being subjected to, and harmed by, the law challenged herein, having not only their enumerated constitutional right to bear arms infringed but also their physical safety jeopardized by Florida's open carry ban.

15. GOA and GOF have heard from members and supporters in Florida who either have been prevented from openly carrying a firearm by Fla. Stat. § 790.053(1) or have been prosecuted thereunder merely for exercising their constitutional rights.

16. Indeed, at least one of GOA's members already has had firsthand experience with Florida's open carry ban, having been arrested for openly carrying his handgun *in his own front yard*.

17. John Leggett, a GOA Life Member, is a resident of Volusia County, Florida.

18. On June 3, 2023, Mr. Leggett and his six-year-old daughter were feeding her pet tortoise in the family's front yard, when a neighbor's pit pull entered the Leggetts' property and began to bark in a threatening manner and chase after the small girl. Mr. Leggett got between the dog and his daughter, and sent her inside.

19. Meanwhile, Daytona Beach Police Officer Kevin Allen was already next door, responding to a call at the house with the loose dog.

20. But when Officer Allen refocused his attention on what was occurring at the Leggetts' house, his focus was not on the aggressive, free-ranging animal, but on Mr. Leggett and the Glock pistol in a holster on his hip.

21. Closing the distance between them, Officer Allen ordered Mr. Leggett to put his hands up, aggressively handcuffed him, and told him he was under arrest for open carrying.

22. Even when Mr. Leggett calmly explained that open carry on one's own property is lawful in Florida – even reciting the specific code section[2] to Officer Allen – the officer's response was, "Wanna bet?"

23. Officer Allen was not done. Although briefly attempting to unload Mr. Leggett's firearm, which he had seized, Officer Allen apparently became distracted, and ended up placing the loaded magazine back into the loaded firearm.

24. Officer Allen then approached Mr. Leggett's front door, still brandishing the loaded handgun, demanding to speak with Mr. Leggett's six-year-old daughter. Seeing Officer Allen at the Leggetts' front door negligently brandishing a gun, another responding officer (Officer Besse) moved in on the Leggetts' little girl with his gun drawn as well, before figuring out that there was no threat at all.

---

[2] *See* Fla. Stat. § 790.25(2)(n).

25. Officer Allen and Officer Besse then began to discuss what had transpired. Officer Allen claimed that Mr. Leggett had reached for his gun, a demonstrable lie clearly refuted by the video footage of the event which has been published online.[3]

26. Officer Besse then asked, "Did you Mirandize him yet?" Officer Allen responded, "Nah, no, I got everything. I don't need to Mirandize him. He had open carry." Seemingly surprised, Officer Besse said, "But he's on his own property." Officer Allen responded, "It doesn't matter, it's just like that one down there."

27. In other words, Officer Allen *was twice notified* that Mr. Leggett's conduct was entirely lawful, but he chose to pursue the arrest anyway.

28. But Officer Allen wasn't done yet. When Mr. Leggett's wife arrived back at the house, Officer Allen turned his sights on a new victim, demanding to know her daughter's name, and then threatening to call Florida Department of Children and Families ("DCF") to report the incident (because it involved a firearm).

29. After an arrest, booking, strip search, psychological evaluation, and retention of a defense attorney, all charges were eventually dropped against Mr. Leggett.

30. But naturally, fallout from the incident continued.

31. Mr. Leggett, who had a perfectly clean record until his arrest by Officer Allen, and who holds a Top Secret security clearance as part of prior employment, was suspended from his job for a significant period of time. His career path was interrupted and stunted, at an employer who has a "zero tolerance" policy for arrests.

---

[3] The Armed Fisherman, *Arrested for Lawfully Carrying on His Property. Open Carry Florida*, YouTube (Sept. 1, 2023), https://tinyurl.com/hzvpv57a.

32. In addition to these harms, Mr. Leggett's wife and daughter both have suffered harm, including professionally, socially, and emotionally, as a result of the June 2023 events.

33. Were it not for Fla. Stat. § 790.053(1), it is highly unlikely that Mr. Leggett would have been arrested for exercising an enumerated constitutional right within the curtilage of his own home.

34. Indeed, the exceptions listed in Fla. Stat. § 790.25(2) are merely affirmative defenses – *after arrest* – to the open carry offense codified at Fla. Stat. § 790.053(1).

35. Fla. Stat. § 790.053(1) thus has caused immeasurable and untold harm to GOA members and supporters, including Mr. Leggett.

36. Another GOA member I spoke with, Jak McDuffie, is an 18-year-old Eagle Scout who currently lives in Hillsborough County, Florida. Mr. McDuffie is not a prohibited person, and has no disqualifiers which would prevent him from carrying a firearm in public – except that he is under 21 years of age.

37. Because Mr. McDuffie is not able to apply for and receive a Florida Concealed Weapon License, he is *prohibited from both carrying either openly or concealed*, and thus his right to public carry is entirely extinguished under Florida law. Mr. McDuffie explained that, were he allowed to openly carry a firearm, he would do so everywhere he is able to, being otherwise unable to "bear arms" under Florida law.

38. For example, Mr. McDuffie mows lawns around his neighborhood for extra money, and explained that there often are aggressive dogs in the neighborhood from which he may need to protect himself. Without any ability to carry a firearm, he is left defenseless.

39. Additionally, Mr. McDuffie has a dog of his own that he frequently walks around the neighborhood, but again, due to his age, he is unable to protect himself and his pet from other animals while on his walks.

40. I also spoke with another GOA member, Lamarre Notargiacomo, who lives in Indian River County, Florida. Ms. Notargiacomo explained that she does not possess a Concealed Weapon License, but owns firearms and desires to be able to openly carry a firearm in public. Ms. Notargiacomo is legally eligible to possess and carry firearms, and would be able to (and would) carry firearms openly, but for the challenged statute.

41. Ms. Notargiacomo stated that she is active outdoors, including hiking and biking, near where she lives in Indian River County. She would carry a firearm openly while hiking and while riding her bicycle, because it is more comfortable than carrying a firearm concealed, especially while wearing a pack or while pedaling a bicycle. The often-extreme heat in Florida and, on top of that, exercising outdoors, makes it difficult for Ms. Notargiacomo to carry a firearm concealed, while either hiking the trails or riding her bicycle. She stated that carrying a firearm concealed while biking would be extremely difficult, as she would have to wear additional clothing to make sure that the firearm is concealed to comply with Florida law, or else she would have to secure a firearm in a pack of some sort while outside.

42. Ms. Notargiacomo explained that she would carry a firearm openly on her person if the law allowed her to. However, because she knows Florida law prohibits her from exercising her enumerated right to bear arms openly, she refrains from openly carrying a firearm while outside her home, as she fears arrest and prosecution.

43. And finally, Mr. Leggett (above) is not the only GOA member who has been harmed under Florida's open carry ban. Rather, several years ago I almost was arrested for carrying my own

firearm, while riding my motorcycle. As a Miami-Dade police officer went to pass me in the right lane, the officer apparently was able to make out my concealed carry pistol under my t-shirt, slammed on his brakes, and pulled in behind me and initiated a traffic stop – *at gunpoint*. Only after I explained that I was an off-duty law enforcement officer, and produced my credentials, did the officer let me go, making it very clear that he otherwise would have arrested me for open carry. Making matters worse, this traffic stop occurred *after* Florida amended its law to permit brief or accidental exposure of a concealed firearm, which apparently was insufficient to protect me from harassment from accidental exposure. Floridians without the shield of law enforcement credentials should be free to exercise their constitutional right to bear arms without having guns pointed at them.

44. Protection of the rights and interests advanced in this litigation is germane to GOA and GOF's respective missions, which include the effort to preserve and protect the Second Amendment and the rights of Americans to keep and bear arms, including against overreach by unelected and unaccountable anti-gun bureaucrats. GOA and GOF routinely litigate cases throughout the country on behalf of their members and supporters, and GOA and GOF are capable of fully and faithfully representing the interests of their members and supporters without participation by each of the individuals and entities.

I, Luis Valdes, declare under penalty of perjury that the foregoing is true and correct.

August 1, 2024
DATE

LUIS VALDES