**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**
Civil Action No. 2:24-cv-14250-JEM

GUN OWNERS OF AMERICA, INC., et al.

     Plaintiffs,

v.

SHERIFF RICHARD R. DEL TORO, in his official
capacity as Sheriff of St. Lucie County, et al.,

     Defendants.

_____/

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND
INCORPORATED MEMORANDUM IN SUPPORT**

     COME NOW Plaintiffs Gun Owners of America, Inc. ("GOA"), Gun Owners Foundation ("GOF"), and Richard Hughes (collectively "Plaintiffs"), pursuant to Fed. R. Civ. P. 56(a) and Local Rule 56.1, and file this, their Motion for Summary Judgment and Incorporated Memorandum in Support, together with a Statement of Material Facts, and state as follows:

**MOTION FOR SUMMARY JUDGMENT**

     1.    Plaintiffs initially filed their Complaint for Declaratory and Injunctive Relief on August 6, 2024, alleging a single cause of action under 42 U.S.C. § 1983 for violations of their Second and Fourteenth Amendment rights.  Compl., ECF No. 1.

     2.    Plaintiffs allege that Fla. Stat. § 790.053(1) (the "Statute"), which generally prohibits the open carry of firearms in Florida, violates the Second and Fourteenth Amendments to the United States Constitution, and places Plaintiffs and their members and supporters at risk of detention, arrest, and prosecution should they carry firearms openly in public outside the statute's limited exceptions.  Dec. of Luis Valdes, ECF No. 1-6; Dec. of Richard Hughes, ECF No. 1-7.

1

3.      Plaintiffs belong to "the people" protected by the Second Amendment, the handguns they wish to carry are protected "arms," and the Amendment's plain text covers the public, open carry of firearms.  Accordingly, the Second Amendment—whose guarantee that the right to keep and bear arms "shall not be infringed" admits of no qualification—presumptively protects Plaintiffs' proposed course of conduct, and the Statute is presumptively unconstitutional.

4.      Because Defendants cannot meet their burden of demonstrating the Statute is consistent with this nation's historical tradition of firearm regulation, the Statute infringes rights that "shall not be infringed" under the Second Amendment, as incorporated against Florida by the Fourteenth Amendment.

## INCORPORATED MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

The Second Amendment guarantees "the people" the "right to keep and bear Arms."  This guarantee protects not only the private ownership of firearms "in the home," but also the public carry of firearms "in case of confrontation," because "[n]othing in the Second Amendment's text draws a home/public distinction."  *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 32-33 (2022).  The same is true with respect to the *manner* in which one carries a firearm – whether openly in plain view or concealed under clothing.  Indeed, the Founders broadly understood the term "to bear" to mean to "wear, bear, or carry … *upon* the person *or* in the clothing *or* in a pocket."  *Heller*, 554 U.S. at 584 (emphases added).  The Second Amendment's plain text therefore "naturally encompasses" not just the concealed carry of firearms, *Bruen*, 597 U.S. at 32, but also their open carry, a fact borne out by the Amendment's prefatory clause, which presupposes a "well-regulated Militia" mustering with openly carried "Musket[s]" and "Firelock[s]."  *United States v. Miller*, 307 U.S. 174, 181 (1939).

Yet despite the Second Amendment's plain textual coverage of the right to open carry – and the indisputable historical record of such a widespread practice – the State of Florida criminalizes the open carry of firearms in all but the narrowest of enumerated contexts, none of which offers Plaintiffs any statutory protection as they go about their daily lives.  *See* Fla. Stat. §§ 790.053(1), 790.25(2).   And to make matters worse, the Statute's limited exceptions "are merely affirmative defenses to the open carry offense." *Fla. Carry, Inc. v. City of Miami Beach*, 564 F. Supp. 3d 1213, 1228 (S.D. Fla. 2021).  Thus, to avoid criminal liability, Plaintiffs generally must carry *concealed* once they venture outside their homes – irrespective of the Florida heat or their own personal preferences.   And when they do, Plaintiffs remain at risk of arrest and prosecution.  Indeed, although the Statute vaguely accommodates inadvertent, "brief[] and open[] display[s]" of firearms, Fla. Stat. § 790.053(1), law enforcement retains the "discretion" to arrest "under the circumstances."  Exhibit 3, Defs. Bakkedahl & SAO's Answers to First Set of Interrogs. ¶13.  Of course, the Second Amendment is something more than a defense to a criminal charge.

Plaintiffs include a Florida gun owner and two public interest organizations that collectively represent thousands of similarly situated members and supporters.  Plaintiffs are law-abiding citizens who wish to carry firearms openly in public, free from detention, arrest, and prosecution under the Statute.  *See* Dec. of Luis Valdes ¶¶4, 6, 14-15; Dec. of Richard Hughes ¶¶3-4, 22.  But Florida law charges Defendants with enforcing the Statute against Plaintiffs and all members of the public.  *See* Fla. Stat. §§ 30.15, 27.02.  And enforce it they have.  *See* Exhibit 1, Answers to Request for Admission, ¶¶9, 10; Exhibit 3, Answers to First Set of Interrogs. ¶¶10-12.

The Statute's continued prohibition of the historical right to open carry cannot stand.  It offends the Second Amendment's text, which broadly protects the "bear[ing]" of arms.  And it offends the memory of the colonists who openly carried their muskets and mustered on the greens

3

at Lexington and Concord to fight for their independence.  Had they complied with an open carry ban, this country might still be a British colony.  Indeed, dating only to 1893, Florida's ban on open carry enjoys no Founding-era support, and Defendants will be unable to proffer any.  Plaintiffs therefore request entry of summary judgment in their favor.

## LEGAL STANDARD

Under Fed. R. Civ. P. 56, "[s]ummary judgment is appropriate where the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is *no genuine issue as to any material fact* and that the moving party is entitled to judgment as a matter of law.'"  *United States v. One Piece of Real Prop.*, 363 F.3d 1099, 1101 (11th Cir. 2004).  In this Circuit, "[t]he moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  And "[w]hen the only question a court must decide is a question of law, summary judgment may be granted" and a trial on the merits is unnecessary.  *Saregama India Ltd. v. Mosley*, 635 F.3d 1284, 1290 (11th Cir. 2011).

## ARGUMENT

## I.     IT IS UNDISPUTED THAT THIS CASE PRESENTS A PURE QUESTION OF LAW.

At the outset, the parties agree that this case presents a purely legal question.  *See* ECF No. 48 at 2 (Defendants agreeing that "the issue before the Court, whether Florida's ban on openly carried firearms violates the Constitution, is a question of law…").  Thus, this case is ripe for resolution via summary judgment.  Indeed, under the Second Amendment's text and historical context, "[t]he existence, or lack thereof, of a particular historical practice is of course in some

sense factual," but resolution ultimately "turns on a distinct *legal* question to which certain historical facts are merely relevant – whether the [government can] show[] an analogous tradition of founding-era firearms regulation that justifies" the law at issue.  *United States* v. *Ayala*, 711 F. Supp. 3d 1333, 1352 (M.D. Fla. 2024).  And as the U.S. Supreme Court explained, "'we follow the principle of party presentation.'  Courts are thus entitled to decide a case based on the historical record compiled by the parties" in briefing.  *Bruen*, 597 U.S. at 25 n.6 (citation omitted); *see Suarez v. Paris*, 741 F. Supp. 3d 237 (M.D. Pa. 2024) (partially granting civil plaintiffs summary judgment in a Second and Fourteenth Amendment challenge to Pennsylvania firearm regulations).  Here, no fact is in dispute.  The parties' controversy is legal in nature.  Summary judgment is appropriate.

## II.    PLAINTIFFS HAVE STANDING TO CHALLENGE THE OPEN CARRY BAN.

To demonstrate standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  But a "plaintiff need not 'first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute' … when fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative," even if a "criminal penalty provision has not yet been applied...." *Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 301 (1979); *see also id.* at 302-03 (standing lies when statute "authorizes imposition of criminal sanctions against" violators).    Thus, "Damocles's sword does not have to actually fall … before the court will issue an injunction," *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016), and "where threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit…."  *MedImmune, Inc. v. Genentech, Inc.*, 549 U. S. 118, 128-29 (2007).

With respect to the first standing prong, a "plaintiff satisfies the injury-in-fact requirement where he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *LaCroix v. Town of Fort Myers Beach*, 38 F.4th 941, 947 (11th Cir. 2022). It is undisputed that Florida generally bans the open carry of firearms, conduct "affected with a constitutional interest." The challenged statute, Fla. Stat. § 790.053(1), provides in pertinent part, that "it is unlawful for any person to openly carry on or about his or her person any firearm…." Violation is a second-degree misdemeanor. Fla. Stat. §§ 775.082 or 775.083.

Moreover, Plaintiffs have alleged an intention to openly carry firearms. Plaintiff Richard Hughes is a natural person, a citizen of the United States and of the State of Florida, and a resident of Palm Beach County. *See* ECF No. 1-7, Dec. of Richard Hughes ¶1. He is a member of Plaintiff GOA, a supporter of Plaintiff GOF, and a law-abiding person who is eligible to possess firearms under federal and Florida law. *Id.* ¶3. Hughes has a valid Florida Concealed Weapons or Firearm License and wishes to openly carry a handgun in locations and during activities that are not excepted from Florida's general prohibition on open carry. *Id.* ¶6. For example, Hughes routinely visits the Oxbow Eco-Center in Port St. Lucie, Florida with his dogs, at least once a month,[1] and he would carry a full-size handgun openly to protect himself, but for the Statute's prohibition. *Id.* ¶¶16-18. He also regularly attends the Great American Port St. Lucie Gun Show, but is not be able to openly carry a handgun there, as he desires. *Id.* ¶19. Hughes also often stops for gas on the Florida Turnpike at the Port St. Lucie Fort Pierce Service Plaza, and would openly carry his handgun while pumping gas or using those facilities, but cannot under Florida law. *Id.* ¶20.

---

[1] A routine "once a month" visit is far from the sort of "some day" intention that the Supreme Court says does "not support a finding of the 'actual or imminent' injury…" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992).

Hughes would carry a handgun openly at each of these and other public locations where concealed carry is lawful but open carry is not, but for the challenged statute. *Id.* ¶22.

The same is true for many of Plaintiffs GOA and GOF's members and supporters throughout Florida. For example, one member was arrested for openly carrying a firearm in his own front yard. *See* ECF No. 1-6, Dec. of Luis Valdes ¶26. Another one of GOA's members "is an 18-year-old Eagle Scout" who is "not … prohibited" from possessing firearms, but who nevertheless is forbidden from obtaining a Florida Concealed Weapons or Firearm License due to his age and, accordingly, may not carry *at all*. *Id.* ¶¶36-37. That member would carry openly but for the Statute's criminal prohibition. *Id.* ¶37. Another member explained that she does not possess a Concealed Weapons or Firearm License and, but for the statute would carry openly. *Id.* ¶41. And GOA and GOF's own Florida state director was held at gunpoint by Miami-Dade police after his concealed handgun briefly became visible while riding a motorcycle. *Id.* ¶43. The Statute puts all of the gun-owning public at risk – guaranteeing armed confrontations for the mere exercise of enumerated constitutional rights.

Next, there exists a credible threat of prosecution by Defendants, which also satisfies the traceability prong. Indeed, Florida law tasks Defendants with the enforcement of Fla. Stat. § 790.053(1), *see* Fla. Stat. §§ 30.15, 27.02, and Defendants have a recent history of enforcing it. For example, Defendant Sheriff Richard Del Toro is the Sheriff of St. Lucie County, Florida. The entity he heads, Defendant St. Lucie County Sheriff's Office ("St. Lucie CSO"), has warned the public that, even following enactment of permitless *concealed* carry in 2023, "[t]he law is not open carry; open carry is still illegal in Florida under most circumstances. *See* Exhibit 4, Pearson's Response to Request for Production of Documents. Accordingly, Defendant St. Lucie CSO has

investigated and arrested at least three individuals for violations of the Statute from 2020 to 2024. *See* Exhibit 4, at 17-24; Exhibit 2, Def. Pearson's Resp. to First Set of Reqs. for Admis. ¶¶10, 11.

Similarly, as the State Attorney for the 19th Judicial Circuit of Florida, Defendant Thomas Bakkedahl has "[a]dmitted," he and Defendant State Attorney's Office for the 19th Judicial Circuit of Florida ("SAO"), have "charged" and "prosecuted" persons "with violations of Fla. Stat. § 790.053(1)." Exhibit 1, Defs. Bakkedahl & SAO's Resp. to First Set of Reqs. for Admis. ¶¶9, 10. In fact, Defendants Bakkedahl and SAO have prosecuted *27 cases* "for violations of Fla. Stat. § 790.053(1) … in the last five (5) years." Exhibit 3, Defs. Bakkedahl & SAO's Answers to First Set of Interrogs. #14. One of Defendant SAO's earlier prosecutions even precipitated the Florida Supreme Court's decision in *Norman v. State*, 215 So. 3d 18 (Fla. 2017). It is clear that Plaintiffs run a serious risk of arrest (or worse) at the hands of Defendants should they engage in their proposed course of conduct and openly carry their handguns in public. Tellingly, no Defendant has disavowed enforcement of the Statute and, in this Circuit, "anything less than a 'clear disavowal of enforcement' does not divest a plaintiff of standing." *HM Florida-ORL, LLC v. Governor of Fla.*, 2025 U.S. App. LEXIS 11541, at *14 (11th Cir. May 13, 2025). Because "the State has not disavowed any intention of invoking the criminal penalty provision against" Plaintiffs, Plaintiffs "are thus not without some reason in fearing prosecution for violation of the ban on" open carry. *Babbitt*, 442 U.S. at 302.

Finally, as to the third prong, "[r]edressability requires that the court be able to afford relief…." *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1205 (11th Cir. 2021). Here, if this Court enjoins both the enforcement and prosecution of Fla. Stat. § 790.053(1), then Plaintiffs and their members and supporters would be able to openly carry firearms in Florida without fear of arrest and prosecution. After all, a suit against Defendant Bakkedahl is a suit

against the State.  *See Scheider v. Leeper*, 2016 U.S. Dist. LEXIS 30839, at *7 (M.D. Fla. Mar. 10, 2016) (a "§ 1983 claim against the State Attorney is treated as a claim against the State of Florida.").

### III.   FLA. STAT. § 790.053(1) VIOLATES THE SECOND AND FOURTEENTH AMENDMENTS.
#### A. Second Amendment Methodology.

The Second Amendment to the U.S. Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  This absolutist language contains no qualification or limitation constraining who may exercise the right, which arms may be owned and carried, how or where the right may be exercised, or for what purposes, and it applies with equal force against federal and state action by operation of the Fourteenth Amendment.  *McDonald v. City of Chicago*, 561 U.S. 742, 765 (2010).  Accordingly, the right presumptively belongs to "all Americans," presumptively protects "all instruments that constitute bearable arms," presumptively covers open and concealed carry, presumptively extends to all locations, and presumptively covers all "lawful purposes." *Heller*, 554 U.S. at 581, 582, 624; *Bruen*, 597 U.S. at 32 ("'bear' naturally encompasses public carry.").

Indeed, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct" and a challenged firearm regulation is presumed unconstitutional.  *Bruen*, 597 U.S. at 24.  To that end, courts must "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding" via examination of the Founding-era "principles that underpin our regulatory tradition."  *Id.* at 26; *United States v. Rahimi*, 602 U.S. 680, 692 (2024).  And "[o]nly" if the government "justif[ies] its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm

regulation … may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen*, 597 U.S. at 24.  In other words, according to the Second Amendment's text, as elucidated by the Court in *Bruen*, if a member of "the people" wishes to "keep" or "bear" an "Arm," then the ability to do so "shall not be infringed," and a challenged regulation affecting such conduct will be presumed unconstitutional, rebuttable only by a strong historical showing demonstrating that the Founders never considered such conduct to be protected in the first place.

Lest there be any doubt, the U.S. Supreme Court already has described the scope of the protected persons, arms, and activities covered by the Second Amendment.  First, *Heller* explained that, "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset."  554 U.S. at 580.  Consequently, "[w]e start … with a strong presumption that the Second Amendment right … belongs to *all Americans*."  *Id.* at 581 (emphasis added).  Plaintiffs clearly are numbered within this group.

Second, with respect to the term "Arms," the Court explained that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding," *Heller*, 554 U.S. at 582, and "that general definition covers modern instruments that" so much as "facilitate armed self-defense."  *Bruen*, 597 U.S. at 28.  As for particular types of "Arms," the Court already has held handguns to be *conclusively* protected because, as a matter of historical practice, "[f]ew laws in the history of our Nation have come close to the severe restriction of the District's handgun ban."  *Heller*, 554 U.S. at 629; *see also id.* (alternatively observing that "handguns are the most popular weapon chosen by Americans for

self-defense in the home, and a complete prohibition of their use is invalid"). The handguns Plaintiffs wish to carry openly are indisputably protected "arms."

And third, *Heller* turned to the "substance of the right: 'to keep and bear Arms.'" *Id.* The Court explained that "'[k]eep arms' was simply a common way of referring to possessing arms, for militiamen and everyone else." *Id.* at 583 (emphasis removed). Next, the Court instructed that the "natural meaning" of "bear arms" was to "'wear, bear, or carry … upon the person or in the clothing or in a pocket, for the purpose … of being armed and ready for offensive or defensive action in a case of conflict with another person.'" *Id.* at 584. And, "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" *Id.* *Bruen* was even more explicit, explaining that the "definition of 'bear' naturally encompasses public carry." 597 U.S. at 32. Plaintiffs' desire to openly carry handguns in public could not fall more squarely within the plain text "bear arms."

Next, when reviewing the government's historical evidence, the *Bruen* Court cabined review of relevant history to a narrow time period, because "not all history is created equal," focusing on the period around and immediately after the ratification of the Second Amendment. *Bruen*, 597 U.S. at 34. Consistent with its approach to other Bill of Rights guarantees, the Court "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.* at 37; *see, e.g.*, *Lynch v. Donnelly*, 465 U.S. 668, 674 (1984) (First Amendment Establishment Clause); *Virginia v. Moore*, 553 U.S. 164, 168 (2008) (Fourth Amendment); *Crawford v. Washington*, 541 U.S. 36, 50 (2004) (Sixth Amendment). Thus, as the Eleventh Circuit recently explained, "the Founding era is the primary period against which we compare the Florida law" because "[t]he Second Amendment was ratified, and its meaning fixed, in 1791."

*NRA v. Bondi*, 2025 U.S. App. LEXIS 6112, at *13, *15 (11th Cir. Mar. 14, 2025).[2]  Subsequent history, including "19th-century evidence," provides "mere confirmation of what the Court thought had already been established" at the Founding, but it "obviously cannot overcome or alter th[e] text." *Bruen*, 597 U.S. at 37, 36.

But temporal relevance is not all.  As the U.S. Supreme Court explained while applying *Bruen* in *Rahimi*, 602 U.S. at 692, a challenged regulation must be "consistent with the principles that underpin our regulatory tradition," and "[a] court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit...."  Accordingly, the "how and why" (*i.e.*, mechanisms and motivations) of purported historical analogues must align with the challenged regulation if they are to offer any support.  *Bruen*, 597 U.S. at 29.  But even so, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."  *Id.* at 26; *see also Rahimi*, 602 U.S. at 692 (emphasis added) ("Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so *to an extent beyond what was done at the founding*.").  Finally, the government's relevant historical record must be "*well-established and representative*," as the challenged regulation must comport with the "*Nation's* historical tradition," and not with mere "outliers" from a smattering of jurisdictions.  *Bruen*, 597 U.S. at 30, 24, 65 (emphases added).  In other words, historical evidence must be

---

[2] *See also Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 441 (3d Cir. 2025) ("the constitutional right to keep and bear arms should be understood according to its public meaning in 1791…"); *Reese v. Bureau of Alcohol*, 127 F.4th 583, 600 (5th Cir. 2025) (favoring 1791, stating that "*Heller* and *Bruen* both considered 19th century sources in their analysis—to confirm and reinforce earlier historical evidence contemporaneous with the Constitution's ratification."); *Worth v. Jacobson*, 108 F.4th 677, 692 (8th Cir. 2024) ("*Bruen* strongly suggests that we should prioritize Founding-era history.").

widespread enough to constitute a national and lasting tradition, rather than a local or transient one. *See also id.* at 69 (discounting "short lived" restrictions as "deserv[ing] little weight").

Thus, Defendants cannot bear their burden by, for example, pointing to all manner of disparate and anachronistic firearm regulations – like Founding-era gunpowder storage laws, or later restrictions on *concealed carry* – to support Florida's ban on *open carry*. Rather, Defendants' task is simple, and the inquiry pointed: they must show a widespread Founding-era tradition of prohibiting the "people" from "bear[ing] arms" openly. Unsurprisingly, they cannot.

## B. The Second Amendment Presumptively Protect Open Carry. In Fact, Florida's Ban Violates the Amendment's Plain Text Without Further Analysis.

Plaintiffs easily meet *Bruen*'s textual qualifier, gaining a presumption of constitutional protection for their desired course of conduct. First, being law-abiding, adult American citizens, Plaintiffs undoubtedly belong to "the people." *See Bruen*, 597 U.S. at 31-32.[3]

Second, Plaintiffs seek to "bear Arms" because they wish to "wear, bear, or carry" handguns "upon the person" for self-defense in public. *Bruen*, 597 U.S. at 32. And much like how "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms," nothing in the Second Amendment's text distinguishes between open or concealed carry, so the Amendment presumptively protects both. *Id.* In fact, the U.S. Supreme Court's textual analysis of "bear[ing] Arms" already concluded as much, having defined

---

[3] This is true even with respect to Plaintiffs GOA and GOF's 18-to-20-year-old members and supporters. *See NRA*, 2025 U.S. App. LEXIS 6112, at *53 ("[W]e assume that the Second Amendment protects individuals under the age of 21."). In *NRA*, this Circuit upheld a restriction on 18-to-20-year-olds' ability to purchase firearms as consistent with Founding-era historical tradition. It did so based on the view that the Founders considered those under age 21 to be "minors," and that the attendant "inability to contract impeded minors from acquiring firearms during the Founding era." *Id.* at *21. Even so, Founding-era 18-to-20-year-olds still were free to possess and carry firearms in public. Indeed, "Founding-era laws required minors to carry arms for militia service." *Id.* at *33. Not only does *NRA* not preclude a finding of constitutional protection for 18-to-20-year-old open carry here, but it actually strengthens Plaintiffs' position.

"to bear" broadly and disjunctively to mean "to 'wear, bear, or carry … *upon the person **or** in the clothing or in a pocket*....'"  *Id.* (emphasis added).[4]

Third and finally, Plaintiffs wish to carry handguns.  As "instruments that constitute bearable arms," handguns are not just presumptively protected, but conclusively so.  *Heller*, 554 U.S. at 629; *see also Bruen*, 597 U.S. at 32 ("Nor does any party dispute that handguns are weapons 'in common use' today for self-defense.").

Having established Plaintiffs' presumption of constitutional protection in openly carrying handguns for self-defense in public, Fla. Stat. § 790.053(1) may be upheld "[o]nly if" Defendants prove it is consistent with "this Nation's historical tradition of firearm regulation."  *Bruen*, 597 U.S. at 17.  But properly understood, *Bruen*'s historical test applies when it is necessary to ascertain the original meaning of one or more of the Second Amendment's terms.  *See Bruen*, 597 U.S. at 25 ("Members of this Court 'loo[k] to history for guidance.'"); *Rahimi*, 602 U.S. at 711 (Gorsuch, J., concurring) ("[d]iscerning what the original meaning of the Constitution requires").  Thus, if a firearm regulation simply bans the keeping or bearing of arms, such prohibition flatly contravenes the text, and *no further analysis is necessary*.  Here, Plaintiffs clearly are "people," their handguns clearly are "Arms," and to carry such a weapon openly about one's person clearly means to "bear" it.  Florida's prohibition of Plaintiffs' arms-bearing therefore is at odds with the plain text itself – outlawing the very thing the Second Amendment explicitly protects –  and no amount of historical analysis can "overcome or alter that text."  *Bruen*, 597 U.S. at 36; *see also id.* ("[T]o the extent later history contradicts what the text says, the text controls.").

---

[4] Moreover, just because one may carry concealed does not mean the Second Amendment's plain text does not protect open carry. As the Ohio Court of Appeals recently explained, "[w]hen determining whether such conduct falls under the Second Amendment's plain text, there is no basis for us to consider hypothetical alternative ways the challenger might bear arms."  *State v. Barber*, 2025 Ohio App. LEXIS 1159, at *14 (1st Dist. Apr. 4, 2025).

Indeed, the Second Amendment's prefatory clause necessarily protects open carry, and so it simply cannot be banned. As *Heller* explained, the Second Amendment "guarantees … the people's militia," one made up of ordinary citizens. 554 U.S. at 600. This clause ensures the people can "repel[] invasions and suppress[] insurrections," "render[] large standing armies unnecessary," and ultimately "resist tyranny." *Id.* at 597-98. One cannot do any of these things without carrying arms openly. In fact, in *United States v. Miller*, 307 U.S. 174 (1939), the Court already identified numerous Founding-era statutes requiring able-bodied men to "provide himself, at his own Expense, with a good Musket or Firelock," and attend "a private muster of every company once in two months." *Id.* at 181. It is difficult to imagine how the militia could *conceal* arms required to be "*three feet eight inches long in the barrel*" (and five or more feet long overall) – or, for that matter, how one might hide "a good bayonet and iron ramrod well fitted thereto, a cartridge box properly made, … [and] a good *knapsack* and canteen" *under clothing. Id.* (emphasis added). If open carry is necessary to effectuate one of the Second Amendment's clauses, then it must be protected.[5] To hold otherwise would "needlessly … cause[]" the prefatory clause "to have no consequence." Antonin Scalia & Bryan A. Garner, <u>Reading Law: The Interpretation of Legal Texts</u> 174 (2012).

### C. There Is No Historical Tradition of Banning the Open Carry of Firearms.

---

[5] *See Aymette v. State*, 21 Tenn. 154, 160-61 (1840) ("To bear arms in defence of the State, is to employ them in war, as arms are usually employed by civilized nations. The arms, consisting of swords, muskets, rifles, &c., must necessarily be borne openly; so that a prohibition to bear them openly, would be a denial of the right altogether."); *State v. Reid*, 1 Ala. 612, 619 (1840) ("Under the provision of our constitution, we incline to the opinion that the Legislature cannot inhibit the citizen from bearing arms openly, because it authorizes him to bear them for the purposes of defending himself and the State, and it is only when carried openly, that they can be efficiently used for defence."); *see also State v. Smith*, 11 La. Ann. 633, 633 (1856) ("The arms … spoken of [in the Second Amendment] are such as are borne by a people in war, or at least carried openly. The article explains itself. It is in these words: 'A well regulated militia....'").

Even if this Court were to proceed beyond the plain text to an analysis of history, the U.S. Supreme Court has failed to identify *any* Founding-era statute that restricted the ability of ordinary people to bear arms openly in public. Rather, as the Court explained in *Bruen*, the only pre-Founding restrictions on public carry did not regulate the peaceable *carrying of* arms (*i.e.*, Plaintiffs' proposed course of conduct), but rather only *certain conduct with* arms – "to breach the peace" or "to terrify the King's subjects." 597 U.S. at 41, 44. *See also United States v. Brown*, 764 F. Supp. 3d 456 (S.D. Miss. 2025) (dismissing indictment for possession of unregistered machinegun in the home, because defendant was not "armed offensively," or "attempting to terrorize the 'good citizens'" and not "going or riding armed anywhere."). The open carry of firearms – on its own – did not and does not suffice to 'terrorize' the people.[6]

And when "public-carry restrictions proliferate[d]" well "after the ratification of the Second Amendment in 1791," 597 U.S. at 50,[7] these laws almost exclusively restricted *concealed carry*, requiring the people to carry openly if they were to exercise their right to public carry at all. *See id.* at 52 (emphasis added) ("In the early to mid-19th century, some States began enacting laws that proscribed the *concealed carry* of pistols and other small weapons."). And in the rare occasion

---

[6] It would be quite something to conclude that merely wearing a handgun in a holster on one's belt while going about daily life – *i.e.*, what many ordinary Americans in other states (and hundreds of thousands of police) do every day – somehow terrorizes the public.

[7] Plaintiffs deny that a *post*-Founding historical record suffices to establish a national tradition even as to regulating concealed carry. Indeed, *Bruen* identified only eight states that cumulatively restricted concealed carry between 1813 and 1859 – all *decades* after the Founding. *Bruen*, 597 U.S. at 52 n.16 (KY, LA, IN, AR, VA, AL, GA, OH). In 1813, the year that began this trend, only *two states* had passed such restrictions, representing a tiny fraction of the 18 states in the Union at the time. *See id.* (KY, LA). Even by 1859, the eight states restricting concealed carry still represented *only a quarter* of the 33 total states in the Union. *See id.* That is hardly a "well-established" historical tradition that is "representative" of the "Nation[]." *Id.* at 30, 24. Rather, historical restrictions on concealed carry represent a minority view, and one that does not shed light on the *original* meaning of the Second Amendment.

that these laws also reached open carry such that no public carry was legal, courts were quick to strike these prohibitions down.  *Id.* at 53-54, 59.

A closer examination of these late-coming enactments only further confirms the Statute's unconstitutionality.  Indeed, they near-universally show that *<u>governments may not ban the open carry of firearms</u>*.  *See Heller*, 554 U.S. at 612 ("In *Nunn v. State*, 1 Ga. 243, 251 (1846), the Georgia Supreme Court construed the Second Amendment as protecting the 'natural right of self-defence' and therefore struck down a ban on carrying pistols openly."); *id.* at 613 ("Likewise, in *State v. Chandler*, 5 La. Ann. 489, 490 (1850), the Louisiana Supreme Court held that citizens had a right to carry arms openly...."); *id.* at 629 ("In *Andrews v. State*, the Tennessee Supreme Court likewise held that a statute that forbade openly carrying a pistol … violated the state constitutional provision (which the court equated with the Second Amendment).").

**D.  *Norman v. State* Is Repudiated and Nonbinding.**

In *Norman v. State*, 215 So. 3d 18 (Fla. 2017), the Florida Supreme Court upheld Florida's ban on open carry against a Second Amendment challenge, but it did so under a deferential interest-balancing test which *Heller* never endorsed and *Bruen* expressly rejected.  Plus, importantly, federal courts "are not bound by a state court's interpretation of federal law."  *Mendel v. Morgan Keegan & Co.*, 654 F. App'x 1001, 1004 (11th Cir. 2016).  Accordingly, not only does *Norman* not control the outcome of the appropriate textual and historical analysis post-*Bruen*, but also it violates several key precepts of the U.S. Supreme Court's *Heller*, *Bruen*, and *Rahimi* decisions.

First, despite taking the general right to public carry as a given,[8] *Norman* failed to conduct a textual analysis à la *Heller* or *Bruen*.

---

[8] *See Norman*, 215 So. 3d at 28, 25 (emphases added) (noting that "Florida's 'shall-issue' licensing scheme provides *almost* every individual the ability to carry a concealed weapon," and that that was "[n]otable for our purposes here."  Of course, not 18-to-20-year-old adults, like many

Second, *Norman* failed to conduct a historical analysis of the nation's early tradition as to open carry – or any tradition, focusing exclusively on modern *judicial* precedents.  *See Norman*, 215 So. 3d at 28-33.  At no point did the *Norman* Court discuss Founding-era or later statutes, whether those statutes were relevantly or distinctly similar to Florida's modern ban, or whether they established a representative national tradition.[9]

Third, *Norman* applied the very "two-step analysis" that *Bruen* declared contained "one step too many." *Norman*, 215 So. 3d at 35; *Bruen*, 597 U.S. at 19.

Fourth, applying intermediate scrutiny, *Norman* engaged in the very "judge-empowering 'interest-balancing inquiry'" that *Heller* "expressly rejected" and *Bruen* once again forbade, disrupting the existing Founding-era "balance – struck by the traditions of the American people – that demands our unqualified deference."  *Id.* at 22, 26.

Finally, *Norman* erroneously assumed that only total prohibitions which *destroy* the right to keep and bear arms – could violate the Second Amendment.  *See, e.g.*, *Norman*, 215 So. 3d at 37-38.  But *Heller* already rejected the notion that the Second Amendment only has something to say when *no* other 'alternatives' to its exercise exist.  Indeed, the Court warned that "[i]t is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed."  *Heller*, 554 U.S. at 629; *see also Jackson v. City & County of San Francisco*, 576 U.S. 1013, 1016 (2015) (Thomas, J., dissenting

---

of GOA's members.  *See* ECF No. 1-6, Declaration of Valdes, at ¶36. *But see Lara*, 125 F.4th at 446 (enjoining "the Commissioner from arresting law-abiding 18-to-20-year-olds who openly carry firearms during a state of emergency…").

[9] The majority erroneously claimed that *Heller* had "thoroughly analyzed the history of th[e] constitutional guarantee" of the Second Amendment.  *Norman*, 215 So. 3d at 29.  But *Heller* stated precisely the *opposite*, expressly warning that "we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment" and even inviting future challenges "to expound … if and when" they arrive before the Court.  *Heller*, 554 U.S. at 626, 635.

from denial of certiorari) ("[N]othing in our decision in *Heller* suggested that a law must rise to the level of the absolute prohibition....").[10]

The U.S. Supreme Court's subsequent precedents only confirm that the Second Amendment's "unqualified command" extends well beyond total bans.  Indeed, *Bruen* invalidated precisely the "proper cause" standard which the *Norman* Court had contrasted with laws "prohibiting entirely" certain conduct.  *Bruen*, 597 U.S. at 71; *Norman*, 215 So. 3d at 31.  And most recently, *Rahimi* applied the Court's textual and historical standard to a law which imposed only "temporary disarmament" – *i.e.*, not a total ban.  *Rahimi*, 602 U.S. at 699.  Although the Court ultimately upheld the law challenged in *Rahimi*, it did so only by finding a Founding-era, national tradition of relevantly similar regulation, and not merely *because* of the law's short-lived prohibition.  Finally, *Bruen* repeatedly reiterated that its test would apply to all "regulation" of firearms – not just 'total prohibitions' or 'bans.'  *See, e.g.*, *Bruen*, 597 U.S. at 17, 18, 19, 22, 24, 26, 27 (describing the test as applying to firearm "regulation"); *see also id.* at 27 (describing the "flat ban" in *Heller* as one type of "regulation").  Certainly, if the Court had intended to limit the Second Amendment's protections to "flat bans" only, it knew how to employ such terminology, which would have dispositively decided *Rahimi* without resort to the historical analysis that the Court actually conducted.

---

[10]  So too is it "no answer to say" that a ban on open carry is permissible so long as concealed carry remains available.  In other words, the government does not get to decide *just how* the people exercise their rights.  No court would uphold a ban on written communication just because oral communication would remain legal, or a mandate that all defense attorneys be court-appointed.  'You still get to speak *somehow*' and 'you still get *some* lawyer' are not constitutional arguments, and the Second Amendment is no different.  *See Bruen*, 597 U.S. at 70 ("The constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'").

Based on these clear federal precedents, *Norman* was wrongly decided and has no bearing on the constitutionality of Fla. Stat. § 790.053(1) under the Second Amendment's purely textual and historical standard.  And, of course, it is nonbinding anyway.

## CONCLUSION

For the reasons stated, this Court should grant Plaintiffs' Motion for Summary Judgment and enter judgment in their favor, (i) declaring Fla. Stat. § 790.053(1) to be an unconstitutional infringement of Plaintiffs' Second and Fourteenth Amendment rights and (ii) enjoining Defendants from enforcing the Statute.

Respectfully submitted this 3rd day of June 2025,

 **KATZ & PHILLIPS, P.A.**

Attorneys for the Plaintiffs
509 W. Colonial Drive
Orlando, Florida 32804
Tel./Fax: 321.332.6864
Email: jphillips@thefirearmfirm.com

_____*James D. Phillips*_____
**JAMES D. PHILLIPS, JR., ESQUIRE**
Florida Bar No.: 22846

Stephen D. Stamboulieh*
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS 38654
601-852-3440 (T)
stephen@sdslaw.us
Mississippi Bar No. 102784
*Admitted Pro Hac Vice*

Attorneys for Plaintiffs

20

## **CERTIFICATE OF SERVICE**

I certify that on June 3, 2025, a copy of the foregoing document or pleading has been electronically filed with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to: Arthur Ivan Jacobs, Esquire, Counsel for Defendants Bakkedahl and SAO, 961687 Gateway Boulevard, Suite 201-I, Fernandina Beach, FL 32034; buddy@jswflorida.com; Summer M. Barranco, Esquire, Andrew Jolly, Esq., and Richard A. Giuffreda, Esquire, Counsel for Defendants Sheriff Del Toro and St. Lucie County Sheriff's Office, 2455 E. Sunrise Blvd, Suite 1216, Fort Lauderdale, FL 33304; summer@purdylaw.com, andrew@purdylaw.com, richard@purdylaw.com.


_____*James D. Phillips*_____
**JAMES D. PHILLIPS, JR., ESQUIRE**
Florida Bar No.: 22846