**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT PIERCE DIVISION**

CASE NO.  2:24-cv-14250-JEM

GUN OWNERS OF AMERICA, INC.,
GUN OWNERS FOUNDATION, and
RICHARD HUGHES,

           Plaintiffs,

v.

SHERIFF KEITH PEARSON, in his
official capacity as Sheriff of St. Lucie
County, the ST. LUCIE COUNTY
SHERIFF'S OFFICE, THOMAS
BAKKEDAHL, in his official capacity
As the State Attorney for the 19th Judicial
Circuit of Florida, and the STATE
ATTORNEY'S OFFICE for the 19th
Judicial Circuit of Florida,

           Defendants.

_____/

**DEFENDANTS' JOINT RESPONSE TO PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT**

The Defendants, SHERIFF RICHARD DEL TORO, in his official capacity as the Sheriff

of St. Lucie County Florida, and THOMAS R. BAKKEDAHL in his official capacity as State

attorney for the Nineteenth Judicial Circuit of Florida, and on behalf of the STATE ATTORNEY'S

OFFICE for the 19th Judicial Circuit of Florida, file this their Joint Response to Plaintiff's Motion

for Summary Judgment, and in support thereof would state as follows:

**MEMORANDUM OF LAW**

**I.**     **THE BROAD RELIEF BEING SOUGHT BY PLAINTIFFS IS IMPERMISSIBLE**

The Summary Judgment is asking that this Court declare that a state law, F.S. §

1

790.053(1) be deemed unconstitutional, and that these Defendants, the Sheriff of St. Lucie County, and the State Attorney's Office for the 19th Judicial Circuit of Florida, be enjoined from enforcing it. As made clear by the Plaintiffs' Summary Judgment, this relief is being sought not only by Richard Hughes, the lone individually named Plaintiff, but also by the collectively thousands of similarly situated members and supporters of two public interest groups (non-parties). [ECF 51 at pg. 3]. The Motion, in essence, is asking this Court to issue a sweeping and broad declaration against a local sheriff's office and local state attorney's office that an entire state law is unconstitutional, such that it would apply to hundreds if not thousands of non-party individuals, who do not reside in the jurisdiction where these defendants have authority to act.

Such broad sweeping relief as applied to countless non-parties, was recently contemplated by the Supreme Court in Trump v. CASA Inc. Like the Plaintiffs here, the plaintiffs in Trump v. CASA Inc., consisted of multiple organizations bringing suit on behalf of their members and supporters. Trump v. CASA, Inc., 2025 WL 1773631 (U.S. June 27, 2025). In that opinion, the Supreme Court made clear that district courts lack the authority to prohibit enforcement of a law or policy against *anyone* who is not a named party to the lawsuit, and that an injunction could not bind "one who is not a party to the cause." Id. at *4, * 6. As part of the analysis, the Supreme Court highlighted the 19th century case of Scott v. Donald, wherein only an injunction between the parties named as plaintiff and defendants was permitted. Id. at *2.  In its application of Scott, the Supreme Court ultimately concluded that under the Judiciary Act, the federal court lacks the authority to issue declaratory relief which is broader than necessary to fully remedy the specific injuries of the *named plaintiffs*. Id

Here, Plaintiffs' Summary Judgment makes clear that the aim of this lawsuit, as brought only against St. Lucie County Sheriff's Office and the State Attorneys Office for the 19th Judicial

Circuit, is to have this Court grant declaratory and injunctive relief which would apply throughout the state and to numerous non-parties similarly situated, in other words, a universal injunction. [ECF 51 at pg. 3, 7, 8]. "A universal injunction, or a nationwide (in this case, a statewide) injunction, is the now-common name for an injunction that prevents a state or the federal government from enforcing a law against both parties *and non-parties*." Henry v. Sheriff of Tuscaloosa Cnty., Alabama, 135 F.4th 1271, 1328 (11th Cir. 2025) (emphasis added). Whether Plaintiffs view it that way or not, this Summary Judgment is seeking a universal injunction.

This is no more apparent than in on page seven of Plaintiffs' Motion, which delineates the injuries and potential future harm of non-party individuals who do not reside in a county where such an injunction would have any legal effect. [ECF 51 at pg. 7]. The proper vehicle for such relief in the wake of Casa would be a class action lawsuit under Rule 23, or for these individual non-parties to bring their own lawsuit, presumably against the agencies who have jurisdiction over areas where they live and are actually likely to engage in this conduct, or against the State of Florida itself. CASA Inc., 2025 WL 1773631 at * 9. Moreover, Casa held that injunctive relief is improper when it is more burdensome than necessary to "administer complete relief *between the parties*." Id. at *3. Here, the relief sought, that this Court declare a state law unconstitutional and that SLCSO and SAO be enjoined from enforcing it such that the thousands of non-party members and supporters of GOA and GOF can openly carry throughout the entire state of Florida [ECF 51 at pg. 8], is clearly more burdensome than necessary to administer complete relief *between the parties*.

Compounding these problems further, is that the Complaint and Motion do not differentiate as to how this broad relief being sought would apply should the Court grant Plaintiffs' Motion. These Plaintiffs, which as the Motion made clear includes many similarly

situated non-parties throughout the state of Florida, are not seeking to have this *state law* declared unconstitutional only in St. Lucie County and the counties of the 19th Judicial Circuit. [ECF 51 at pg. 3]. As argued, they are seeking to have this Court issue an Order which would apply to thousands of members of GOA and GOF who are not parties before this Court, and who live in jurisdictions overseen by non-party agencies which would not be bound by any injunction this Court may issue. A district court should not grant a declaratory judgment unless such adjudication would serve a useful purpose. Blue Hill Invs., Ltd. v. Silva, 2015 WL 9319394, at *3 (S.D. Fla. Dec. 23, 2015). Here, not only would there be no useful purpose in issuing relief which would not bind the government entities who are likely to arrest and prosecute these individuals, it may serve to create confusion and chaos[1], and the Court should refrain from doing so, especially in light of Trump v. CASA Inc.

Put simply, this kind of broad-sweeping relief in favor of non-parties, which would also potentially impact many other non-party law enforcement agencies throughout Florida, is the exact kind of judicial overreach that was rejected by the Court in Trump v. CASA Inc., as Justice

---

[1] By issuing such a far reaching and broad ruling, would the Court then also have to include as part of its ruling an explanation of what it means to peaceably carry in a way that is consistent with Bruen and Heller? Would that include, at a minimum, requiring that the gun remain in a holster while in public? Would this apply to certain handguns and firearms which are less likely to cause fear and apprehension, or might terrorize others? If so, what would those be? After all, people throughout Florida who go in public may have different sensibilities than those of the Plaintiffs. An unfortunate reality of modern American society is the prevalence of mass shootings in very public areas, and how such events have seeped into the average American's consciousness over the last two decades. Due to this reality, it is worth considering that some may find an individual openly carrying a large handgun or firearm in a certain manner and at certain locations, in and of itself to be terrorizing to a degree. As an example, high capacity extended or drum magazines can be purchased for many semi-automatic pistols, which would not be suitable for concealed carry, but could be openly carried, and may very well incite terror and/or fear in average citizens in public more so than other standard issued firearms. Will the Court have to address these concerns as well? Further, if the relief can only be granted as to Richard Hughes, the only named Plaintiff, would SLCSO be required to then train their officers to allow only this individual to open carry, and pass around photographs so everyone knows what he looks like? Additionally, Mr. Hughes could still be arrested by Fort Pierce PD, the Florida Highway Patrol, or Palm Beach County Sheriff's Office for openly carrying.

Barret so aptly put it, the answer here, "is not for the court to exceed its power, too." CASA, Inc.,

2025 WL 1773631, at *15. Therefore, Plaintiffs' Motion, which is predicated on this Court

granting relief which the Supreme Court has now prohibited, should be denied.

## II.   PLAINTIFFS' FAIL TO MEET THEIR BURDEN AS TO STANDING

In the context of a challenge to a law prior to its enforcement, the three prerequisites

necessary to establish standing are that: "(1) the plaintiff has suffered an "injury in fact" -- an

invasion of a judicially cognizable interest, which is (a) concrete and particularized, and (b)

actual or imminent, ***not conjectural or hypothetical***; (2) there be a causal connection between

that injury and the conduct complained of -- the injury must be fairly traceable to the challenged

action of the defendant, and ***not the result of the independent action of some third party not***

***before the court***; and (3) it be likely, not merely speculative, that the injury will be redressed by

a favorable decision." Corbett v. Transportation Sec. Admin., 930 F.3d 1225, 1232 (11th Cir.

2019) (internal citations omitted). "The injury in fact requirement prevents the federal courts

from becoming a vehicle for the vindication of the value interests of concerned bystanders."

Food & Drug Admin. v. All. for Hippocratic Med., 602 U.S. 367, 382, 144 S. Ct. 1540, 1556,

219 L. Ed. 2d 121 (2024). Further, each element of standing "must be supported in the same way

as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and

degree of evidence required at the successive stages of the litigation." McDonald v. City of

Pompano Beach, Fla., 556 F. Supp. 3d 1334, 1347 (S.D. Fla. 2021) (quoting Lujan v. Defs. of

Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

Starting with the first prong, "[a] plaintiff satisfies the injury-in-fact requirement where

he alleges an intention to engage in a course of conduct arguably affected with a constitutional

interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder."

<u>Susan B. Anthony List v. Driehaus</u>, 573 U.S. 149, 134 S. Ct. 2334, 2336, 189 L. Ed. 2d 246 (2014). However, the Eleventh Circuit has "held many times that a plaintiff failed to establish an injury in fact when the likelihood of future constitutional injury was too speculative." <u>Corbett</u> 930 F.3d at1233. "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is <u>certainly</u> impending." <u>Lujan</u>, 504 U.S. at 564 n.2, 112 S.Ct. 2130 (internal quotations and citations omitted). Consequently, "'[a]llegations of <u>possible</u> future injury' are not sufficient." <u>Clapper v. Amnesty Int'l USA</u>, 568 U.S. 398, 409, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013) (quoting <u>Whitmore v. Arkansas</u>, 495 U.S. 149, 158, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990)). Additionally, "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish". <u>Lujan</u> 504 U.S. 555, at 562 (internal quotations and citations omitted). While it is true that Damocles's sword does not have to actually fall before the Court may issue an injunction, the mere presence of a 'sword' in a neighboring county is not enough either.

Here, the only named Plaintiff, Richard Hughes, does not reside in St. Lucie County. He has asserted that he wishes to openly carry a full-size handgun as opposed to one he can conceal, during visits to Oxbow Eco-Center in Port St. Lucie, during the great American Port St. Lucie gun show, and while pumping gas at the Fort Pierce Service Plaza [ECF 1-7, ECF 50 at pgs. 2-3 ¶'s 9 – 17, ECF 51 at pgs. 6 – 7]. In other words, Plaintiff would have to choose to openly carry a "full size" handgun to protect himself as opposed to one he can conceal, in one of these areas which are located in a county where he does not live, on some unknown date in the future, while a St. Lucie County Sheriff's deputy and *not* a member of a different law enforcement agency

6

was present[2], culminating in the SLCSO deputy observing the conduct and then choosing to arrest him, and it would have to lead to a prosecution. This highly attenuated chain of completely hypothetical possibilities does not come close to satisfying the requirement that the threatened injury must be certainly impending. Clapper 568 U.S. 398, 410, (2013). "The Supreme Court has repeatedly held that harms lying at the end of a highly attenuated chain of possibilities are too speculative to support standing. The risk of a future injury must be substantial, not just conceivable" D.N. by Jessica N. v. DeSantis, 701 F. Supp. 3d 1244, 1267 (S.D. Fla. 2023) (internal quotations and citations omitted). Furthermore, "[w]here a 'hypothetical future harm' is not 'certainly impending,' plaintiffs 'cannot manufacture standing merely by inflicting harm on themselves.'" Muransky v. Godiva Chocolatier, Inc., 979 F.3d 917, 931 (11th Cir. 2020) (en banc) (quoting Clapper 568 U.S. 398, at 416, 133 S. Ct. 1138).

Even assuming arguendo that CASA Inc., does not preclude this Court from granting declaratory and injunctive relief as to the non-party individuals who are identified in the Motion, their standing argument is even weaker than Mr. Hughes. Mr. Legget lives in Volusia County and was arrested by Daytona Beach PD for a violation of this statute [ECF 1-6 at ¶'s 17-29; ECF 50 at pg. 2 ¶ 4]; Jack McDuffie lives in Hillsborough County and takes issue with open carry simply because he is under 21. [ECF 1-6 at ¶ 37; ECF 50 at pg. 2 ¶ 5]; Ms. Notargiacomo lives in Indian

---

[2] Oxbow Park is located in Port St. Lucie, Florida, an area policed by the Port St. Lucie Police Department, who is not a party.  Oxbow Park's website indicates that it was acquired through Environmentally Significant Lands and Save Our Rivers, which are state programs, and in cooperation with South Florida Water Management District, making the park subject to the jurisdiction of Florida Fish and Wildlife Conservation Commission (FWC). Any potential enforcement of this state statute is likely to be undertaken by these agencies, who Plaintiff Hughes is much more likely to encounter while hiking in this park, than he is the SLCSO. To the extent Plaintiff Hughes' concern relates to enforcement of this law at a Florida Turnpike Service Plaza, it is worth noting that such enforcement is likely to be carried out not by the SLCSO but by the Florida Highway Patrol, which has a station located at mile marker, SR-91 Florida's Tpke #145, Port St. Lucie, FL 34986.

River and cannot open carry while doing outdoor activities in that county [ECF 1-6 at ¶ 41]. Mr. Valdes was arrested by Miami-Dade PD while on a motorcycle for violation of this statute. [ECF 1-6 at ¶ 43]. Here Plaintiffs have failed to provide any record evidence that these individual non-parties have ever even been to St. Lucie County, let alone evidence that they have ever been investigated, arrested, and prosecuted as a result of action taken by these Defendants. Further, any examples of enforcement were a result of actions taken by law enforcement agencies in *other* jurisdictions and counties. [ECF 51 at pg. 7].

Of course, that is not where Plaintiffs' standing issues end. Arguably the most glaring problem are the next two prongs and whether there exists a credible threat of prosecution, i.e. whether Plaintiffs' injuries are traceable to the challenged action of these Defendants, and whether it is likely, not merely speculative, that the injury will be redressed by a favorable decision here. Richard Hughes resides in Palm Beach County, and to the extent his basis for bringing this lawsuit against St. Lucie County Sheriff's Office and the State Attorney for the 19th Judicial Circuit, is a Facebook post by the former Sheriff Mascara, as indicated by the Summary Judgment [ECF 50 at pg. 3 ¶ 16, ECF 51 at pg. 7], a closer look reveals that the post Plaintiff refers to as a warning, is hardly anything more than a public service announcement to members of the St. Lucie County community, and is not even focused primarily on the crime of open carry, as most of it concerns other aspects of Florida's new gun laws generally.[3]

---

[3] The full post states as follows and corresponds to a bulletin: There is a lot of misinformation about the new permitless carry law here in Florida. On behalf of the St. Lucie County Sheriff's Office, let us set the record straight. Here are the facts: the law is not open carry; open carry is still illegal in Florida under most circumstances; the new law does not change who can purchase a firearm, the waiting period to purchase a firearm, or where you can carry a firearm.; the criteria to carry a concealed firearm is the same to be eligible for a permit, including being a U.S. citizen who is at least 21 years of age with no felony convictions or other disqualifying conditions; when carrying a concealed firearm, you must also possess valid identification and you are required to provide it to law enforcement upon request. The new law does not change where you can carry a firearm. You may not carry a firearm anywhere

Further undermining Plaintiff's claims that his concerns of imminent arrest and prosecution stem from this Facebook post, is the fact that the Sheriff of Palm Beach County posted an almost identical message on social media, and yet Hughes strangely did not feel compelled to name him as a party to this lawsuit out of a purported fear of arrest and prosecution. [See ECF 32-1 at pgs. 3-4]. Plaintiffs also point to examples of enforcement of this law against other individuals in support of their position on standing. [ECF 50 at pg. 4 ¶ 21, ECF 51 at pgs. 7 – 8]. However, in the only *three* arrests that have been carried out by SLCSO in the past five years, two involved individuals who first violated traffic laws, and the other an individual exiting a residence under surveillance and with a known gang member, and all were arrested for a violation of § 790.053(1) in addition to other charges. (See Defendants' Response to Plaintiff's Statement of Facts – SOF – at ¶'s 24 - 31). Out of the twenty-seven cases prosecuted by the State Attorney's Office for the 19th Judicial Circuit nine were nolle-prossed and/or abandoned, and two were consolidated into another identified case involving other charges. (SOF ¶ 32). Moreover, out of twenty-seven cases, only twelve solely rested on a violation of § 790.053(1) with all others having one or more additional charges, some of which included violent actions or drug charges. Of those twelve cases solely resting on a violation of § 790.053(1), seven were nolle-prossed/abandoned, leaving only five cases in the last five (5) years that were prosecuted fully for violations of § 790.053(1). (SOF ¶ 33).

---

that a private business or property owner has prohibited them or anywhere outlined in 790.06 of the Florida Statues, including but not limited to schools, colleges, universities, bars, courthouses, and at government meetings. Carrying a concealed firearm, let alone possessing a firearm, comes with a lot of responsibility. Do your part by taking firearms training education seriously. Learn the law; seek out experienced professional firearms training. Become proficient, because your life and that of your family may depend on it. Ensure the safe storage of your firearm and never leave your firearm unsecured in your vehicle.

These examples hardly reflect that these Plaintiffs face a credible threat of prosecution from these Defendants, and instead appear to reflect that Plaintiffs' theory of standing is predicated on a hypothetical that they would first violate a traffic law in St. Lucie County where they do not reside, which a SLCSO deputy would observe, who would then choose to arrest them, and that in addition to committing other crimes, they would also be charged with a violation of § 790.053(1), which as noted above is insufficient to meet their burden of standing.

Further, Plaintiffs' are asking that the Court declare they can open carry in areas all over Florida which are policed and overseen by other government entities not a party to this lawsuit, who would not be bound by an injunction, and even cite past examples of enforcement by these other entities in support of their Motion. [ECF 51 at pg. 7]. However, "when a plaintiff's theory of redressability depends on the possible future actions of nonparties, any persuasive effect a judicial order might have upon ... absent nonparties who are not under [the defendant's] control, cannot suffice to establish redressability. Rather, it must be the effect of the court's judgment on the defendant—not an absent third party—that redresses the plaintiff's injury, whether directly or indirectly." Berrocal v. Att'y Gen. of United States, 136 F.4th 1043, 1052 (11th Cir. 2025) (internal citations and quotations omitted).

Here, the Summary Judgment claims that by enjoining both the enforcement and prosecution of Fla. Stat. § 790.053(1), Plaintiffs and their numerous unnamed members and supporters would be able to openly carry firearms throughout Florida without fear of arrest and prosecution. [ECF 51 at pg. 8]. However, such relief would only be possible if this Court issued an injunction that would apply to every law enforcement agency in the state that has authority to enforce this statute, the exact kind of broad relief that CASA Inc., has now determined is no longer permissible. "A plaintiff's injury isn't redressable by prospective relief where other state

10

actors, who aren't parties to the litigation, would remain free and clear of any judgment and thus free to engage in the conduct that the plaintiffs say injures them." <u>Berrocal</u>, 136 F.4th 1043, at 1053. (quoting <u>Support Working Animals, Inc. v. Governor of Fla.</u>, 8 F.4th 1198, 1200 (11th Cir. 2021)). <u>See</u> <u>also</u> <u>Jacobson v. Fla. Sec'y of State</u>, 974 F.3d 1236, 1255 (11th Cir. 2020) (emphasizing that a federal court cannot erase a duly enacted law from the statute books but rather has only the more limited power to enjoin executive officials from taking steps to enforce a statute, and can exercise that power only when the officials who enforce the challenged statute are properly made parties to a suit) (internal quotations omitted)).

As every other law enforcement agency and state attorney's offices, including those which have jurisdiction over the areas where these individuals actually reside and where they are likely to engage in this conduct, would be free to investigate, arrest, and prosecute anyone who violates this statute even if the Court grants the narrow declaratory and injunctive relief which is permitted, it is clear that that these injuries will not be redressed by a favorable decision here. Plaintiffs argue that by suing a local state attorney's office, an order entered against it would allow Plaintiffs and their thousands of members and supporters to openly carry throughout Florida. Putting aside that this describes the exact kind of universal injunction that the Supreme Court has now expressly prohibited, the Motion only cites to a single Middle District case in support of this proposition. In that case, the court delineated the standard for bringing a § 1983 claim against state attorney's office and explained that a suit against an individual in his or her official capacity is no different than a suit against the office of the official, and that the state attorney's office is an arm of the state for purposes of applying immunity. <u>Scheider v. Leeper</u>, 2016 WL 916557, at *3 (M.D. Fla. Mar. 10, 2016). It does not however stand for the proposition that when seeking declaratory and injunctive relief which would bind and impact every other law

11

enforcement agency, state attorney's office, and circuit court in the state, it is sufficient to sue only the state attorney's office in a county where the Plaintiffs do not even reside, and which does not have statewide jurisdiction to prosecute violations of this criminal law.

It is rather telling that Plaintiffs' Motion does not reference any cases where standing was contingent on a similar chain of attenuated hypotheticals. The cases they do rely on for this tenuous position do not do them many favors either, which warrant a closer examination.  In Babbitt v. United Farm Workers National Union, referenced on page 5 of Plaintiffs' Motion, the plaintiffs were challenging provisions of Arizona's Agricultural Employment Relations Act (AERA) by suing the *Attorney General of Arizona*. In MedImmune, Inc. v. Genentech, Inc., referenced on page 5 of Plaintiffs' Motion, the patent licensee brought action against the licensor, challenging the patent's validity. In LaCroix v. Town of Fort Myers Beach, referenced on page 6 of Plaintiffs' Motion, the plaintiff sued the *town responsible for the local ordinance that led to his citation*, as well as *the officers who issued it*. In HM Fla.-ORL, LLC v. Governor of Fla., a drag themed restaurant was forced to cancel shows and alter their business practice as a result of action taken by the Defendant, Secretary of Florida Department of Business and Professional Regulation, stemming from a Florida law. None of these citations are similarly situated to this instant action brought by an individual who resides in a completely different county than defendants and organizations with members across the entire state challenging the constitutionality of a state law.

Conversely, the Eleventh Circuit recently held that a similar series of hypotheticals including that plaintiffs would need to carry in a manner noticeable by a highway patrol man before they were to be arrested, was not sufficient to establish standing. Baughcum v. Jackson, 92 F.4th 1024, 1034–35 (11th Cir. 2024). This seems especially relevant considering the only

past examples of enforcement of § 790.053(1) by SLCSO Plaintiffs can point to involve

individuals who were first subject to a valid traffic stop or were being surveilled for other

unrelated reasons. (SOF ¶'s 24 - 31).

To satisfy traceability and redressability, these Plaintiffs should have sued the State of

Florida, or the other non-party entities for whom these issues can be traced and against whom

this harm could be redressed. "That approach would have made for more defendants, but nothing

prevented the [Plaintiffs] from taking that course of action." <u>Jackson</u>, 974 F.3d 1236, at 1258.

**III.  FLORIDA'S OPEN CARRY RESTRICTIONS ARE CONSTITUTIONAL UNDER THE LEGAL FRAMEWORK SET FORTH IN *HELLER* AND *BRUEN***

In <u>New York State Rifle & Pistol Association v. Bruen</u>, the Court held that the Second

Amendment protects the right to carry firearms in public for self-defense, "subject to certain

reasonable, well-defined restrictions," including limits on "the manner by which one carrie[s]

arms." 142 S. Ct. at 2156. The Court, moreover, recognized that as a historical matter, States

were able to "lawfully eliminate one kind of public carry . . . so long as they left open the [other]

option." <u>Id</u>. at 2150. <u>Bruen</u> expressly approved of public carry licensing systems like Florida's,

which do not "prevent law-abiding, responsible citizens from exercising their Second

Amendment right to public carry." 142 S. Ct. at 2138 n.9 (internal quotations omitted).

Therefore, based on the Supreme Court's previous ruling, it would follow that Florida's current

public carry licensing system and restrictions on open carry are constitutional and do not infringe

on Plaintiffs' Second Amendment rights.

**a. Plaintiffs have not established that the Second Amendment's text protects the right to openly carry firearms in public**

First, Plaintiffs bear the burden to show that the Second Amendment's text covers their

proposed conduct—openly carrying firearms in public—and thus presumptively protects that

13

conduct. See Bruen, 142 S. Ct. at 2129-30 ("When plain text covers an individual's conduct . . . [t]he government must then justify its regulation.") (emphasis added); *id*. at 2141 n.11 ("[B]ecause the Second Amendment's bare text covers petitioners' public carry, the respondents here shoulder the burden of demonstrating that New York's proper-cause requirement is consistent with the Second Amendment's text and historical scope.") (emphasis added). Generally, the burden shifts to the government to justify a challenged regulation only after the plaintiff shows, as an initial matter, that their rights have been infringed. See, e.g., Kennedy v. Bremerton Sch. Dist., 142 S. Ct. 2407, 2421 (2022) ("Under this Court's precedents, a plaintiff bears certain burdens to demonstrate an infringement of his rights under the Free Exercise and Free Speech Clauses. If the plaintiff carries these burdens, the focus then shifts to the defendant to show that its actions were nonetheless justified[.]"); Tennant v. Jefferson Cnty. Comm'n, 567 U.S. 758, 760 (2012) (plaintiff challenging constitutionality of redistricting plan must first show population differences could be practically avoided, then burden shifts to State to justify plan). The Second Amendment's text does not protect a right to the open carriage when another means of public carriage (concealed carriage) is available. The Amendment's operative clause provides that "the right of the people to keep and bear [a]rms, shall not be infringed," U.S. Const. amend. II, and its "'words and phrases'" should be given their "'normal and ordinary'" meaning, Heller, 554 U.S. at 576 (quoting United States v. Sprague, 282 U.S. 716, 731 (1931)). If the framers had intended to guarantee a right to bear arms openly, "nothing would have been simpler" than to say so. Sprague, 282 U.S. at 732. Because the Second Amendment's text does not guarantee a right to carry firearms in public in a particular manner, the Amendment does not "presumptively protect[ ]" the open carriage of firearms, Bruen, 142 S. Ct. at 2130, and Plaintiffs' challenge fails on this basis alone.

14

Plaintiffs cite three federal Supreme Court decisions – *Heller, Bruen*, and *Rahimi* – and not only acknowledge them but also seemingly accept them as governing law. These three (3) cases all address the same issues of state restrictions on the right to bear arms. As such, below the Defendants will properly present the similarities of the claims presented by Plaintiff including a discussion regarding the bare text of the Second Amendment and review of the historical tradition contemporaneously with the previous decisions made by the Supreme Court in order to establish the fact that the issues presented by Plaintiff have already been addressed and therefore, Plaintiff fails to present any issues that would warrant review by this Court.

       **b.**    **Florida's prohibition of open carriage of firearms in public, while permitting concealed carriage, is consistent with the applicable historical tradition**

While Plaintiffs' Summary Judgment would have this Court believe that laws regulating the manner in which individuals publicly carry their firearms are some kind of recent aberration inconsistent with this country's traditions and history, such a claim could not be further from the truth. Gun laws are by no means a contemporary phenomenon – while gun possession is as old as America, so too are the laws that regulate them. To show that a challenged regulation aligns with historical tradition, as Bruen explained, the government may either identify historical regulations that are "distinctly similar" to the challenged regulation or use "analogical reasoning" to demonstrate that the challenged regulation is analogous to historical regulations. Id. at 2131-32. Moreover, Bruen recognized that a variety of historical sources and periods may inform these inquiries, including (1) "English practices that prevailed up to the period immediately before and after the framing of the Constitution;" (2) public understanding of the right to keep and bear arms in 1791, when the Second Amendment was ratified, and in 1868, when the Fourteenth Amendment was ratified; and (3) the interpretation of the right in the years following both

Amendments' ratification. Id. at 2136-38 (internal quotations omitted). The Court

"acknowledge[d] . . . an ongoing scholarly debate on whether courts should primarily rely on the

prevailing understanding" of the right to keep and bear arms from 1791 or 1868.

Recently, the Eleventh Circuit, in upholding a more restrictive statute which prohibits

sales of firearms to persons younger than 21, wherein Bruen was applied, held that courts "may

look to historical practice from the mid-to-late nineteenth century to at least confirm the

Founding-era understanding of the Second Amendment." Nat'l Rifle Ass'n v. Bondi, 133 F.4th

1108, 1116 (11th Cir. 2025). With that in mind, the following are examples of laws from the

colonial era up to and including the early 20th century, which regulated the manner in which any

individual can openly carry in public, and while "not dead ringers for historical precursors" are

"analogous enough" such that Florida's open carry law passes constitutional muster. Bruen, 597

U.S. at 2133. (See SOF ¶ 34).

- New Jersey: The Grants, concessions, and Original Constitutions of the Province of New Jersey, 289 (1758). An Act Against Wearing Swords, &c.,(1686): (banned) "several Persons [from] wearing Swords, Daggers, Pistols, Dirks, Stilladoes, Skeines, or any other unusual and unlawful Weapons(in public because it induced)great Fear and Quarrels"
- Virginia: A Collection of all Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as are Now in Force, 33 (Augustine Davis 1794): confirming that no person may go or ride armed by night or day, in fairs, markets, or elsewhere, or in the presence of the Court's Justices or other ministers of justice.
- Tennessee: *Tenn. Pub. Acts of 1879, chap. 186*: (Carrying) publically or privately, any . . . belt or pocket pistol, revolver, or any kind of pistol, except the army or navy pistol, usually used in warfare, which shall be carried openly in hand.
- Kansas: *General Statutes of 1901, § 1003*: The council may prohibit and punish the carrying of fire arms or other deadly weapons, concealed or otherwise, and may arrest and imprison, fine or set at work all vagrants and persons found in said city without visible means of support, or some legitimate business.
- Georgia: *Act of Dec. 25, 1837, 1837 Ga. Laws 90. § 1:* it shall not be lawful for any merchant, or vender of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell, or to keep or have about their person or elsewhere, any of the hereinafter described weapons, to wit: Bowie, or any other kind of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offense or defense, pistols, dirks, sword canes, spears etc., shall also be contemplated in this act, save such pistols as are known and used, as horseman's pistols, etc.

16

- Wisconsin: The Revised Statutes of the State of Wisconsin: Passed at the Annual Session of the Legislature Commencing January 13, 1858, and Approved May 17, 1858 at 985 (W.B. Keen, Chicago 1858): If any person shall go armed with a dirk, dagger, sword, pistol or pistols, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person . . . ..
- 1889 Ariz. Laws, no. 13, § 1 (prohibiting the carrying of a pistol "within any settlement, town, village, or city"); 1869 N.M. Laws 312, ch. 32 § 1 ("It shall be unlawful. . .to carry deadly weapons. . .within any of the settlements of this Territory")
- 1876 Wyo. Laws 352, ch. 52, § 1 (prohibiting a "resident of any city, town or village" from carrying a firearm "within the limits of any city, town or village")
- Acts of the General Assembly of the State of Georgia Passed in Milledeville at an Annual Session in November and December, 1837: An Act to guard and protect the citizens of this State against the unwarrantable and too prevalent use of deadly weapons," assented to on the 25th December, 1837 § 1 enacts: "that it shall not be lawful for any merchant or vender of wares or merchandize in this State, or any other person or persons whatever, to sell, or to offer to sell, or to keep or to have about their persons, or elsewhere, any of the herein-after-described weapons, to wit: Bowie or any other kinds of knives, manufactured and sold for the purpose of wearing or carrying the same as arms of offence or defense; pistols, dirks, sword-canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used as horseman's pistols."
- District Of Columbia: The Revised Code of the District of Columbia, Prepared Under the Authority of the Act of Congress, 570 (A.O.P. Nicholson, Washington 1857): If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person . . . .
- Massachusetts: Boston Gazette, January 16, 1809, at 2 (Ordinance in Gloucester, MA): To suppress all disturbers of the peace, and notice every abuse offered by any individual, or combination of men, patrolling our streets and wharves, having offensive weapons, either by night or day, to the annoyance and terror of the inhabitants; and have them apprehended and punished at the expense of the town . . . (edited for clarity).
- Oregon: The Statutes of Oregon Enacted and Continued in Force by the Legislative Assembly, as The Session Commencing 5th December, 1853, 220 (Asahel Bush, Oregon 1854): If any persons shall go armed with dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault, injury, or other violence to his person, or to his family or property, he may, on complaint of any other person, having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace for a term not exceeding six months, with the right of appealing as before provided.
- Tennessee: 1821 Tenn. Pub. Act, chap. 13, at 16. Passed at the First Session of the Twenty Second General Assembly of the State of Tennessee 1837-38: Each and every person so degrading himself, by carrying a dirk, sword cane, French knife, Spanish stiletto, belt or pocket pistols . . . Shall pay a fine.

17

- Virginia: 1856-57 Va. Acts, chap. 140, pt. 554, as codified in Virginia Code, tit. 54. (1873): If a person go armed with a deadly or dangerous weapon, without reasonable cause to fear violence to his person, family or property, he may be required to give a recognizance, with the right of appeal, as before provided , and like proceedings shall be had on such appeal.

Notwithstanding the above independent historical analysis which applies here, the Supreme Court has repeatedly recognized—including in Bruen—a robust historical tradition of regulating the manner of public carriage by allowing one manner of carriage while prohibiting another. In Heller, the Court explained that "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right [to keep and bear arms] was not a right to keep and carry any weapon whatsoever in any manner whatsoever." 554 U.S. at 626 (emphasis added); see McDonald v. City of Chi., 561 U.S. 742, 786 (2010) (same). The Court repeatedly reiterated this point in Bruen. See, e.g., 142 S. Ct. at 2128 (declining to find a Second Amendment right to carry weapons "'in any manner whatsoever'") (quoting Heller, 554 U.S. at 626); id. at 2138 ("[T]he right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing . . . the manner of carry[.]"); Id. at 2150 ("The historical evidence from antebellum America does demonstrate that the manner of public carry was subject to reasonable regulation.") (emphasis in original); Id. at 2156 ("[T]hrough the Anglo-American history of public carry," the Second Amendment has been subject to restrictions "limit[ing]" the "manner by which one carried arms[.]"); see also Id. at 2157 (Alito, J., concurring) ("Nor have we disturbed anything that we said in Heller or McDonald . . . about restrictions that may be imposed on the possession or carrying of guns."); Id. at 2162 (Kavanaugh, J., concurring) (noting Heller and McDonald's reiteration that right to keep and bear arms does not guarantee right to carry weapon in any manner). Bruen also explained that as a historical matter, States were able to "lawfully eliminate one kind of public carry . . . so long as they left open the [other] option." Id.

18

at 2150. Particularly relevant here, <u>Bruen</u> also stated that "these antebellum state-court decisions evince a consensus view that States could not altogether prohibit the public carry of 'arms,'" but could prohibit one manner of public carriage so long as another manner of carriage was permitted. <u>Bruen</u>, 142 S. Ct. at 2147; see AE Br. 18- 21 (explaining that antebellum cases demonstrated that right to bear arms was subject to limits on manner of carriage).

Like its historical counterparts, Florida has "lawfully eliminate[d] one kind of public carry" while leaving "open [another] option," and has thus has not "altogether prohibit[ed] the public carry of arms" for self-defense. <u>Bruen</u>, 142 S. Ct. at 2147, 2150 (internal quotations omitted). To be sure, Florida has made the converse choice by allowing concealed carriage while prohibiting open carriage. But, as <u>Bruen</u> explained, the historical regulations need not be identical, but rather only "distinctly similar" to the challenged regulation. <u>Id</u>. at 2131. Historical practice through the end of the 19th-century "confirm[s]" this tradition of regulating the manner of public carriage. <u>Bruen</u>, 142 S. Ct. at 2137 (internal quotations omitted). States and their localities continued to enact statutes prohibiting the concealed carriage of weapons, and to enforce them. Courts, moreover, "almost universally held that the legislature may regulate and limit the mode of carrying arms" without violating the right to keep and bear arms. <u>Commonwealth v. Murphy</u>, 166 Mass. 171, 172-73 (1896). Florida's public carry licensing regime and restrictions on open carry satisfy this standard.

On the other hand, Plaintiffs have provided virtually no historical evidence which reflects the history they presume to conform to. Indeed, there are examples of courts expressing a much different view than the one Plaintiffs argue and such a view is more consistent with American history and tradition. In <u>State v. Reid</u>, a case decided in 1840, the Alabama Supreme Court acknowledged that carrying weapons openly would not be something a person would do except

in situations of exigency. <u>State v. Reid</u>, 1 Ala. 612, 612 (1840). A similar approach was taken by the North Carolina Supreme Court in <u>State v. Huntley</u>, wherein the court reasoned, in support of upholding a conviction, that:

> No man amongst us carries it about with him, as one of his every day accoutrements--as a part of his dress--and never we trust will the day come when any deadly weapon will be worn or wielded in our peace loving and law-abiding State, as an appendage of manly equipment. <u>State v. Huntly</u>, 25 N.C. 418, 422 (1843)

Mirroring the language of the North Carolina Supreme Court in <u>Huntley</u>, one South Carolina grand jury issued a statement saying: "It is apparent to every good citizen and man of sense, that any gentleman would blush and feel deeply ashamed to be caught parading the streets on a public occasion, or, for the matter of that, on a private occasion, with a revolver swinging around his neck like a powder horn, or sticking vulgarly and threateningly out of his hip pocket, making him the picture of a pirate." Presentment of the Grand Jury, WKLY. UNION TIMES (S.C.), June 25, 1879, at 2. Perhaps somewhat ironically, this attitude was no more evident than in the wild west, where towns like Tombstone and other municipalities in the 19th century commonly enacted laws which prohibited the open carrying of any kind of gun other than outside the town borders and inside the home. (SOF ¶ 35). Plaintiffs' assertion that there is no historical tradition of regulating the open and public carry of firearms is simply inaccurate and paints this picture of American history and tradition with much too broad a brush.

Plaintiffs' Motion should be denied.

Respectfully Submitted,

**JACOBS SCHOLZ & WYLER, LLC**

*/s/ Arthur I. Jacobs*
Arthur I. Jacobs, Esq

20

Fla. Bar No. 108249
961687 Gateway Blvd., Suite 201-I
Fernandina Beach, FL  32034
Telephone: (904) 261-3693
Facsimile: (904) 261-7879
Primary:  filings@jswflorida.com
Secondary: Buddy@jswflorida.com

**I HEREBY CERTIFY** that a copy of the foregoing has been electronically filed with the

Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to:

**STEPHEN D. STAMBOULIEH, ESQUIRE,** Co-Counsel for Plaintiffs, P.O. Box 428, Olive

Branch, MS 38654  [stephen@sdslaw.us]; **JAMES D. PHILLIPS, JR., ESQUIRE**, Co-Counsel

for Plaintiffs, 509 W. Colonial Drive, Orlando, FL 32804 [jphillips@thefirearmfirm.com]; and

**ARTHUR IVAN JACOBS, ESQUIRE,** Counsel for Defendants Bakkedahl and SAO, 961687

Gateway Boulevard, Suite 201-I, Fernandina Beach, FL 32034 [buddy@jswflorida.com] this

July 8, 2025.

   *s/Andrew W. Jolly*
ANDREW W. JOLLY, ESQUIRE
Fla. Bar No. 1032793
PURDY, JOLLY, GIUFFREDA, BARRANCO & JISA, P.A.
2455 E. Sunrise Boulevard, Suite 1216
Fort Lauderdale, Florida 33304
Telephone:(954) 462-3200
e-mail: Andrew@purdylaw.com
       Cecilia@purdylaw.com
Attorney for *Defendant Sheriff and St. Lucie County Sheriff's Office*
Trial Counsel