**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT PIERCE DIVISION**

CASE NO.  2:24-cv-14250-JEM

GUN OWNERS OF AMERICA, INC.,
GUN OWNERS FOUNDATION, and
RICHARD HUGHES,

       Plaintiffs,

v.

SHERIFF KEITH PEARSON, in his
official capacity as Sheriff of St. Lucie
County, the ST. LUCIE COUNTY
SHERIFF'S OFFICE, THOMAS
BAKKEDAHL, in his official capacity
As the State Attorney for the 19th Judicial
Circuit of Florida, and the STATE
ATTORNEY'S OFFICE for the 19th
Judicial Circuit of Florida,

       Defendants.

_____/

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**(AND MEMORANDUM OF LAW)**

      The Defendants, SHERIFF RICHARD DEL TORO, in his official capacity as the Sheriff

of St. Lucie County Florida, and THOMAS R. BAKKEDAHL in his official capacity as State

attorney for the Nineteenth Judicial Circuit of Florida, and on behalf of the STATE

ATTORNEY'S OFFICE for the 19th Judicial Circuit of Florida, pursuant to Rule 56 of the

Federal Rules of Civil Procedure, file this their Motion for Summary Judgment (and

Memorandum of Law), and in support thereof would state as follows:

**MEMORANDUM OF LAW**

**I.**      **SUMMARY JUDGMENT STANDARD**

1

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.  Once a moving party identifies those portions of the record showing the absence of a genuine issue of material fact, the party opposing summary judgment must set forth specific facts showing a genuine issue for trial and may not rely on mere allegations or denials.  See Celotex v. Catrett, 477 U.S. 317, 324 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-57 (1986).

A court need not permit a case to go to a jury when the inferences that are drawn from the evidence, and upon which the non-movant relies, are implausible. Cuesta v. School Bd. of Miami–Dade County, 285 F.3d 962, 970 (11th Cir. 2002).  Nor are conclusory allegations based on subjective beliefs sufficient to create a genuine issue of material fact. Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir. 2000).

## II.    THE BROAD RELIEF BEING SOUGHT BY PLAINTIFFS IS IMPERMISSIBLE

Plaintiffs are asking that this Court declare that a state law, F.S. § 790.053(1) be deemed unconstitutional, and that these Defendants, the Sheriff of St. Lucie County and the State Attorney's Office for the 19th Judicial Circuit of Florida, be enjoined from enforcing it. As made clear by the Plaintiffs' separate Summary Judgment, this relief is being sought not only by Richard Hughes, the lone individually named Plaintiff, but also by several other non-parties and by the collectively thousands of similarly situated members and supporters of two public interest groups. [ECF 51 at pg. 3].

Such broad sweeping relief as applied to countless non-parties, was recently contemplated by the Supreme Court in Trump v. CASA Inc. Like the Plaintiffs here, the plaintiffs in Trump v. CASA Inc., consisted of multiple organizations bringing suit on behalf of

2

their members and supporters. Trump v. CASA, Inc., 145 S. Ct. 2540 (2025). That the organizations may have had representational standing was not the issue, it was the broad relief that the organizations were seeking on behalf of their members and against other non-parties, not before the Court. In that opinion, the Supreme Court made clear that district courts lack the authority to prohibit enforcement of a law or policy against *anyone* who is not a named party to the lawsuit, and that an injunction could not bind "one who is not a party to the cause." Id. at *2548, 2551. As part of the analysis, the Supreme Court highlighted the 19th century case of Scott v. Donald, wherein only an injunction between the parties named as plaintiff and defendants was permitted. Id. at *2552. In its application of Scott, the Supreme Court ultimately concluded that under the Judiciary Act, the federal court lacks the authority to issue declaratory relief which is broader than necessary to fully remedy the specific injuries of the *named plaintiffs*. Id. "A universal injunction, or a nationwide (in this case, a statewide) injunction, is the now-common name for an injunction that prevents a state or the federal government from enforcing a law against both parties *and non-parties*." Henry v. Sheriff of Tuscaloosa Cnty., Alabama, 135 F.4th 1271, 1328 (11th Cir. 2025) (emphasis added).

    To be clear, CASA has significantly clarified and narrowed the scope of relief that federal courts may grant, particularly with respect to nonparty individuals—even where an organization claims to represent them. In CASA, the Court rejected the idea that an organization can sue on behalf of hundreds or thousands of unnamed individuals and ask the court to enjoin the enforcement of a law against everyone, and in fact held that district courts lack authority to prohibit enforcement of a law against anyone who is not a named party to the lawsuit. CASA at 2551. Moreover, CASA held that injunctive relief is improper when it is more burdensome than necessary to "administer complete relief *between the parties*." Id. at * 2540. Here, the relief

3

sought, that this Court declare a state law unconstitutional and that SLCSO and SAO be enjoined from enforcing it such that the thousands of non-party members and supporters of Gun Owners of America (GOA) and Gunowners Foundation (GOF) can openly carry throughout the entire state of Florida [ECF 51 at pg. 8], is clearly more burdensome than necessary to fully remedy the specific injuries of the *named plaintiffs*.

Plaintiffs, in support of their own Summary Judgment, contend that, because the relief is sought by organizations, they may assert representational standing. [ECF 58 at pg. 3]. But even assuming they can establish standing in this manner—which is far from certain as will be explained below— CASA makes clear that representational standing does not expand the Court's authority. The Court in CASA held that judicial relief must be limited to what is necessary to redress the specific injuries of the plaintiffs themselves, not the thousands of unnamed members and supporters, and not against other non-parties not before the Court. Plaintiffs' request for an indivisible, sweeping remedy on behalf of all GOA and GOF members and supporters is not supported by that holding. Instead, the Supreme Court emphasized that a universal injunction is warranted only in the rare circumstance where it would be *"all but impossible"* to tailor relief to the actual plaintiffs. Id. at 2565. That standard is intentionally demanding, and it has not been met here. Furthermore, a district court should not grant a declaratory judgment unless such adjudication would serve a useful purpose. Blue Hill Invs., Ltd. v. Silva, 2015 WL 9319394, at *3 (S.D. Fla. Dec. 23, 2015). Here, not only would there be no useful purpose in issuing relief which would not bind the government entities who are likely to arrest and prosecute these

individuals, it may serve to create confusion and chaos[1], and the Court should refrain from doing

so, especially in light of <u>CASA</u>.

## III.   PLAINTIFFS FAIL TO MEET THEIR BURDEN AS TO STANDING

An organization has standing to sue on behalf of its members if: (a) its members would

otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane

to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires

the participation of individual members in the lawsuit." <u>Hunt v. Wash. State Apple Advert.</u>

<u>Comm'n,</u> 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). Here, because none of the

---

[1] By issuing such a far reaching and broad ruling, would the Court then also have to include as part of its ruling an explanation of what it means to peaceably carry in a way that is consistent with <u>Bruen</u> and <u>Heller</u>? Would that include, at a minimum, requiring that the gun remain in a holster while in public? Would this apply to certain handguns and firearms which are less likely to cause fear and apprehension, or might terrorize others? If so, what would those be? After all, people throughout Florida who go in public may have different sensibilities than those of the Plaintiffs. An unfortunate reality of modern American society is the prevalence of mass shootings in very public areas, and how such events have seeped into the average American's consciousness over the last two decades. Due to this reality, it is worth considering that some may find an individual openly carrying a large handgun or firearm in a certain manner and at certain locations, in and of itself to be terrorizing to a degree. As an example, high capacity extended or drum magazines can be purchased for many semi-automatic pistols, which would not be suitable for concealed carry, but could be openly carried, and may very well incite terror and/or fear in average citizens in public more so than other standard issued firearms. Will the Court have to address these concerns as well? Further, if the relief can only be granted as to Richard Hughes, the only named Plaintiff, would SLCSO be required to then train their officers to allow only this individual to open carry, and pass around photographs so everyone knows what he looks like? Additionally, Mr. Hughes could still be arrested by Fort Pierce PD, the Florida Highway Patrol, or Palm Beach County Sheriff's Office for openly carrying. Lastly, since Hughes is only a member of GOF, it stands to reason that if the Court finds he has standing and issues the relief as to him, it could therefore only apply by extension, via representational standing, to GOF and not GOA, thereby creating possibly even more confusion and chaos. Would SLCSO and other law enforcement agencies have to first ask individuals if they are affiliated with GOF and only allow those members to open carry? This is impractical and serves no useful purpose.

named individuals can establish standing, Plaintiffs' theory of representational standing necessarily fails as well. It should be noted that the only named individual who has even traveled through and visited St. Lucie County, Richard Hughes, is only a member of GOA and not GOF, meaning that only that group would have standing if the Court found that he met the threshold, which as discussed below, he does not.

In the context of a challenge to a law prior to its enforcement, the three prerequisites necessary to establish standing are that: "(1) the plaintiff has suffered an "injury in fact" -- an invasion of a judicially cognizable interest, which is (a) concrete and particularized, and (b) actual or imminent, ***not conjectural or hypothetical***; (2) there be a causal connection between that injury and the conduct complained of -- the injury must be fairly traceable to the challenged action of the defendant, and ***not the result of the independent action of some third party not before the court***; and (3) it be likely, not merely speculative, that the injury will be redressed by a favorable decision." Corbett v. Transportation Sec. Admin., 930 F.3d 1225, 1232 (11th Cir. 2019) (internal citations omitted). "The injury in fact requirement prevents the federal courts from becoming a vehicle for the vindication of the value interests of concerned bystanders." Food & Drug Admin. v. All. for Hippocratic Med., 602 U.S. 367, 382, 144 S. Ct. 1540, 1556, 219 L. Ed. 2d 121 (2024). Further, each element of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." McDonald v. City of Pompano Beach, Fla., 556 F. Supp. 3d 1334, 1347 (S.D. Fla. 2021) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

Starting with the first prong, "[a] plaintiff satisfies the injury-in-fact requirement where he alleges an intention to engage in a course of conduct arguably affected with a constitutional

6

interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 134 S. Ct. 2334, 2336, 189 L. Ed. 2d 246 (2014). However, the Eleventh Circuit has "held many times that a plaintiff failed to establish an injury in fact when the likelihood of future constitutional injury was too speculative." Corbett 930 F.3d at1233. "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending." Lujan, 504 U.S. at 564 n.2, 112 S.Ct. 2130 (internal quotations and citations omitted). Consequently, "'[a]llegations of possible future injury' are not sufficient." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013) (quoting Whitmore v. Arkansas, 495 U.S. 149, 158, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990)). Additionally, "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish". Lujan 504 U.S. 555, at 562 (internal quotations and citations omitted). While it is true that Damocles's sword does not have to actually fall before the Court may issue an injunction, the mere presence of a 'sword' in a neighboring county is not enough either.

Here, the only named Plaintiff, Richard Hughes, does not reside in St. Lucie County. He has asserted that he wishes to openly carry a full-size handgun as opposed to one he can conceal, during visits to Oxbow Eco-Center in Port St. Lucie, during the great American Port St. Lucie gun show, and while pumping gas at the Fort Pierce Service Plaza [Statement of Facts – SOF – ¶'s 1-21]. In other words, Plaintiff would have to choose to openly carry a "full-size" handgun— rather than a concealable one—in a county where he does not reside, during possible future visits to locations like Oxbow Park or gun shows, that may or may not occur in the future. These areas

7

are also primarily policed by other law enforcement agencies that are not parties to this suit. Id. Therefore, Plaintiff Hughes' standing claim is predicated on the following: that a St. Lucie County Sheriff's deputy be present—not an officer from another agency who would be more likely to have jurisdiction—observe the conduct, decide to arrest him, and that the arrest result in prosecution. This highly attenuated chain of completely hypothetical possibilities does not come close to satisfying the requirement that the threatened injury must be certainly impending. Clapper 568 U.S. 398, 410, (2013). "The Supreme Court has repeatedly held that harms lying at the end of a highly attenuated chain of possibilities are too speculative to support standing. The risk of a future injury must be substantial, not just conceivable" D.N. by Jessica N. v. DeSantis, 701 F. Supp. 3d 1244, 1267 (S.D. Fla. 2023) (internal quotations and citations omitted). Furthermore, "[w]here a 'hypothetical future harm' is not 'certainly impending,' plaintiffs 'cannot manufacture standing merely by inflicting harm on themselves.'" Muransky v. Godiva Chocolatier, Inc., 979 F.3d 917, 931 (11th Cir. 2020) (en banc) (quoting Clapper 568 U.S. 398, at 416, 133 S. Ct. 1138).

Even assuming arguendo that CASA does not preclude this Court from granting declaratory and injunctive relief as to the non-party individuals who are identified in Plaintiffs' Complaint, their standing argument as against these Defendants, is even weaker than Mr. Hughes. Mr. Legget lives in Volusia County and was arrested by Daytona Beach PD for a violation of this statute [SOF ¶23 ]. Jack McDuffie lives in Hillsborough County and takes issue with open carry simply because he is under 21. [SOF ¶24]; Ms. Notargiacomo lives in Indian River and cannot open carry while doing outdoor activities in that county [SOF ¶25]. Mr. Valdes was arrested by Miami-Dade PD while on a motorcycle for violation of this statute. [SOF ¶26]. Here the record is devoid of any evidence that these individual non-parties have ever even

been to St. Lucie County, let alone evidence that they have ever been investigated, arrested, and prosecuted as a result of action taken by these Defendants. Further, any examples of enforcement as against these individuals were a result of actions taken by law enforcement agencies in *other* jurisdictions and counties. [ECF 51 at pg. 7].

Of course, that is not where Plaintiffs' standing issues end. Arguably the most glaring problems lie in the next two prongs and whether there exists a credible threat of prosecution, i.e. whether Plaintiffs' injuries are traceable to the challenged action of these Defendants, and whether it is likely, not merely speculative, that the injury will be redressed by a favorable decision here. Richard Hughes resides in Palm Beach County, and to the extent his basis for bringing this lawsuit against only St. Lucie County Sheriff's Office and the State Attorney for the 19th Judicial Circuit, is a Facebook post by the former Sheriff Mascara, as indicated by Plaintiffs' Summary Judgment [ECF 50 at pg. 3 ¶ 16; ECF 51 at pg. 7], a closer look reveals that the post Plaintiff refers to as a warning, is hardly anything more than a public service announcement to members of the St. Lucie County community, and is not even focused primarily on the crime of open carry, as most of it concerns other aspects of Florida's new gun laws generally. (SOF ¶ 5).

Further undermining Plaintiff's claims that his concerns of imminent arrest and prosecution stem from this Facebook post, is the fact that the Sheriff of Palm Beach County posted an almost identical message on social media, and yet Hughes strangely did not feel compelled to name him as a party to this lawsuit out of a purported fear of arrest and prosecution, despite residing in that county. (SOF ¶ 8). Additionally, Plaintiffs are asking that the Court declare they can open carry in areas all over Florida which are policed and overseen by other government entities not a party to this lawsuit, who would not be bound by an injunction,

and even cite past examples of enforcement by these other entities in support of their claims and related arguments as to standing. [ECF 51 at pg. 7]. However, "when a plaintiff's theory of redressability depends on the possible future actions of nonparties, any persuasive effect a judicial order might have upon ... absent nonparties who are not under [the defendant's] control, cannot suffice to establish redressability. Rather, it must be the effect of the court's judgment on the defendant—not an absent third party—that redresses the plaintiff's injury, whether directly or indirectly." Berrocal v. Att'y Gen. of United States, 136 F.4th 1043, 1052 (11th Cir. 2025) (internal citations and quotations omitted). To be clear, Defendants are not suggesting that Plaintiffs must sue every jurisdiction where harm might conceivably occur. Rather, that Plaintiffs should have brought suit against the parties actually responsible for the alleged harm—namely, those in the jurisdictions where Plaintiffs live or intend to engage in the challenged conduct, and whose actions can be directly traced to the injury and redressed by the Court.

Plaintiffs' separate Summary Judgment avers that by enjoining these Defendants, namely the SAO, from enforcing F.S. § 790.053(1), Plaintiffs and their numerous unnamed members and supporters would be able to openly carry firearms throughout Florida without fear of arrest and prosecution. [ECF 51 at pg. 8]. However, such relief would only be possible if this Court issued an injunction that would apply to every law enforcement agency in the state that has authority to enforce this statute, the exact kind of broad relief that CASA has now determined is no longer permissible. "A plaintiff's injury isn't redressable by prospective relief where other state actors, who aren't parties to the litigation, would remain free and clear of any judgment and thus free to engage in the conduct that the plaintiffs say injures them." Berrocal, 136 F.4th 1043, at 1053. (quoting Support Working Animals, Inc. v. Governor of Fla., 8 F.4th 1198, 1200 (11th Cir. 2021)). See also Jacobson v. Fla. Sec'y of State, 974 F.3d 1236, 1255 (11th Cir. 2020)

(emphasizing that a federal court cannot erase a duly enacted law from the statute books but rather has only the more limited power to enjoin executive officials from taking steps to enforce a statute, and can exercise that power only when the officials who enforce the challenged statute are properly made parties to a suit) (internal quotations omitted)).

Plaintiffs' prior reliance on Hafer v. Melo, Ex parte Young, and Scheider v. Leeper in their attempts to overcome this fatal deficiency to standing is misplaced. [ECF 58 at pg. 7]. Hafer v. Melo addressed whether state officials sued in their personal capacities for actions taken under color of state law are "persons" under 42 U.S.C. § 1983. Hafer did not involve, much less endorse, the notion that suing a single local official, such as a State Attorney from one circuit, empowers a federal court to issue statewide relief against a law's enforcement. Indeed, such a proposition sems especially shaky now in the wake of CASA. Ex parte Young authorizes suits for prospective injunctive relief against state officials who are specifically responsible for enforcing the challenged law. But that doctrine does not give federal courts license to issue relief that reaches beyond the actual defendant's enforcement authority. In Florida, a State Attorney's jurisdiction is limited to the judicial circuit in which they are elected and appointed to serve. They have no authority to enforce laws outside that circuit. Lastly, in Schneider, at no point does the court suggest that the plaintiff could obtain an injunction that would bind other sheriffs or state actors outside that defendant's jurisdiction.

It is rather telling that Plaintiffs have at no point been able to reference any cases where standing was contingent on a similar chain of attenuated hypotheticals. The cases they have relied on for this tenuous position do not do them many favors either, which warrant a closer examination.  In Babbitt v. United Farm Workers National Union, referenced on page 5 of Plaintiffs' Motion, the plaintiffs were challenging provisions of Arizona's Agricultural

Employment Relations Act (AERA) by suing the *Attorney General of Arizona*. In <u>MedImmune, Inc. v. Genentech, Inc</u>., referenced on page 5 of Plaintiffs' Motion, the patent licensee brought action against the licensor, challenging the patent's validity. In <u>LaCroix v. Town of Fort Myers Beach</u>, referenced on page 6 of Plaintiffs' Motion, the plaintiff sued the *town responsible for the local ordinance that led to his citation*, as well as *the officers who issued it*. In <u>HM Fla.-ORL, LLC v. Governor of Fla.</u>, a drag themed restaurant was forced to cancel shows and alter their business practice as a result of action taken by the Defendant, Secretary of Florida Department of Business and Professional Regulation, stemming from a Florida law. In <u>Antonyuk v. Hochul</u>, 639 F. Supp. 3d 232, 262 (N.D.N.Y. 2022), plaintiff established that he was going to conceal carry on a weekly basis to provide security for his church and community where he was a pastor. This church was located in an area under the jurisdiction of the individual he brought his claim against and included a congregant who was a law enforcement officer and who was likely to report his violations, and the Sheriff *of that county,* made a direct threat of arrest. This case was more fully rebutted and distinguished from Plaintiffs' claims in Defendant Sheriff's Reply in support of his Motion to Dismiss. [ECF 32]. None of these citations are similarly situated to this instant action brought by an individual who resides in a completely different county than defendants and organizations with members across the entire state challenging the constitutionality of a state law.

The Eleventh Circuit recently held that a similar series of hypotheticals including that plaintiffs would need to carry in a manner noticeable by a highway patrol man before they were to be arrested, was not sufficient to establish standing. <u>Baughcum v. Jackson</u>, 92 F.4th 1024, 1034–35 (11th Cir. 2024). This seems especially relevant considering the only past examples of enforcement of § 790.053(1) by SLCSO Plaintiffs can point to involve individuals who were first

subject to a valid traffic stop or were being surveilled for other unrelated reasons. (ECF 56 at ¶'s 24 - 31). Plaintiff, in support of their own Summary Judgment, attempted to distinguish the facts of <u>Baugham</u> with this case, arguing that it does not apply here because "Georgia law prohibits officers from detaining people solely to investigate whether they are lawful weapons carriers," and therefore "the plaintiffs would need to be doing *something else* unlawful" to be harassed. [ECF 58 at pg. 12].  However, this misapprehends the core reasoning of the Eleventh Circuit's standing analysis. In <u>Baughcum</u>, the court emphasized that a plaintiff must demonstrate a *credible threat of enforcement* that is *not too speculative*. This threshold requirement applies regardless of whether the statute has been enforced previously or whether state law includes additional constraints on officer discretion. Moreover, Plaintiffs' argument assumes that the absence of a Georgia-style statutory protection in Florida creates a per se credible threat. But this flips the burden: it is Plaintiffs' obligation to show that the risk of enforcement is *sufficiently imminent and concrete*, not merely that the statute is on the books and has been enforced in other unrelated cases. Indeed, the Eleventh Circuit in <u>Baughcum</u> explained that plaintiffs cannot rely on a speculative 'chain of events', that runs from the specific defendant to the enforcement of the challenged law, as is the case here, to establish standing. <u>Id</u>. at 1035

Lastly, while Plaintiffs rely heavily on <u>New York State Rifle & Pistol Ass'n, Inc. v. Bruen</u>, 597 U.S. 1 (2022), in support of their lawsuit against SLCSO and the SAO, it is important to emphasize how distinct that case is from the facts here. In <u>Bruen</u>, the plaintiffs challenged the constitutionality of New York's "proper cause" requirement for obtaining a public carry license. Critically, the defendants in <u>Bruen</u>—the Superintendent of the New York State Police and a local licensing official—were directly responsible for enforcing the challenged statute and for adjudicating the plaintiffs' license applications. In other words, there was a clear causal

connection between the defendants' conduct and the constitutional injuries alleged, and therefore the injury was "fairly traceable" to the defendants' conduct and could be redressed by a favorable decision. By contrast, this lawsuit is brought on behalf of numerous non-parties and one named Plaintiff, none of whom live in the jurisdiction of the two defendants, and whose injuries are not remotely traceable to the conduct of these Defendants, as discussed *supra.* To satisfy traceability and redressability, these Plaintiffs should have sued the State of Florida, i.e. the Attorney General, or the other non-party entities for whom these issues can be traced and against whom this harm could be redressed. "That approach would have made for more defendants, but nothing prevented the [Plaintiffs] from taking that course of action." Jackson, 974 F.3d 1236, at 1258; see also Am. Booksellers Ass'n, Inc. v. Webb, 590 F. Supp. 677 (N.D. Ga. 1984) (the Attorney General's appearance in this case clearly served to represent the rights and interests of other subordinate state law enforcement officials, not named as parties to this action, who might seek to enforce the challenged Act. Accordingly, these state law enforcement officials also will be bound by the Court's injunction, and plaintiffs will thus enjoy state-wide interim relief from enforcement of the act's provisions)

## IV.    FLORIDA'S OPEN CARRY RESTRICTIONS ARE CONSTITUTIONAL UNDER THE LEGAL FRAMEWORK SET FORTH IN *HELLER* AND *BRUEN*

Bruen established a two-part inquiry in determining whether a regulation should be upheld which is as follows: 1) Does the Second Amendment's text cover the conduct? If no, the inquiry ends and there is no Second Amendment protection; and 2) if the conduct is protected, is the regulation justified by historical tradition? In Bruen, the Court held that the Second Amendment protects the right to carry firearms in public for self-defense, "subject to certain reasonable, well-defined restrictions," including limits on "the manner by which one carrie[s]

14

arms." 142 S. Ct. at 2156. The Court, moreover, recognized that as a historical matter, States were able to "lawfully eliminate one kind of public carry . . . so long as they left open the [other] option." Id. at 2150. Bruen expressly approved of public carry licensing systems like Florida's, which do not "prevent law-abiding, responsible citizens from exercising their Second Amendment right to public carry." 142 S. Ct. at 2138 n.9 (internal quotations omitted). Therefore, based on the Supreme Court's previous ruling, it would follow that Florida's current public carry licensing system and restrictions on open carry are constitutional and do not infringe on Plaintiffs' Second Amendment rights.

### a. Plaintiffs have not established that the Second Amendment's text protects the right to openly carry firearms in public

First, Plaintiffs bear the burden to show that the Second Amendment's text covers their proposed conduct—openly carrying firearms in public—and thus presumptively protects that conduct. See Bruen, 142 S. Ct. at 2129-30 ("When plain text covers an individual's conduct . . . [t]he government must then justify its regulation.") (emphasis added); id. at 2141 n.11 ("[B]ecause the Second Amendment's bare text covers petitioners' public carry, the respondents here shoulder the burden of demonstrating that New York's proper-cause requirement is consistent with the Second Amendment's text and historical scope.") (emphasis added). Generally, the burden shifts to the government to justify a challenged regulation only after the plaintiff shows, as an initial matter, that their rights have been infringed. See, e.g., Kennedy v. Bremerton Sch. Dist., 142 S. Ct. 2407, 2421 (2022) ("Under this Court's precedents, a plaintiff bears certain burdens to demonstrate an infringement of his rights under the Free Exercise and Free Speech Clauses. If the plaintiff carries these burdens, the focus then shifts to the defendant to show that its actions were nonetheless justified[.]"); Tennant v. Jefferson Cnty. Comm'n, 567

U.S. 758, 760 (2012) (plaintiff challenging constitutionality of redistricting plan must first show population differences could be practically avoided, then burden shifts to State to justify plan).

The Second Amendment's plain text does not protect a right to the open carriage when another means of public carriage (concealed carriage) is available. The Amendment's operative clause provides that "the right of the people to keep and bear [a]rms, shall not be infringed," U.S. Const. amend. II, and its "'words and phrases'" should be given their "'normal and ordinary'" meaning Heller, 554 U.S. at 576 (quoting United States v. Sprague, 282 U.S. 716, 731 (1931)). If the framers had intended to guarantee a right to bear arms openly, "nothing would have been simpler" than to say so. Sprague, 282 U.S. at 732. The plain text protects the *right to keep and bear arms*, not the right to carry them in any particular manner, such as *openly*. "Bear" means to publicly carry, especially for confrontation but that does not equate to the idea that open carrying a firearm is covered by the plain text, it simply indicates *some* right to carry, not the *manner* of carry. Bruen, at 2119. While Heller interpreted the phrase "to bear arms" to mean "to wear, bear, or carry ... upon the person or in the clothing or in a pocket," as Plaintiffs have noted [ECF 58 at pg. 9], this definition does not dictate how arms must be carried (i.e., openly or concealed), nor does it establish that any and all modes of carry are constitutionally protected. To the contrary, Heller emphasized that the right to "bear arms" is not unlimited, and that governments may regulate the manner of carry, particularly in public. Heller at 2786. The Supreme Court explicitly declined to address whether the Second Amendment protects open or concealed carry, stating that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions" and regulations surrounding the public carry of weapons. Id. at 626–627. Because the Second Amendment's text does not guarantee a right to carry firearms in public in a particular manner,

the Amendment does not "presumptively protect[ ]" the open carriage of firearms, Bruen, 142 S.

Ct. at 2130, and Plaintiffs' challenge fails on this basis alone.

> **b.      Florida's prohibition of open carriage of firearms in public, while permitting concealed carriage, is consistent with the applicable historical tradition**

While Plaintiffs would have this Court believe that laws regulating the manner in which

individuals publicly carry their firearms are some kind of recent aberration inconsistent with this

country's traditions and history, such a claim could not be further from the truth. Gun laws are by

no means a contemporary phenomenon – while gun possession is as old as America, so too are

the laws that regulate them. To show that a challenged regulation aligns with historical tradition,

as Bruen explained, the government may either identify historical regulations that are "distinctly

similar" to the challenged regulation or use "analogical reasoning" to demonstrate that the

challenged regulation is analogous to historical regulations. Id. at 2131-32. Moreover, Bruen

recognized that a variety of historical sources and periods may inform these inquiries, including

(1) "English practices that prevailed up to the period immediately before and after the framing of

the Constitution;" (2) public understanding of the right to keep and bear arms in 1791, when the

Second Amendment was ratified, and in 1868, when the Fourteenth Amendment was ratified;

and (3) the interpretation of the right in the years following both Amendments' ratification. Id. at

2136-38 (internal quotations omitted). The Court "acknowledge[d] . . . an ongoing scholarly

debate on whether courts should primarily rely on the prevailing understanding" of the right to

keep and bear arms from 1791 or 1868.

Recently, the Eleventh Circuit, in upholding a more restrictive statute which prohibits

sales of firearms to persons younger than 21, wherein Bruen was applied, held that courts "may

look to historical practice from the mid-to-late nineteenth century to at least confirm the

Founding-era understanding of the Second Amendment." <u>Nat'l Rifle Ass'n v. Bondi</u>, 133 F.4th 1108, 1116 (11th Cir. 2025). With that in mind, the Defendants would direct the Court's attention to the countless examples of relevantly similar laws and historical analogues from the colonial era up to and including the early 20th century, which regulated the manner in which any individual can openly carry in public, and which while "not dead ringers for historical precursors" are "analogous enough" such that Florida's open carry law passes constitutional muster, and reflect a historical tradition of regulating firearms in a similar manner. <u>Bruen</u>, 597 U.S. at 2133. (See SOF ¶'s 29-32).[2]

Plaintiffs' attempt to dismiss the 19th-century historical analogues on temporal or categorical grounds, as was argued in their Reply in Support of their Summary Judgment [ECF 58 at pgs. 10-11], misreads both the methodology and holding of <u>Bruen</u>. While <u>Bruen</u> emphasized the importance of Founding-era traditions, it also recognized that courts must engage in a nuanced historical inquiry—one that allows for reasonable modern regulations so long as they are analogous enough, i.e. relevantly similar, to historical ones. <u>Bruen</u> a 2132. <u>Bruen</u>

---

[2] Plaintiffs' objection, as noted in their Reply in support of their own Summary Judgment [ECF 58 at pg. 11] to the format or source of Defendants' historical materials misunderstands the nature of the <u>Bruen</u> framework and the role of scholarly support in constitutional litigation. <u>Bruen</u> does not require that parties submit only "original source documents" or limit their historical presentation to primary materials in isolation. Rather, the Court emphasized that the inquiry should be based on the *historical tradition as presented by the parties*. <u>See</u> <u>Bruen</u> at 25 n.6 (noting the Court relies on "the historical record compiled by the parties"). Defendants' reliance on historical analysis prepared by legal historians in this area, including those affiliated with Everytown for Gun Safety and the Smithsonian Magazine falls squarely within that framework. Courts routinely rely on historical scholarship to interpret the meaning of constitutional provisions, and <u>Bruen</u> did not prohibit the use of such materials simply because they are compiled or advanced by certain advocacy organizations.

explicitly endorsed the notion that later historical practices—particularly those from the 19th century—may help confirm the enduring understanding of the right to bear arms. Id. at 59. The Eleventh Circuit followed that very approach in NRA V. Bondi. In Bondi, Eleventh Circuit upheld Florida's law prohibiting firearm sales to individuals under 21 based on a line of historical analogues from the 19th century which restricted minors' access to firearms. The court found these analogues sufficiently comparable to the challenged modern law, consistent with Bruen's requirement that modern regulations be "relevantly similar" to historical ones.

Moreover, the Supreme Court has repeatedly recognized—including in Bruen—a robust historical tradition of regulating the manner of public carriage by allowing one manner of carriage while prohibiting another. In Heller, the Court explained that "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right [to keep and bear arms] was not a right to keep and carry any weapon whatsoever in any manner whatsoever." 554 U.S. at 626 (emphasis added); see McDonald v. City of Chi., 561 U.S. 742, 786 (2010) (same). The Court repeatedly reiterated this point in Bruen. See, e.g., 142 S. Ct. at 2128 (declining to find a Second Amendment right to carry weapons "'in any manner whatsoever'") (quoting Heller, 554 U.S. at 626); id. at 2138 ("[T]he right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing . . . the manner of carry[.]"); Id. at 2150 ("The historical evidence from antebellum America does demonstrate that the manner of public carry was subject to reasonable regulation.") (emphasis in original); Id. at 2156 ("[T]hrough the Anglo-American history of public carry," the Second Amendment has been subject to restrictions "limit[ing]" the "manner by which one carried arms[.]"); see also Id. at 2157 (Alito, J., concurring) ("Nor have we disturbed anything that we said in Heller or McDonald . . . about restrictions that may be imposed on the possession or carrying of guns.");

19

Id. at 2162 (Kavanaugh, J., concurring) (noting *Heller* and *McDonald*'s reiteration that right to keep and bear arms does not guarantee right to carry weapon in any manner). Bruen also explained that as a historical matter, States were able to "lawfully eliminate one kind of public carry . . . so long as they left open the [other] option." Id. at 2150. Particularly relevant here, Bruen also stated that "these antebellum state-court decisions evince a consensus view that States could not altogether prohibit the public carry of 'arms,'" but could prohibit one manner of public carriage so long as another manner of carriage was permitted. Bruen, 142 S. Ct. at 2147; see AE Br. 18- 21 (explaining that antebellum cases demonstrated that right to bear arms was subject to limits on manner of carriage).

Like its historical counterparts, Florida has "lawfully eliminate[d] one kind of public carry" while leaving "open [another] option," and has thus has not "altogether prohibit[ed] the public carry of arms" for self-defense. Bruen, 142 S. Ct. at 2147, 2150 (internal quotations omitted). To be sure, Florida has made the converse choice by allowing concealed carriage while prohibiting open carriage. But, as Bruen explained, the historical regulations need not be identical, but rather only "distinctly similar" to the challenged regulation. Id. at 2131. Historical practice through the end of the 19th-century "confirm[s]" this tradition of regulating the manner of public carriage. Bruen, 142 S. Ct. at 2137 (internal quotations omitted). States and their localities continued to enact statutes prohibiting the concealed carriage of weapons, and to enforce them. Courts, moreover, "almost universally held that the legislature may regulate and limit the mode of carrying arms" without violating the right to keep and bear arms. Commonwealth v. Murphy, 166 Mass. 171, 172-73 (1896).

Defendants' Motion should be granted.

Respectfully Submitted,

20

**JACOBS SCHOLZ & WYLER, LLC**

*/s/ Arthur I. Jacobs*
Arthur I. Jacobs, Esq
Fla. Bar No. 108249
961687 Gateway Blvd., Suite 201-I
Fernandina Beach, FL  32034
Telephone: (904) 261-3693
Facsimile: (904) 261-7879
Primary:  filings@jswflorida.com
Secondary: Buddy@jswflorida.com

 **I HEREBY CERTIFY** that a copy of the foregoing has been electronically filed with the

Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to:

**STEPHEN D. STAMBOULIEH, ESQUIRE,** Co-Counsel for Plaintiffs, P.O. Box 428, Olive

Branch, MS 38654  [stephen@sdslaw.us]; **JAMES D. PHILLIPS, JR., ESQUIRE**, Co-Counsel

for Plaintiffs, 509 W. Colonial Drive, Orlando, FL 32804 [jphillips@thefirearmfirm.com]; and

**ARTHUR IVAN JACOBS, ESQUIRE,** Counsel for Defendants Bakkedahl and SAO, 961687

Gateway Boulevard, Suite 201-I, Fernandina Beach, FL 32034 [buddy@jswflorida.com] this

July 8, 2025.

 *s/Andrew W. Jolly*
ANDREW W. JOLLY, ESQUIRE
Fla. Bar No. 1032793
PURDY, JOLLY, GIUFFREDA, BARRANCO & JISA, P.A.
2455 E. Sunrise Boulevard, Suite 1216
Fort Lauderdale, Florida 33304
Telephone:(954) 462-3200
e-mail: Andrew@purdylaw.com
   Cecilia@purdylaw.com
Attorney for *Defendant Sheriff and St. Lucie County*
*Sheriff's Office*
Trial Counsel