IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Civil Action No. 2:24-cv-14250-JEM

GUN OWNERS OF AMERICA, INC., et al.,

    Plaintiffs,

v.

SHERIFF RICHARD R. DEL TORO, in his official
capacity as Sheriff of St. Lucie County, et al.,

    Defendants.

_____

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

COME NOW Plaintiffs Gun Owners of America, Inc. ("GOA"), Gun Owners Foundation ("GOF"), and Richard Hughes (collectively "Plaintiffs"), and file this, their Response in Opposition to Defendants' Motion for Summary Judgment, and state as follows:

**MEMORANDUM OF LAW**

**I.  DEFENDANTS' MEMORANDUM REITERATES THEIR PRIOR ARGUMENTS ALMOST VERBATIM, WHICH FAIL FOR THE REASONS ALREADY BRIEFED.**

With scattered alterations, Defendants' Memorandum of Law in support of their instant Motion for Summary Judgment (ECF #60) ("XMSJ") largely restates their Joint Response (ECF #58) ("Resp.") to Plaintiffs' previously filed Motion for Summary Judgment (ECF #51) ("MSJ"). Accordingly, Plaintiffs already addressed Defendants' duplicative arguments in Plaintiffs' previously filed Reply (ECF #58). This Response reiterates and expands upon those prior arguments.

Ultimately, Defendants' arguments in favor of Florida's ban on the open carry of firearms are no more appealing the second time around. Defendants continue to dispute this Court's well-

1

settled ability to "say what the law is" and declare a statute to be unconstitutional. They claim Plaintiffs seek "broad relief" and that *Trump v. CASA, Inc.*, 222 L. Ed. 2d 930 (2025), forbids it – suggesting that the Court somehow overruled decades of its own representational standing precedents *sub silentio*. Defendants maintain that the individual Plaintiff lacks standing, even though he sued the very officials tasked with enforcing the very law that proscribes his desired course of conduct, in the very district where he desires to engage in such conduct. Defendants deny a credible threat of enforcement, despite providing examples of their own enforcement and refusing to disavow enforcement of the challenged statute now. Defendants take issue with the organizational Plaintiffs' unnamed members and supporters, yet they fail to cite any binding authority imposing a naming requirement for representational standing. Defendants claim the Second Amendment has *absolutely nothing* to say about the open carry of firearms, in direct contravention of the Amendment's plain text and the Supreme Court precedents that have construed it. And in a last-ditch attempt to shoulder their historical burden, Defendants vaguely incorporate by reference anachronistic enactments that *never banned the open carry of firearms*. If anything, Defendants have shown that it is *Plaintiffs* who are entitled to summary judgment.

Finally, to the extent that Defendants' memorandum *differs* from the verbatim text of their prior Joint Response, these scattered additions are little more than "a disguised sur-reply that d[oes] not comply with Local Rule 7.1(a)(3)." *Taverna Imps., Inc. v. A&M Wine & Spirits, Inc.*, 2018 U.S. Dist. LEXIS 241291, at *5 (S.D. Fla. June 4, 2018); *see, e.g.*, XMSJ at 4 (replying to arguments in Plaintiffs' Reply, ECF #58). This Court should deny Defendants' Motion for Summary Judgment, grant Plaintiffs' Motion for Summary judgment, and repudiate Florida's outlier ban on the bearing of arms as violative of the Second and Fourteenth Amendments.

## II. THIS COURT CLEARLY HAS AUTHORITY TO GRANT THE RELIEF PLAINTIFFS SEEK.

Defendants once again characterize Plaintiffs' request for declaratory and injunctive relief as "broad" and "sweeping," on the theory that, if granted, it would "appl[y] to countless non-parties...."  XMSJ at 2.  But the "non-parties" Defendants obliquely reference are in fact the members and supporters of *Plaintiffs* Gun Owners of America, Inc. ("GOA") and Gun Owners Foundation ("GOF") – people whose interests GOA and GOF have standing to represent.  *See* MSJ at 7.  It is black-letter law that an organization may "ha[ve] standing to bring suit *on behalf of its members*," precisely so that those members may enjoy "*the relief requested*."  *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (emphases added).  To claim otherwise would defeat the purpose of representational standing entirely.  Indeed, other district courts have recognized Plaintiffs GOA and GOF's representational standing to challenge firearm regulations on their members and supporters' behalf, granting relief specifically *to* those members and supporters (who are not named).[1]

The Supreme Court's recent decision in *Trump v. CASA, Inc.*, 222 L. Ed. 2d 930 (2025), does nothing to question – much less *repudiate* – the standard-fare relief Plaintiffs seek.  Defendants cite *CASA* for its rejection of the so-called "universal injunction" – relief for the benefit of "non-parties, not before the Court."  XMSJ at 3.  But Defendants completely misunderstand what a "universal injunction" is.  As the Supreme Court explained in its first footnote:

> Such injunctions are sometimes called "nationwide injunctions," reflecting their use by a single district court to bar the enforcement of a law anywhere in the Nation.

---

[1] *See, e.g.*, *Texas v. BATFE*, 2024 U.S. Dist. LEXIS 89647, at *21 (N.D. Tex. May 19, 2024) (temporarily enjoining enforcement of a rule "against Plaintiffs Texas, Jeffery Tormey, the Gun Owners of America, Inc., the Gun Owners Foundation," the latter of which asserted standing only in a representational capacity); *Texas v. BATFE*, 737 F. Supp. 3d 426, 444 (N.D. Tex. 2024) (similarly enjoining enforcement "against all Plaintiffs," including GOA and GOF's members and supporters).

3

> But the term "universal" better captures how these injunctions work. Even a traditional, parties-only injunction can apply beyond the jurisdiction of the issuing court. ... The difference between a traditional injunction and a universal injunction is not so much *where* it applies, but *whom* it protects: A universal injunction prohibits the Government from enforcing the law against *anyone*, anywhere. [*CASA*, 222 L. Ed. 2d at 939 n.1.]

*CASA* never foreclosed "judicial relief" for the "unnamed members and supporters" (XMSJ at 4) properly represented by an organizational plaintiff. In fact, the Northern District of Florida recently applied *CASA* to grant a preliminary injunction protecting, *inter alia*, "the League of Women Voters's and LULAC's non-citizen *members* who gather signed initiative petitions." *Fla. Decides Healthcare, Inc. v. Byrd*, 2025 U.S. Dist. LEXIS 128841, at *50 (N.D. Fla. July 8, 2025) (emphasis added); *see also id.* at *25 ("Plaintiffs … League of Women Voters, LULAC, and Poder Latinx have … associational standing to challenge the citizenship requirement."). *CASA* did not foreclose even *preliminary* relief for the members of those plaintiff organizations. To the contrary, it "afford[ed] complete relief to the parties with standing to sue...." *Id.* at *50.

Nor does *CASA* prevent this Court from *declaring* that Fla. Stat. § 790.053(1) violates the Second Amendment. Indeed, "a federal court ha[s] … the duty – to strike down an unconstitutional statute...." *Brenner v. Scott*, 999 F. Supp. 2d 1278, 1286 (N.D. Fla. 2014). No language in *CASA* prevents a court from "say[ing] what the law is" (*Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)), and the Declaratory Judgment Act, 28 U.S.C. § 2201, expressly allows a court to "declare the rights and other legal relations of any interested party...." Even so, Defendants claim that Plaintiffs' requested relief would "create confusion and chaos," on the theory that simply *declaring* one statute violative of the Second Amendment would invite all manner of inquiry into *other*, unrelated, theoretical, and constitutional questions not before this Court. XMSJ at 5 & n.1. But Defendants' footnote parade of horribles is quintessential "whataboutism" – "a 'fallacy [that] ignores the question and switches the subject to something else.'" *United States v. Jones*, 2021

4

U.S. App. LEXIS 37158, at *9 n.3 (9th Cir. Dec. 16, 2021) (Baker, J., dissenting).  Of course, "[w]hataboutism … is not an argument," *League of Women Voters of Fla. v. Lee*, 2022 U.S. Dist. LEXIS 37991, at *42 (N.D. Fla. Jan. 4, 2022), and Defendants never explain why the *Supreme Court* never saw fit to answer any of their questions in its *own* Second Amendment decisions.[2]

Nor do Defendants explain just why it is they anticipate "other law enforcement agencies" would continue to enforce the statute if this Court declared it unconstitutional.  XMSJ at 5 n.1.  To the contrary, courts "have long presumed that officials of the Executive Branch will adhere to the law as declared by the court." *Comm. on the Judiciary of the U.S. House of Representatives v. Miers*, 542 F.3d 909, 911 (D.C. Cir. 2008); *accord Florida v. HHS*, 780 F. Supp. 2d 1307, 1315 (N.D. Fla. 2011) ("it will not be presumed that that officer will ignore the judgment of the Court").[3] Indeed, law enforcement has every incentive to heed a court's declaration – including to maintain eligibility for qualified immunity.  But regardless of what actions non-parties might take in the

---

[2] Defendants now expand their prior footnote parade of horribles to claim that, because Plaintiff "Hughes is only a member of GOF," a finding of representational standing would apply only "to GOF and not GOA" and therefore require law enforcement to inquire whether individuals carrying openly "are affiliated with GOF...." XMSJ at 5 n.1.  But one page later, Defendants claim the opposite: "Hughes[] is only a member of GOA and not GOF...." *Id.* at 6.  In reality, Plaintiff Hughes is both "a member of Gun Owners of America and a supporter of Gun Owners Foundation." Declaration of Richard Hughes ¶3, ECF #1-7.  And in any case, any law enforcement officers engaging in this sort of investigative tactic would be *knowingly enforcing a statute that has been declared unconstitutional* – an unlikely proposition.  And if Defendants are imagining these sorts of hypotheticals, they clearly intend to continue enforcing the statute.  How this does not undermine their later argument against credible threats of enforcement, Defendants do not say.

[3] *See also Steffel v. Thompson*, 415 U.S. 452, 484 (1974) (Rehnquist, J., concurring) ("If the federal court finds that the threatened prosecution would depend upon a statute it judges unconstitutional, the State may decide to forgo prosecution of similar conduct in the future, believing the judgment persuasive.  Should the state prosecutors not find the decision persuasive enough to justify forbearance, the successful federal plaintiff will at least be able to bolster his allegations of unconstitutionality in the state trial with a decision of the federal district court in the immediate locality.  The state courts may find the reasoning convincing even though the prosecutors did not.").

5

future, none of that stops *this* Court from enjoining *these* Defendants from enforcing the law against *these* Plaintiffs.

Defendants likewise fail to unpack their apparent belief that *CASA* eliminated Plaintiffs' hornbook facial challenge, such that this Court now may only declare Florida law unconstitutional *as applied* to particular parties and peculiar activities.[4]  *See* XMSJ at 2.  To the contrary, the plaintiffs in *Bruen* sued the Superintendent of New York State Police and a local licensing officer, yet the Court declared that "New York's proper-cause requirement violates the Fourteenth Amendment" across the state.  *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 71 (2022).  *CASA* does not prevent this Court from likewise declaring that "[Fla. Stat. § 790.053(1)] violates the Fourteenth Amendment...."  Indeed, that is precisely what Plaintiffs have asked the Court to do.  Compl. at 1 ("Plaintiffs seek a declaration that Fla. Stat. § 790.053(1) is unconstitutional"); *see also id.* at 39.

Defendants continue to claim that Plaintiffs must sue *every* official in *every* jurisdiction in the State of Florida in order to obtain statewide relief.  XMSJ at 4, 8, 14 (maligning relief that would apply "throughout the entire state of Florida," and recommending further actions against "another agency who would be more likely to have jurisdiction," such as "the State of Florida, i.e.[,] the Attorney General").  But it is beyond dispute that a "§ 1983 claim against the State Attorney is treated as a claim against the State of Florida."  *Scheider v. Leeper*, 2016 U.S. Dist. LEXIS 30839, at *7 (M.D. Fla. Mar. 10, 2016) (collecting cases); *see also* ECF #26 at 5, 14-15.  *CASA* did not disturb that basic principle.[5]

---

[4] Indeed, Defendants speculate that relief would apply to *only* one person, and Defendants would "be required to then train their officers to allow only this individual to open carry...."  XMSJ at 5 n.1.

[5] Later, Defendants walk their position back, claiming they "are not suggesting that Plaintiffs must sue every jurisdiction where harm might conceivably occur" – only those

Finally, Defendants note that Plaintiffs seek injunctive relief not only for Plaintiff Hughes, but also for "all GOA and GOF members and supporters," labeling this the sort of "universal injunction" that *CASA* rejected. XMSJ at 4; *see also id.* at 3 (claiming relief sought for "hundreds or thousands of unnamed individuals," and asserting that "district courts lack authority to prohibit enforcement of a law against anyone who is not a named party to the lawsuit"). But *CASA* never overruled the doctrine of representational standing established in *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977). *See* Compl. ¶11. Rather, the Supreme Court reaffirmed that doctrine as recently as 2023, in *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181 (2023). Defendants assert that the members and supporters of Plaintiffs GOA and GOF are "non-parties" (XMSJ at 2), ignoring that, "[w]here … an organization has identified members and represents them in good faith," then "neither the claim asserted nor the relief requested requires the participation of individual members...." 600 U.S. at 201, 199. *CASA* did not disturb this settled law. *See CASA*, 222 L. Ed. 2d at 945 (positively referencing a 1676 case where "lead miners … named four of their members to defend the suit in a representative capacity").

Of course, *CASA* did not silently overrule the law of representational standing, because the "Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*." *Shalala v. Ill. Council on Long Term Care*, 529 U.S. 1, 18 (2000).[6] Indeed, the Court in *Students for Fair*

---

"jurisdictions where Plaintiffs live or intend to engage in the challenged conduct...." XMSJ at 10. But this jurisdiction is *precisely* where Plaintiffs "intend to engage in the challenged conduct...."

[6] Providing further evidence that *CASA* did not overrule the settled doctrine of representational standing, Justice Thomas's concurrence in *FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024), recommended that, "[i]n an appropriate case, we should explain just how the Constitution permits associational standing." *Id.* at 399 (nevertheless recognizing that "the Court consistently applies the doctrine"). But that was the opinion of just one Justice, not the Court.

7

*Admissions* never required each member to be named.[7] Had the Court intended a 180-degree pivot on this recently decided issue, surely the Court would have said so. Nor does this Circuit require an organizational plaintiff "to identify by name the members on whose behalf it was suing." *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 773 (11th Cir. 2024) (citing *Doe v. Stincer*, 175 F.3d 879, 884 (11th Cir. 1999)).[8] Placing all their eggs in the *CASA* basket, Defendants never address this Circuit's separate rejection of the very naming requirement they propose.

### III. PLAINTIFFS HAVE STANDING, AND DEFENDANTS' REHASHED ARGUMENTS ARE UNAVAILING.

Claiming that Plaintiffs lack standing, Defendants make several arguments, largely mirroring their motions to dismiss (ECF ##24, 25). None holds water. First, Defendants claim that Hughes' asserted injury is based on a "highly attenuated chain of completely hypothetical possibilities...." XMSJ at 8. Defendants claim that Hughes "would have to choose to openly carry a 'full-size' handgun … in a county where he does not reside," *id.* at 7, ignoring that Hughes expressed the intention *to do just that*. ECF #1-7 at ¶¶14, 15-21. Next, Defendants claim that Hughes's "possible future visits … may or may not occur," XMSJ at 7, ignoring that Hughes visits St. Lucie County "at least once a month" and gave *specific dates* of his frequent gun show attendance. ECF #1-7 at ¶¶ 16, 19. In other words, Hughes stated his "intent to take the action

---

[7] In addition to Hughes, Plaintiffs *did name* Legget, McDuffie, Notargiacomo, and Valdes as GOA members, explaining how each suffers (or has suffered) harm due to Florida's ban on open carry. *See* ECF #1-6 at ¶¶17-35 (Legget), ¶¶36-39 (McDuffie), ¶¶40-42 (Notargiacomo), ¶43 (Valdes).
[8] Other courts are in accord. *Disability Rts. Wis., Inc. v. Walworth Cnty. Bd. of Supervisors*, 522 F.3d 796, 802 (7th Cir. 2008); *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015); *Speech First, Inc. v. Shrum*, 92 F.4th 947, 949-50 (10th Cir. 2024).

8

that [he] asserts is prohibited[,]" showing that he is "'able and ready' to do so" and demonstrating "a concrete injury." *Am. All. for Equal Rts.*, 103 F.4th at 772. Nothing more is needed.

Next, Defendants (i) question whether their officers even would be present, (ii) theorize that they may choose *not* to arrest and prosecute a flagrant lawbreaker, and (iii) speculate that it is more likely another agency would be involved. XMSJ at 8. But Defendants ignore that they *have repeatedly* arrested and prosecuted Floridians for this very crime. *See* ECF #50-1 Requests for Admission ##9-10; ECF #50-3 Interrogatories ##10-14; *see also Antonyuk v. Hochul*, 639 F. Supp. 3d 232, 272 (N.D.N.Y. 2022) (rejecting a nearly identical attempt at finger-pointing). And when seeking "a declaration of the unconstitutionality of a state statute or to enjoin the enforcement of the statute," all that is required is that the "defendant … has *some connection* with the enforcement of the act." *Diaz v. Cobb*, 2007 U.S. Dist. LEXIS 110640, at *3 (S.D. Fla. May 4, 2007).[9] Defendants clearly fit the bill.

Defendants also downplay their explicit warning that "open carry is still illegal in Florida," characterizing this as "hardly anything more than a public service announcement," and demurring that *another* sheriff posted a *similar* warning. XMSJ at 9. *But see Antonyuk*, 639 F. Supp. 3d at 263-64 (finding a credible threat of enforcement based on a sheriff's Facebook post). Again, each of these arguments already has been raised – and rebutted. *See* ECF #26 at 4-10; ECF #58 at 4. If Defendants' *extensive* history of this *specific* jurisdiction and this *specific* law enforcement agency arresting and prosecuting for this *specific* crime against otherwise-*law-abiding* individuals does not constitute a credible threat of enforcement to Plaintiffs, it is difficult to see what would.

---

[9] As a Pennsylvania federal district court recently explained, such "pointing fingers" amongst defendants (or, in this case, pointing fingers at nonparties) is "irrelevant," because "the Court is not charged with determining 'the most suitable defendants,' but rather … 'whether the complaint has named defendants who meet the prerequisites to adjudication in … court.'" *OpenPittsburgh.Org v. Voye*, 563 F. Supp. 3d 399, 413 (W.D. Pa. 2021).

Next, Defendants reference the Eleventh Circuit's decision in *Baughcum v. Jackson*, 92 F.4th 1024 (11th Cir. 2024), asserting that it demonstrates Plaintiffs lack of standing. XMSJ at 12. But the *Baughcum* court found no credible threat of enforcement because "Georgia law prohibits officers from detaining people solely to investigate whether they are lawful weapons carriers," and therefore "the plaintiffs would need to be doing *something else* unlawful" to be harassed. 92 F.4th at 1034-35 (presuming that the police *would not violate state law*). No such protective Florida statute exists here. Rather, Fla. Stat. § 790.053(1) expressly prohibits open carry, and Defendants admit that they have enforced it repeatedly (XMSJ at 12-13).[10]

Defendants' newfound attempt to rehabilitate their reliance on *Baughcum* fails. They now generally "emphasize[] that a plaintiff must demonstrate a *credible threat of enforcement* that is *not too speculative*," and that "it is Plaintiffs' obligation to show that the risk of enforcement is *sufficiently imminent and concrete*, not merely that the statute is on the books and has been enforced in other unrelated cases." XMSJ at 13. But a statute "merely" being on the books with an enforcement history *is precisely enough* under the Eleventh Circuit's precedents. As the court explained in a more recent case, "anything less than a 'clear disavowal of enforcement' does not divest a plaintiff of standing." *HM Fla.-ORL, LLC v. Governor of Fla.*, 137 F.4th 1207, 1218 (11th Cir. 2025).[11] Defendants have never "clear[ly] disavow[ed]" enforcement of the statute. To the contrary, they contemplate its future enforcement. *See* XMSJ at 5 n.1 ("[W]ould SLCSO be

---

[10] In fact, there is an entire YouTube channel devoted to one Floridian's repeated detention and arrest by police for open carrying *lawfully* while fishing. *See* https://www.youtube.com/@TheArmedFisherman.

[11] *See also Johnson v. District of Columbia*, 71 F. Supp. 3d 155, 161 (D.D.C. 2014) ("presumption of enforcement may be overcome by a showing that the law is moribund or will not be enforced").

10

required to then train their officers to allow only this individual to open carry, and pass around photographs so everyone knows what he looks like?").

Next, without citation, Defendants claim that "Plaintiffs are asking that the Court declare they can open carry in areas all over Florida which are policed and overseen by other government entities … who would not be bound by an injunction...." XMSJ at 9. On the contrary, Plaintiffs simply asked the Court to declare Fla. Stat. § 790.053(1) unconstitutional. Compl. at 1, 39. And Plaintiffs asked only that Defendants be enjoined. *Id.* To be sure, Defendant Bakkedahl represents the State, and any relief against him would bind the State – including other State Attorneys. Thus, Defendants are simply wrong that relief "would not bind" other "government entities who are likely to arrest and prosecute these individuals...." XMSJ at 4-5. But as the Supreme Court itself noted in *CASA*, "[e]ven a traditional, parties-only injunction can apply beyond the jurisdiction of the issuing court...." *CASA*, 222 L. Ed. 2d at 939 n.1. Plaintiffs most certainly have *not* asked the Court to bind "every law enforcement agency in the state...." XMSJ at 10. That strawman is entirely a figment of Defendants' imagination.

Defendants once again dispute that courts treat official-capacity suits against state actors as suits against the state. XMSJ at 11. *But see Scheider v. Leeper*, 2016 U.S. Dist. LEXIS 30839, at *7 (M.D. Fla. Mar. 10, 2016) ("§ 1983 claim against the State Attorney is treated as a claim against the State of Florida."); *Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity therefore should be treated as suits against the State."); *Ex parte Young*, 209 U.S. 123, 184 (1908) ("a suit against the officers of a State … is, in effect, a suit against the State itself"). Rather than address the substance of these authorities, Defendants simply highlight their factual differences. *See* XMSJ at 11. Meanwhile, Defendants fail to address both this Court and this Circuit's prior pronouncements entirely. *See Fla. Immigrant Coal. v. Uthmeier*, 2025 U.S.

11

Dist. LEXIS 94451, at *55, *51 (S.D. Fla. Apr. 29, 2025) ("[A] district court may bind nonparties 'who are in active concert' with a defendant," including "those identified with them in interest...."); *see also id.* at *57-58 (noting that a "preliminary injunction properly included district attorneys tasked with enforcing the law because the suit was a facial challenge to a state criminal statute, and district attorneys prosecute criminal cases on behalf of the state"); *Attwood v. Clemons*, 818 F. App'x 863, 871 (11th Cir. 2020) ("[I]n 'an official-capacity claim, the relief sought is only nominally against the official and in fact is against the official's office and thus the sovereign itself.' … And the result of such a suit, if successful, is that both the current officeholder and any future officeholder will be barred from carrying out whatever policy is at issue.").[12]

Finally, Defendants' repeated appeals to residency fail once more. XMSJ at 14 (noting that "none of [Plaintiffs] live in the jurisdiction of the two defendants"). No rule of standing requires that a litigant *reside* within a district to challenge a source of harm within.

### IV. FLORIDA'S BAN ON OPEN CARRY VIOLATES THE SECOND AMENDMENT'S PLAIN TEXT, AND DEFENDANTS HAVE FAILED TO BEAR THEIR HISTORICAL BURDEN.

Defendants dispute that Plaintiffs can even make the minimal threshold "show[ing] that the Second Amendment's text covers their proposed conduct – openly carrying firearms in

---

[12] Defendants previously quipped that Plaintiffs should have sued the state of Florida directly, ignoring that this is impossible, because "Congress has not abrogated Eleventh Amendment immunity in § 1983 cases, and the State of Florida has not waived sovereign immunity or consented to suit with respect to such actions." *Driessen v. Univ. of Miami Sch. of L. Children & Youth L. Clinic*, 835 F. App'x 489, 492 (11th Cir. 2020). Now, Defendants clarify that they *really* meant the Attorney General. XMSJ at 14. But suing the Attorney General is completely unnecessary. As this Court previously explained, when seeking "a declaration of the unconstitutionality of a state statute or to enjoin the enforcement of the statute," all that is required is that the "defendant … has *some connection* with the enforcement of the act." *Diaz*, 2007 U.S. Dist. LEXIS 110640, at *3. Defendants also omit that they themselves asked the Attorney General to help them defend Florida's ban on bearing arms, a request the Attorney General refused. *See* Elaine Mallon, *Florida Attorney General Declines to Represent Defendants in Gun Case that Could Change Open Carry Laws*, Wash. Examiner (Sept. 24, 2024), https://tinyurl.com/4ufbeyz9.

12

public...." XMSJ at 15. Thus, Defendants claim, Plaintiffs are not entitled even to *presumptive* Second Amendment protection, which would shift the burden to Defendants to justify their restriction. *Id.* Rather, as Defendants see it, because Florida allows people to "bear arms*" in some manner – i.e.*, concealed carry – the State can prohibit people from bearing arms openly. *Id.* at 16. As Defendants put it, had the Founders intended to protect open carry, "'nothing would have been simpler' than to say so." *Id.* But by that logic, Defendants could justify a ban on Qurans, because the Bible may still be read. After all, the First Amendment's plain text does not protect the right to any "particular" (*id.*) exercise of religion, and had the Founders wished to prevent Congress from enacting a "law respecting an establishment of [the Islamic] religion," then "'nothing would have been simpler' than to say so."

Unsurprisingly, the Supreme Court already has rejected Defendants' spurious argument, explaining that, historically, the term "to bear" meant to "wear, bear, or carry … *upon* the person *or in* the clothing or in a pocket." *District of Columbia v. Heller*, 554 U.S. 570, 584 (2008) (emphases added). Defendants simply gloss over the plain meaning of "upon" – "*on the surface*."[13] In other words, the "plain text" presumptively supports both open *and* concealed carry. *Rahimi* was similarly unequivocal, explaining that, "when the Government regulates *arms-bearing conduct* … it bears the burden to 'justify its regulation.'" *United States v. Rahimi*, 602 U.S. 680, 691 (2024) (emphasis added). If the open carry of firearms does not constitute "arms-bearing conduct," it is hard to see what would. Indeed, this illogic would mean that *concealed* carry is not protected either. And if the Second Amendment's plain text protects *neither* open *nor* concealed carry, then Defendants would seem to suggest that there is no right to bear arms at all. As one

---

[13] https://www.merriam-webster.com/dictionary/upon (emphasis added).

district court quipped in response to similar reasoning, "[w]hat a marvelous, Second Amendment loophole!" *United States v. Hicks*, 649 F. Supp. 3d 357, 360 (W.D. Tex. 2023).

Pre- and post-*Heller* cases confirm that the prefatory clause *at the very least* covers open carry, guaranteeing a "well-regulated Militia" which, at the Founding, openly carried firearms nearly *five feet* in length. In *United States v. Miller*, 307 U.S. 174 (1939), the Court surveyed Founding-era militia statutes, which often required that a citizen musketeer "carry a 'good fixed musket,' not under bastard musket bore, not less than three feet, nine inches, nor more than four feet three inches in length...." *Id.* at 180. It would have been impossible for each member of the militia to "appear at his respective muster-field on the day appointed, by eleven o'clock in the forenoon, armed, equipped, and accoutred" for inspection, only to *conceal* such an instrument down his pantleg. *Id.* at 181.

As Plaintiffs previously explained, the Second Amendment must protect, at *minimum*, the persons, arms, conduct, and *manner of carry* necessary to effectuate the prefatory clause. MSJ at 13-15. As *Heller* observed, "[l]ogic demands that there be a link between the stated purpose and the command" of the Second Amendment's operative "right of the people" clause. 554 U.S. at 577. Thus, the prefatory clause serves a "clarifying function," one that "does not limit or expand the scope of the operative clause." *Id.* at 578. But to accept Defendants' argument that the text's *silence* as to manner of carry means that none in "particular" is protected (XMSJ at 16) would "completely detach[] … the prefatory clause" from the rest of the Amendment's text. *Heller*, 554 U.S. at 627. Indeed, the very thing the Second Amendment was enacted to protect (bearing arms to resist tyranny) would be the *only* thing not protected. Unsurprisingly, the Supreme Court has never read the text in this way, and this Court should decline to do so now. *See Bruen*, 597 U.S. at 32 (noting that, because "[n]othing in the Second Amendment's text draws a home/public

distinction with respect to the right to keep and bear arms," it presumptively protects *both* home and public carry).[14]

Finally attempting to make a historical showing to justify Florida's open carry ban, Defendants fall flat. At the outset, they offer the most general of propositions – that "[g]un laws are by no means a contemporary phenomenon...." XMSJ at 17. But the fact that governments *sometimes* have regulated firearms is no justification for the *specific* ban Defendants seek to uphold here. Indeed, *Bruen* requires modern and historical laws to share the same "how and why," 597 U.S. at 29, and a "court must be careful not to read a principle at such a high level of generality that it waters down the right." *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring). Defendants' appeal to the highest level of generality only proves that "he who writes the resolve clause wins the debate."[15]

Next, Defendants seek to water down the hurdle they must overcome, asserting that they need not show "distinctly similar" historical gun laws, but rather may engage in "'analogical reasoning' to demonstrate" that Florida's law is "analogous enough." XMSJ at 17-18. Not so. *Bruen* instructed that, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is" unconstitutional. 597 U.S. at 26.

---

[14] Defendants mischaracterize *Bruen* to suggest that states could "eliminate one kind of public carry … so long as they left open the [other] option." XMSJ at 15. But the *complete* quotation summarized that, after the Founding, "States could lawfully eliminate one kind of public carry – concealed carry – so long as they left open the option to carry openly." *Bruen*, 597 U.S. at 59). Defendants reimagine this to mean that states may eliminate *either* concealed or open carry so long as they leave the *other* option open. But Defendants do not engage with Plaintiffs' criticism of their logical fallacy. *See* ECF #27 at 12. Nor do Defendants explain how a ban on open carry would not undermine the Second Amendment's prefatory clause – protection of the militia and its ubiquitous long guns.
[15] M. Stanton Evans.

Any purported "societal problem" that Florida's law seeks to address is nothing new, and yet the Founders never banned open carry in response.

But even if some sort of loosened analogical reasoning *were* appropriate here (it is not), Defendants still failed to muster a relevant tradition. As the Eleventh Circuit recently held, "the Founding era is the primary period against which we compare the Florida law" because "[t]he Second Amendment was ratified, and its meaning fixed, in 1791." *NRA v. Bondi*, 133 F.4th 1108, 1115-16 (11th Cir. 2025). Ignoring that principle, Defendants claim "*Bruen* recognized that a variety of historical sources and periods may inform these inquiries," including English practice, the colonial period, the Founding, and beyond. XMSJ at 17. But *Bruen* merely was responding to that which had been proffered by the parties. In terms of methodology for future cases, *Bruen* was clear: "19th-century evidence [i]s 'treated as mere confirmation of what the Court thought had already been established.'" *Bruen*, 597 U.S. at 37. Defendants cannot skip the Founding-era "establish" part and go straight to 19th-century "confirmation" part.

Even so, Defendants utterly fail to quote – much less identify – a single historical law relied upon in their memorandum. Instead, Defendants vaguely "direct the Court's attention to the countless examples of relevantly similar laws … from the colonial era up to and including the early 20th century," citing their Statement of Facts. XMSJ at 18. But this Court is "not obliged to sift the historical materials for evidence to sustain [Florida's] statute. That is [Defendants'] burden." *Bruen*, 597 U.S. at 60. And although Defendants insist otherwise – that *Bruen* somehow permits them to bear their burden however they please (XMSJ at 18 n.2) – all Defendants do is undermine their own credibility. In fact, Defendants acknowledge that so-called "legal historians … affiliated with Everytown for Gun Safety" prepared their materials – hardly a neutral party. In contrast,

16

Plaintiffs provided *actual* evidence of a robust Founding-era tradition of open carry (ECF #58 at 9-10), relying on the underlying historical sources themselves.

Because Defendants have failed to identify a single historical analogue in their Motion for Summary Judgment or Memorandum of Law, this Court should deny their motion on that basis alone. As this Court recently explained, the Best Evidence Rule requires that an "original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise." *Rivera v. Palm Beach County*, 2021 U.S. Dist. LEXIS 51376, at *15 (S.D. Fla. Mar. 15, 2021). Importantly, "[t]he Best Evidence Rule applies to summary judgment motions because although evidence does not have to be in admissible form to be considered at the summary judgment stage, '[o]n motions for summary judgment, we may consider only that evidence which can be reduced to an admissible form.'" *Id.* Without a primary source anywhere in sight, this Court should decline to consider mere opinions and quoted excerpts contained within reports and other secondary sources. That sort of third-hand hearsay is not the sort of historical rigor *Bruen* requires.

In any case, Defendants previously proffered only *two* Founding-era enactments – *one* state and *one* city. Resp. at 16-17 (1794 VA; 1809 Gloucester, MA). Of course, *Bruen* "doubt[ed] that just *three* … regulations could suffice to show a tradition of public-carry regulation." 597 U.S. at 46 (emphasis added).[16]

---

[16] Nor are Defendants' regulations even "relevantly similar" to Florida's broad ban on open carry. *Bruen* already dispensed with Virginia's "going armed" statute, which regulated the *brandishing* of arms "in Terror of the People" and "require[d] something more than merely *carrying* a firearm in public." 597 U.S. at 49 n.14, 50. The same is true for the Gloucester ordinance, which required as an element "annoyance and terror." Resp. at 17. Banning peaceable carry by law-abiding persons, Florida's open carry ban requires no such nexus to "terror" or "affray."

Defendants' remaining 19th-century analogues necessarily fail, as there is no "well-established and representative" Founding-era tradition for them to "confirm." *Bruen*, 597 U.S. at 30, 37.  And aside from their temporal distance from the Founding, most regulated only certain *types* of weapons (pistols, knives) and did not ban open carry generally.  *See* Resp. at 16-17 (1879 TN; 1837 GA (duplicated); 1821 TN).  At least one expressly *allowed* the open carry of certain pistols.  *See id.* (1879 TN).  Another allowed open carry upon payment of a surety.  *See id.* (1856-57 VA).  Those that purported to ban the carrying of *all* weapons were unconstitutional on passage and cannot serve as analogues.  *See id.* (1901 KS; 1858 WI; 1857 DC); *cf. Bruen*, 597 U.S. at 53.  And Defendants' remaining analogues either were colonial (1686 NJ) or territorial (1889 AZ; 1876 WY; 1853 OR) and therefore "deserve little weight."  *Id.* 597 U.S. at 69.

Unsurprisingly, Defendants ignore the robust Founding-era tradition showing that open carry was the norm.  As early as 1637, a Massachusetts Bay statute required adults to "come to the publike assemblies with their muskets...."[17]  *See also* Virginia (1642) (requiring men bring "to church on Sondays one fixed and serviceable [long] gun"); Connecticut (1643) (same); Massachusetts (1706) (same); South Carolina (1743) (same).[18]  Such statutes continued through the Founding era.  *See* Georgia (1770) (requiring men to carry "a gun, or a pair of pistols" into the pew at church).[19]  The colonists who gathered on the town greens at Lexington and Concord were not strangers to open carry.

Defendants end with a series of generalizations from several cases, and one statement from an out-of-state *grand jury*.  Resp. at 18-20.  None forecloses Plaintiffs' challenge.  First, the

---

[17] https://tinyurl.com/23dt84rn.
[18] https://tinyurl.com/534p29hk (VA); https://tinyurl.com/msyjj3t3 (CT); https://tinyurl.com/yexwn523 (MA); https://tinyurl.com/yfur7fe7 (SC).
[19] https://tinyurl.com/5bze6caj.

Supreme Court's recognition that there is no right to carry "in any manner whatsoever" contemplates historical prohibitions on the *criminal brandishing* of arms, evidenced by the Court's repeated discussion of historical laws banning just that. *See Heller*, 554 U.S. at 623; *Bruen*, 597 U.S. at 50. Second, Defendants' state cases (Resp. 19-20) are inapposite. *State v. Huntley*, 25 N.C. 418, 420 (1843) dealt with "the offence of riding or going about armed with unusual and dangerous weapons, to the terror of the people" – not peaceful open carry. And *State v. Reid*, 1 Ala. 612 (1840), **says the opposite** of what Defendants claim, dealing with "the evil practice of carrying weapons secretly" and opining that "the Legislature cannot inhibit the citizen from bearing arms openly...." *Id*. at 614, 619. And third, Defendants' vague appeal to 1879 "attitude[s]" (Resp. at 20) derived from a newspaper story cannot "illuminate the scope of the right" at the Founding. *Bruen*, 597 U.S. at 34.

## CONCLUSION

This Court should deny Defendants' Motion for Summary Judgment and grant Plaintiffs' Motion for Summary Judgment.

Respectfully submitted this 7th day of August 2025,

**KATZ & PHILLIPS, P.A.**
Attorneys for the Plaintiffs
509 W. Colonial Drive
Orlando, Florida 32804
Tel./Fax: 321.332.6864
Pleadings: pleadings@kplegalteam.com
Email: jphillips@thefirearmfirm.com

*James D. Phillips*

**JAMES D. PHILLIPS, JR., ESQUIRE**
Florida Bar No.: 22846

19

> Stephen D. Stamboulieh*
> Stamboulieh Law, PLLC
> P.O. Box 428
> Olive Branch, MS 38654
> 601-852-3440 (T)
> stephen@sdslaw.us
> Mississippi Bar No. 102784
> *Admitted Pro Hac Vice*
>
> Attorneys for Plaintiffs

### CERTIFICATE OF SERVICE

I certify that on August 7, 2025, a copy of the foregoing document or pleading has been electronically filed with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to: Arthur Ivan Jacobs, Esquire, Counsel for Defendants Bakkedahl and SAO, 961687 Gateway Boulevard, Suite 201-I, Fernandina Beach, FL 32034; buddy@jswflorida.com; Summer M. Barranco, Esquire, Andrew Jolly, Esquire, and Richard A. Giuffreda, Esquire, Counsel for Defendants Sheriff Del Toro and St. Lucie County Sheriff's Office, 2455 E. Sunrise Blvd, Suite 1216, Fort Lauderdale, FL 33304; summer@purdylaw.com, andrew@purdylaw.com, richard@purdylaw.com.

*James D. Phillips*_____

**JAMES D. PHILLIPS, JR., ESQUIRE**
Florida Bar No.: 22846