UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT PIERCE DIVISION

CASE NO.  2:24-cv-14250-JEM

GUN OWNERS OF AMERICA, INC.,
GUN OWNERS FOUNDATION, and
RICHARD HUGHES,

      Plaintiffs,

v.

SHERIFF KEITH PEARSON, in his
official capacity as Sheriff of St. Lucie
County, the ST. LUCIE COUNTY
SHERIFF'S OFFICE, THOMAS
BAKKEDAHL, in his official capacity
As the State Attorney for the 19th Judicial
Circuit of Florida, and the STATE
ATTORNEY'S OFFICE for the 19th
Judicial Circuit of Florida,

      Defendants.
_____/

## DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
### (AND MEMORANDUM OF LAW)

      The Defendants, SHERIFF RICHARD DEL TORO, in his official capacity as the Sheriff of St. Lucie County Florida (SLCSO), and THOMAS R. BAKKEDAHL in his official capacity as State attorney for the Nineteenth Judicial Circuit of Florida, and on behalf of the STATE ATTORNEY'S OFFICE for the 19th Judicial Circuit of Florida (SAO), file this their Reply in Support of their Motion for Summary Judgment, and in support thereof would state as follows:

### MEMORANDUM OF LAW

      As an initial matter Plaintiffs' characterization of Defendants' summary judgment arguments as an impermissible "disguised sur-reply" is unfounded. [ECF 61 at pg. 2].

1

Defendants have a right to file a cross-motion for Summary Judgment or risk waiving that right, and in so doing, address the record in this case in its entirety, much in the same way Plaintiffs mirrored and bolstered arguments made in response to the pending Motion to Dismiss in support of their own Motion for Summary Judgment. [ECF 26, 27, and 61]. The overlap in reasoning is both inevitable and appropriate given that the motions concern the same legal issues, facts, and record. The purpose of Local Rule 7.1(a)(3) is not to prohibit a party from advancing in its own dispositive motion the same legal theories it has already raised in opposition to an opponent's motion. Much like the rest of Plaintiffs' Response, a closer look at the authority they cite for this proposition tells a very different story than what they purport. Taverna Imports, Inc. v. A&M Wine & Spirits, Inc., 2018 WL 11227737, at *1 (S.D. Fla. June 4, 2018) (plaintiff's Request for Judicial Notice of facts in opposition of Defendants' Motion filed after Defendants' motion fully briefed, was stricken as impermissible sur-reply, among other reasons not because it was a cross-motion for summary judgment with similar arguments). Notwithstanding the above, Plaintiffs' Response is insufficient based on the arguments presented below.

I.      **Plaintiff's fail to rebut that the relief they are seeking is precluded by Trump v. Casa**

Plaintiffs devote much of their response to arguing that Trump v. CASA, Inc., 145 S. Ct. 2540 (2025), left representational standing intact. [ECF 61 at pgs. 3-4]. However, the question is not whether GOA or GOF can sue on behalf of members but whether the relief they seek can extend and apply to non-parties on a statewide basis. On that point, CASA is crystal clear: it cannot. In their Response Plaintiffs incorrectly treat CASA almost as though it reaffirmed an unlimited right of organizational plaintiffs to obtain sweeping injunctions for all members, everywhere. Despite Plaintiffs' misinterpretation of the case, Supreme Court expressly held that district courts lack authority to prohibit enforcement of a law or policy against anyone who is not

2

a named party to the lawsuit. CASA at 2551. That holding applies regardless of whether the plaintiffs are individuals or organizations suing representationally.

Representational standing determines who can sue, not the scope of the remedy, and Casa is explicit that district courts are not authorized to grant relief more burdensome than necessary to administer complete relief between the parties. Id. at 2557. Even where an organization sues on behalf of its members, the court may not enter an injunction binding as to numerous unnamed, nonparty individuals in every jurisdiction of the state. Plaintiffs have already conceded they seek an order that would bar enforcement of § 790.053(1) against "all GOA and GOF members and supporters" throughout Florida. [ECF 51 at 8]. That is a textbook universal injunction in that it "prohibits the Government from enforcing the law against anyone, anywhere" who is not a party to the case, which would include the countless non-members on whose behalf this lawsuit is brought. CASA, 145 S. Ct. at 2548 n.1. In fact, this is precisely the type of relief the Eleventh Circuit has already recognized as constituting a universal injunction, as the court explained, "[a] universal injunction, or a nationwide (in this case, a statewide) injunction, is the now-common name for an injunction that prevents a state or the federal government from enforcing a law against both parties and non-parties." Henry v. Sheriff of Tuscaloosa Cnty., Alabama, 135 F.4th 1271, 1328 (11th Cir. 2025) (emphasis added). Plaintiffs do not even attempt to address Henry, which Defendants cited in their Motion [ECF 60 at pg. 3], presumably because they recognize it squarely undermines their contention that the relief they seek is not, in fact, a universal injunction.

Additionally, Plaintiffs' reliance on Fla. Decides Healthcare, Inc. v. Byrd, 2025 WL 1884799 (N.D. Fla. July 8, 2025), is misplaced. That case involved narrowly tailored preliminary relief limited to the specific conduct and injuries of the named plaintiffs. In fact, Byrd

3

underscores a central point in Defendants' Motion: the court in <u>Byrd</u> extended an injunction to numerous non-parties, only because the plaintiffs had sued the proper parties, namely the Florida Attorney General and Secretary of State, which was consistent with <u>Casa</u>, and such relief was appropriate to ensure complete relief between the parties and was not more burdensome than necessary. <u>Id</u>. at *13. Here, Plaintiffs ask the Court to strike down a criminal statute in its entirety and to enjoin law enforcement across the state on behalf of thousands of unnamed individuals with unknown factual circumstances. Unlike the plaintiffs in <u>Byrd</u>, however, they have not sued the Attorney General or any other statewide official. Instead, they have chosen to pursue this sweeping relief against a local sheriff and state attorney's office in a jurisdiction where none of them reside. This overreaching request not only exceeds the limits recognized in <u>Byrd</u>, but it also underscores that Plaintiffs are attempting to obtain through this litigation what amounts to a universal injunction by suing the wrong parties in the wrong forum, and any such relief is clearly more burdensome than necessary to afford complete relief between the parties.

     Plaintiffs' attempt to reframe Defendants' legitimate concerns should this broad relief be granted as mere "whataboutism" misses the point. [ECF 61 at pg. 4]. The "parade of horribles" is not a rhetorical diversion but a practical demonstration of why <u>CASA</u> draws a bright line against remedies that extend beyond the named parties, as such remedies invite conflicting enforcement practices, uncertainty among law enforcement agencies not before the court, and inevitable collateral litigation. <u>CASA</u> exists precisely to prevent such confusion and chaos by ensuring judicial decrees operate only within the bounds of necessity and party-specific relief. Thus, Plaintiffs' position would have this Court ignore the Supreme Court's express warning in <u>CASA</u> that the judiciary is not authorized to rewrite state law in favor of thousands of individuals not before this court, and against numerous other non-parties. The relief sought here would

impermissibly bind thousands of non-parties without adjudicating their specific circumstances, far exceeding what is legally permissible.

## II.     Plaintiffs' Response fails to establish standing

Plaintiffs attempt to brush aside the standing defects in this case by pointing to Mr. Hughes' professed "intent" to openly carry a firearm in St. Lucie County, but this does not cure the fatal deficiencies identified in Defendants' motion. [ECF 61 at pgs. 8-9]. First, while Hughes alleges that he visits St. Lucie County at least once a month and attends certain gun shows, Article III requires more than stated desires and speculative plans—it demands a *certainly impending* injury. Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409–10 (2013). Hughes' future intentions aside, his alleged future *injury by these Defendants* still depends on a *string of contingencies*. [ECF 51 at pgs. 7-8]. Plaintiffs' response fails to address that such an attenuated chain of events is the type of speculative harm the Supreme Court has held is insufficient for standing. Lujan v. Defs. of Wildlife, 504 U.S. 555, 564 n.2 (1992).

Second, Plaintiffs' attempt to downplay the problem of redressability by asserting that enjoining these Defendants would allow them to openly carry throughout Florida is contrary to controlling law, and precisely the sort of overbroad relief the Eleventh Circuit has forbidden, and Plaintiffs cannot evade that limitation by suing a single local sheriff and SAO county and hoping for statewide effect. "If a plaintiff sues the wrong defendant, an order enjoining the correct official who has not been joined as a defendant cannot suddenly make the plaintiff's injury redressable. The district court was without jurisdiction to enjoin the lone defendant in this action, much less the nonparty Supervisors." Jacobson v. Fla. Sec'y of State, 974 F.3d 1236, 1255 (11th Cir. 2020)

Defendants do not dispute that official-capacity suits are nominally against the State; however, what Plaintiffs' response fails to contend with is that courts may only extend injunctions to non-party officials if they are *in active concert* with the defendant or share a sufficient connection to the challenged enforcement. Fla. Immigrant Coal. v. Uthmeier, 2025 WL 1423357, at *1 (S.D. Fla. Apr. 29, 2025). Ironically, Plaintiffs' reliance on Uthmeier undermines their own position. [ECF 61 at pgs. 11-12]. In Uthmeier, the court allowed an injunction against non-parties *only because the plaintiffs sued the proper official, the Attorney General,* whose enforcement authority created a connection to other agencies. Here, Plaintiffs sued no official with statewide authority and have shown no link between these Defendants and other law enforcement or state attorneys' offices, so they cannot obtain statewide relief.

Lastly, while Plaintiffs Response suggests that a statute merely being on the books with a prior enforcement history is sufficient for standing, prior enforcement does not eliminate the need for imminence or concreteness. HM Fla.-ORL, LLC v. Governor of Fla., 137 F.4th 1207, 1218 (11th Cir. 2025) emphasized that absent a "clear disavowal of enforcement," a threat may exist—but it must still meet the Article III standard. Here, Hughes' purported plans require him to engage in speculative conduct across multiple hypothetical scenarios, many of which will likely involve other law enforcement agencies. [ECF 59 ¶'s 16 – 19]. Enforcement history alone does not convert these conjectural actions and situations into a "certainly impending" injury.

### III. Plaintiffs fail to demonstrate that Florida's Open Carry regulation is unconstitutional

The Supreme Court has previously reiterated that the law is not "trapped in amber." United States v. Rahimi, 144 S. Ct. 1889, at 691 (2024). The regulatory challenges posed by firearms today "implicat[e] unprecedented societal concerns [and] dramatic technological

changes." New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1 at 27, 142 (2022). Accordingly, "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." Rahimi, 602 U.S. at 691-92, 144 S.Ct. 1889. After all, "the Founders created a Constitution—and a Second Amendment—'intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs.'" Bruen, 597 U.S. at 27-28, 142 S.Ct. 2111 (quoting McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 415, 4 L.Ed. 579 (1819)).

With that in mind, the Second Amendment does not presumptively protect open carry merely because concealed carry is available as Plaintiffs argue. [ECF 61 at pgs. 12 - 14]. The operative clause guarantees the right "to keep and bear Arms" but says nothing about a particular manner of carrying. District of Columbia v. Heller, 554 U.S. S.Ct. 2783, at 576 171 L.Ed.2d 637 (2008))). Plaintiffs attempt to rely on Heller's definition of "bear arms" to claim open carry is automatically protected, but they fail to address that reality that Heller did not resolve whether the Second Amendment protects open versus concealed carry. Heller at 626–27. Plaintiffs' analogy to the First Amendment is likewise inapposite. [ECF 61 at pg. 13]. Defendants are not contending that the right to bear arms can be abolished, just as the First Amendment does not permit abolishing the right to practice religion. Rather, Defendants argue, consistent with *Heller*, *Rahimi*, and *Bruen*, that the State may regulate the *manner* in which the right is exercised, so long as one lawful avenue remains. Regulating whether public carry is open or concealed is no more an abolition of the right than requiring worship services to comply with fire codes is an abolition of religious freedom.

Moreover, Plaintiffs' invocation of United States v. Hicks, 649 F. Supp. 3d 357 (W.D. Tex. 2023), is equally misplaced. Hicks addressed whether the Second Amendment's plain text

7

covers the commercial acquisition of firearms (buying and selling) as an activity necessary to the core right to "keep" arms. The court reasoned that without the ability to acquire firearms, the constitutional right to keep them would be meaningless. That holding rests on the undeniable link between acquisition and possession. The link here is not comparable to that in Hicks. The right to "bear" arms does not logically or textually require that any and all modes of public carry be immune from regulation.

Without belaboring the point, the Defendants respectfully submit that Florida's law at issue, which prohibits open carry while permitting concealed carry, fits squarely within the framework set by the very cases Plaintiffs rely on. It is a modern regulation analogous to the long-standing historical tradition of regulating the *manner* of public carriage, as was outlined in Defendants' Motion [ECF 59 ¶ 29]. The law addresses present-day public safety concerns while leaving open an alternative method of carrying a firearm, just as its historical analogues did. Plaintiffs' insistence on a Founding-era "identical twin" is therefore inconsistent with controlling precedent, which recognizes that states may regulate the manner of carry to address contemporary circumstances without violating the Second Amendment.

Plaintiffs' Response claims Defendants "appeal to the highest level of generality" by noting that firearm regulations have existed since the Nation's founding. [ECF 61 at pg. 15] That mischaracterizes Defendants' argument. Defendants have not relied on abstract generalities, but on a specific and well-documented historical tradition of regulating similar manners of public carriage. *Heller* and *Bruen* both confirm that such manner restrictions have deep historical roots. Bruen at 2147, 2150; Heller at 626.

Plaintiffs also incorrectly suggest that *Bruen* requires Defendants to locate an identical Founding-era open carry ban, but that is simply not the law. *Bruen* expressly allows for

8

"analogical reasoning" and "relevantly similar" historical comparisons, recognizing that "regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders." Bruen at 2132. Where a historical analogue is not a "dead ringer," the question is whether it is comparable in burden and justification, not identical in form. Id. Florida's law is precisely such a comparable analogue—falling squarely within the historical tradition of regulating the manner of public carriage of firearms.

Moreover, Plaintiffs' Response misreads NRA v. Bondi, 133 F.4th 1108, 1115-16 (11th Cir. 2025). The Eleventh Circuit there did not, as Plaintiffs contend, restrict the inquiry to 1791 alone. [ECF 61 at pg. 16]. Rather, it confirmed that courts "may look to historical practice from the mid-to-late nineteenth century to at least confirm the Founding-era understanding of the Second Amendment." Bondi at 1116. That is exactly what Defendants have done, drawing from the colonial period through the early 20th century to show an enduring tradition of manner restrictions on public carry. Plaintiffs' effort to exclude this confirmatory evidence is contrary to both *Bondi* and *Bruen*.

Lastly, Plaintiffs are wrong to assert that Defendants "failed to identify a single historical law." [ECF 61 at pg. 16] Defendants' Statement of Facts and supporting exhibits cite numerous statutes, ordinances, judicial decisions, and historical counterparts, all which demonstrate that regulating public carry in this way is consistent with this country's history and tradition. [ECF 59 ¶'s 29-31]. Plaintiffs' suggestion that the Court "is not obliged to sift" through these sources ignores that Defendants have already done the sifting; the historical analogues are in the record and properly before the Court. The historical record clearly shows that legislatures from the colonial period through the early 20th century consistently regulated the public carrying of weapons in ways analogous to modern open carry laws. Statutes and ordinances across multiple

states—including New Jersey (1686), Virginia (1794, 1856-57), Massachusetts (1809), Tennessee (1821, 1879), Georgia (1837), Wisconsin (1858), Oregon (1853), Arizona (1889), New Mexico (1869), Wyoming (1876), and Kansas (1901)—restricted the manner, type, and location of firearms or other deadly weapons in public, often requiring "reasonable cause" or limiting carry in populated areas. [ECF 59 ¶ 29]. These historical measures demonstrate a longstanding tradition of regulating the *manner* of public carriage to protect public safety and prevent fear or disorder, while leaving intact the right to bear arms. Modern open carry laws operate under the same principle and thus fall squarely within the historical analogues recognized under *Bruen* and reaffirmed by *Bondi*.

Plaintiffs' "Best Evidence Rule" argument at best is a red herring. The rule does not bar reliance on summaries, compilations, studies, or scholarly articles when those materials are used to present facts, expert opinions, or historical context, rather than to prove the precise text of a document. In United States v. Miller, 307 U.S. 174 (1939), the Supreme Court referenced historical analyses and legal commentaries to assess the constitutionality of a firearm regulation. The Court's use of secondary sources that provided insights into historical firearm regulations was integral to its decision-making process. The Fifth Circuit in United States v. Emerson, 270 F.3d 203 (5th Cir. 2001) examined historical writings and legal commentaries to interpret the Second Amendment. The court's reliance on secondary sources that cited primary historical materials was deemed appropriate for understanding the historical context of the right to bear arms.

For the foregoing reasons together with the Defendants' Motions for Summary Judgment, Defendants are entitled to judgment as a matter of law.

Respectfully Submitted,

**JACOBS SCHOLZ & WYLER, LLC**

*/s/ Arthur I. Jacobs*
Arthur I. Jacobs, Esq
Fla. Bar No. 108249
961687 Gateway Blvd., Suite 201-I
Fernandina Beach, FL  32034
Telephone: (904) 261-3693
Facsimile: (904) 261-7879
Primary:  filings@jswflorida.com
Secondary: Buddy@jswflorida.com

**I HEREBY CERTIFY** that a copy of the foregoing has been electronically filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to: **STEPHEN D. STAMBOULIEH, ESQUIRE,** Co-Counsel for Plaintiffs, P.O. Box 428, Olive Branch, MS 38654  [stephen@sdslaw.us]; **JAMES D. PHILLIPS, JR., ESQUIRE**, Co-Counsel for Plaintiffs, 509 W. Colonial Drive, Orlando, FL 32804 [jphillips@thefirearmfirm.com]; and **ARTHUR IVAN JACOBS, ESQUIRE,** Counsel for Defendants Bakkedahl and SAO, 961687 Gateway Boulevard, Suite 201-I, Fernandina Beach, FL 32034 [buddy@jswflorida.com] this August 14, 2025.

   s/Andrew W. Jolly
ANDREW W. JOLLY, ESQUIRE
Fla. Bar No. 1032793
PURDY, JOLLY, GIUFFREDA, BARRANCO & JISA, P.A.
2455 E. Sunrise Boulevard, Suite 1216
Fort Lauderdale, Florida 33304
Telephone:(954) 462-3200
e-mail: Andrew@purdylaw.com
           Cecilia@purdylaw.com
Attorney for *Defendant Sheriff and St. Lucie County Sheriff's Office*
Trial Counsel