# First District Court of Appeal
## State of Florida

_____

No. 1D2023-0533
_____

Stanley Victor McDaniels,

    Appellant,

v.

State of Florida,

    Appellee.

_____

On appeal from the County Court for Escambia County.
Kerra A. Smith.

September 10, 2025

Ray, J.

    Florida law generally makes it a crime for an ordinary, law-abiding, adult citizen to carry a firearm openly in public. Stanley Victor McDaniels was convicted under that law, and he now appeals. He contends that this open carry ban is incompatible with the Second Amendment's guarantee of the right to bear arms. Guided by the Constitution's text and this Nation's historical tradition of firearm regulation, we agree. We therefore declare the law unconstitutional, vacate McDaniels's conviction, and reverse his sentence.

I.

A. Florida's Open Carry Ban

Florida is an outlier. Along with California, Connecticut, and Illinois, it is one of the few States that generally prohibit the open carrying of firearms.

Enacted in 1987, section 790.053, Florida Statutes ("Florida's Open Carry Ban"), makes it "unlawful for any person to openly carry on or about his or her person any firearm or electric weapon or device." *Id.* at (1). A violation is a second-degree misdemeanor, punishable by up to sixty days in jail or a fine of up to $500. *Id.* For those licensed to carry concealed, the statute permits the "brief[] and open[] display" of a firearm, provided it is not "intentionally displayed in an angry or threatening manner, not in necessary self-defense." *Id.* There are also narrow exceptions for activities such as hunting, fishing, or other specified lawful purposes. § 790.25(2), Fla. Stat. These exceptions, however, function only as affirmative defenses if one is prosecuted under the statute. *Norman v. State*, 215 So. 3d 18, 25 n.4 (Fla. 2017). As a practical matter, then, Florida law criminalizes the open carrying of firearms by ordinary, law-abiding, adult citizens in their daily lives.

B. McDaniels's Conviction

On the Fourth of July 2022, McDaniels stood at a major intersection in downtown Pensacola. He held a copy of the United States Constitution in one hand and was waving at vehicles that drove by with his other hand. He also had a loaded handgun tucked inside his pants using an inside-the-waistband holster. The holstered firearm was visible to anyone who passed by, but McDaniels was not threatening anyone. He had also set up a camera on a tripod to record his activity.

When law enforcement officers arrived at the scene several hours later, McDaniels was cooperative. He explained that he wanted to take this case to the supreme court. When asked for identification, he gave them a copy of his Florida Concealed Carry permit. They advised him that while concealed carry was lawful, open carry was not. After his background check came back

2

negative, officers removed the firearm from his pants and returned the holster to him. Their body cameras also recorded the encounter.

Officers later obtained a warrant for McDaniels's arrest for openly carrying a firearm in violation of Florida's Open Carry Ban. On July 10, he turned himself in after learning about the warrant by phone from the local police department earlier that day.

Prior to trial, McDaniels moved to dismiss the charge and to have Florida's Open Carry Ban declared unconstitutional under the Second Amendment to the United States Constitution both facially and as applied. After a hearing, the trial court denied his motion but certified a question to this court as one of great public importance:

> DOES SECTION 790.053, FLORIDA STATUTES, VIOLATE THE SECOND AMENDMENT RIGHT TO BEAR ARMS IN PUBLIC CONSIDERING THE NATION'S HISTORICAL TRADITION OF FIREARM REGULATION?

McDaniels was convicted as charged and sentenced to probation and community service. The trial court stayed his sentence pending the outcome of this appeal. We have jurisdiction. Art. V, § 4(b)(1), Fla. Const.; Fla. R. App. P. 9.030(b)(1)(A).

II.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed." Amend. II, U.S. Const. We start by reviewing the United States Supreme Court's modern Second Amendment jurisprudence, which sets the framework for deciding the question before us. Over the past two decades, that body of law has been shaped by three landmark decisions: *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); and *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022). Taken together, these decisions define the contours of the Second Amendment right and establish the framework by which firearm regulations must be judged.

3

A. *Heller*: The Individual Right to Keep and Bear Arms

In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment codifies a preexisting right of individuals to "possess and carry weapons in case of confrontation." 554 U.S. at 592. The District of Columbia ordinance at issue imposed a complete ban on the possession of handguns in the home and further required that any lawfully owned firearm be kept unloaded and either disassembled or secured by a trigger lock, thereby rendering it inoperable for immediate use. *Id*. at 575. The Court concluded that such restrictions "make[] it impossible for citizens to use [their firearms] for the core lawful purpose of self-defense" and were therefore unconstitutional. *Id*. at 630.

Rejecting the argument that the Second Amendment protects only a collective right related to militia service, the Court grounded its reasoning in the text and historical understanding of the Amendment, emphasizing that "the inherent right of self-defense has been central to the Second Amendment right." *Id*. at 628. In support, the Court relied in part on William Blackstone, "the preeminent authority on English law for the founding generation," among other commentators of the era. *Id*. at 593–94. Blackstone described the right to keep and bear arms as one of the "fundamental rights of Englishmen," rooted in "the natural right of resistance and self-preservation" and encompassing "the right of having and using arms for self-preservation and defence." *Id*. (quoting 1 Blackstone 136, 139–40 (1765)).

At the same time, the Court acknowledged that the right is not without limits. *Id*. at 626. It identified a non-exhaustive list of longstanding, historically grounded regulations—such as prohibitions on firearm possession by felons and the mentally ill, or laws that forbid carrying of arms in "sensitive places"—as "presumptively lawful." *Id*. at 626–27, n.26.

Still, the Court drew a sharp distinction between permissible regulation and unconstitutional restriction, making clear that a categorical ban on the use of handguns—"the most preferred firearm in the nation to keep and use for protection of one's home and family"—could not withstand any level of scrutiny. *Id*. at 628–29 (cleaned up). It observed that few laws in our history have

4

approached the severity of the District of Columbia's ban, and those that did were struck down. Of particular relevance here, the Court pointed to 19th-century state court decisions invalidating broad prohibitions on the open carrying of pistols as examples of firearm regulations deemed unconstitutional. *Id*. at 629 (citing *Nunn v. State*, 1 Ga. 243 (1846); *Andrews v. State*, 50 Tenn. 165 (1871); and *State v. Reid*, 1 Ala. 612 (1840), discussed *infra*).

Ultimately, the Court declined to "undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment," instead signaling that further elaboration on the constitutional boundaries of firearms regulation would be left for future cases. *Id*. at 626. In the meantime, *Heller* established two key methodological principles of enduring significance. First, it categorically rejected rational basis review. *Id*. at 628 n.27 (explaining that the rational basis test cannot "be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, or the right to keep and bear arms"). And second, it dismissed any "freestanding 'interest-balancing' approach" that would weigh the right to keep and bear arms against the government's policy objectives. *Id*. at 634. As the Court explained, "[a] constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all." *Id*.

### B. *McDonald*: Enforceable Against the States

Two years after *Heller*, the Court considered whether the Second Amendment right to keep and bear arms applies with equal force to the States. In *McDonald v. City of Chicago*, the petitioners challenged a sweeping handgun ban in Chicago that closely resembled the District of Columbia's prohibition struck down in *Heller*. 561 U.S. at 750. They argued that the Second Amendment should be incorporated against the States through the Fourteenth Amendment. *Id*.

A plurality of the Court agreed, holding that the right to keep and bear arms is a "fundamental right[] necessary to our system of ordered liberty," *id*. at 778, and is "deeply rooted in this Nation's history and tradition" *id*. at 768 (internal citation omitted). On

5

that basis, the plurality concluded that the Second Amendment applies to the States through the Due Process Clause of the Fourteenth Amendment. *Id*. at 791. Reaffirming *Heller*, the plurality stressed that "citizens must be permitted to use handguns for the core lawful purpose of self-defense." *Id*. at 768 (internal quotations and citation omitted).

Justice Thomas concurred in the judgment, agreeing that the Fourteenth Amendment makes the Second Amendment fully applicable to the States but reasoning that incorporation properly rests on the Fourteenth Amendment's Privileges or Immunities Clause. *Id*. at 805–06. (Thomas, J., concurring in part and concurring in the judgment). In his view, the right to keep and bear arms is a "privilege of American citizenship" that no State may abridge. *Id*. at 806.

While *McDonald* did not alter the substance of *Heller*, it extended its reach, placing the Second Amendment on equal footing with other rights incorporated against the States. The Court rejected the notion that the Second Amendment is "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Id*. at 780. Yet, as in *Heller*, the Court left to future cases the task of further defining the full scope of the Second Amendment right to keep and bear arms.

C. After *Heller* and *McDonald*: The Rise of Means-End Scrutiny

In the decade following *Heller* and *McDonald*, lower courts generally settled on a "two-step" framework for evaluating Second Amendment challenges that included a form of interest balancing or means-end scrutiny. At the first step, courts asked whether the challenged law regulated conduct within the scope of the Second Amendment, as informed by its text and historical context. *See, e.g., Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019). If the conduct was not categorically unprotected, or if the historical record was inconclusive, courts proceeded to a second step, applying means-end scrutiny. *Id*. The level of scrutiny turned on the degree to which the law burdened what was generally regarded as the "core" of the right: armed self-defense. *Id*. at 441–42. Most often, courts applied intermediate scrutiny, upholding laws that imposed only modest burdens if they advanced important

6

governmental interests and were appropriately tailored to those objectives. *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 96–97 (2d Cir. 2012).

The Florida Supreme Court's decision in *Norman* illustrates this approach. Dale Lee Norman was arrested for openly carrying a holstered handgun on a public street, in violation of Florida's Open Carry Ban. 215 So. 3d at 22. He challenged the statute under both the Second Amendment and article I, section 8 of the Florida Constitution. *Id.* at 28.

Applying the two-step framework, the supreme court first held that Florida's Open Carry Ban burdened conduct within the scope of the Second Amendment because it restricted one manner of bearing arms for self-defense. *Id.* at 36. At the second step, the court determined that the ban "related to the core" of the right, since it limited public carry where a need for self-defense exists. *Id.* at 37. But it concluded that the restriction was "not so close" to the core as to foreclose the ability to protect oneself, given Florida's permissive shall-issue concealed-carry licensing regime. *Id.* Viewing the burden as not severe, the court applied intermediate scrutiny. *Id.* at 38–39.

In doing so, it observed that "courts have traditionally been more deferential to the legislature in this area," particularly where "reliable scientific proof regarding the efficacy of prohibiting open carry is difficult to obtain." *Id.* at 41 (cleaned up). Deferring to legislative judgment, the court held that Florida's significant interests in "ensuring public safety by reducing firearm-related crime" justified limiting public carry to licensed concealed handguns. *Id.* at 39. In its view, the combination of an open-carry prohibition with a permissive concealed-carry licensing regime constituted a reasonable fit with those objectives. *Id.* at 41. The court thus upheld Florida's Open Carry Ban under intermediate scrutiny. *Id.* at 42.

> D. *Bruen*: Rejecting Means-End Scrutiny and
> Restoring the Text, History, and Tradition Test

The two-step framework, with its interest-balancing inquiry, met its end in *New York State Rifle & Pistol Association, Inc. v.*

7

*Bruen*. There, the Court concluded that the approach was "one step too many" and reaffirmed that Second Amendment claims must be resolved by text, history, and tradition alone. 597 U.S. at 19.

The petitioners in *Bruen* challenged New York's requirement that applicants for a license to carry a concealed handgun in public demonstrate "proper cause" or a heightened need for self-protection. *Id.* at 16. The Court held that the Second and Fourteenth Amendments secure not only the "right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense" but also the right to "carry a handgun for self-defense *outside* the home." *Id.* at 8–9 (emphasis added). As the Court observed, "[m]any Americans hazard greater danger outside the home than in it." *Id.* at 33. Striking down the law, the Court reasoned that conditioning public carry on the showing of special need deprived "law-abiding citizens with ordinary self-defense needs" of the very right the Second Amendment guarantees. *Id.* at 71.

In so holding, the Court reiterated—and made more explicit—the standard first articulated in *Heller* for assessing whether a firearm regulation is constitutional:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 24 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)). The Court rejected judicial interest balancing and means-end scrutiny, underscoring that "[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id.* at 23 (alteration in original) (quoting *Heller*, 554 U.S. at 634).

Under *Bruen*'s historical test, the government must prove that the challenged "regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19. That requires identifying a "well-established and representative historical analogue" from either the Founding or Reconstruction era that is relevantly similar in both *how* and *why* it burdens the Second Amendment right. *Id.* at 29, 30 (emphasis omitted). While a historical law need not be a "historical twin," it must impose a "comparable burden" and be "comparably justified," to serve as a historical analogue. *Id.* at 30.

As will be explained below, the shift from the deferential, means-end analysis employed in *Norman* to *Bruen*'s text-history-tradition framework is dispositive for present purposes.

### III.

With these principles in mind, we turn to Florida's Open Carry Ban. We first address why we are bound to apply the analytical framework reaffirmed by the United States Supreme Court in *Bruen*, rather than simply adhering to the earlier holding of the Florida Supreme Court in *Norman*. We then apply that framework to the facts of this case and conclude that the State has failed to carry its burden to show that Florida's Open Carry Ban is consistent with this Nation's historical tradition of firearm regulation.

#### A. The United States Supreme Court's Decisions are Binding on Questions of Federal Constitutional Law

The Supremacy Clause of the United States Constitution binds state judges to abide by the federal Constitution despite any state law to the contrary:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

9

Art. VI, cl. 2, U.S. Const. Consistent with this command, the United States Supreme Court is the ultimate authority construing the federal Constitution. *See In re Advisory Op. to the Governor*, 509 So. 2d 292, 302 (Fla. 1987) ("Although this Court is the final arbiter of questions arising under the Florida Constitution, the United States Supreme Court is the final arbiter of federal constitutional law. Thus, this Court cannot address federal questions as authoritatively as it can state constitutional questions.").

Here, McDaniels has challenged Florida's Open Carry Ban solely under the Second Amendment to the Constitution of the United States. He raises no independent claim under article I, section 8 of the Florida Constitution. The United States Supreme Court has not directly addressed whether Florida's Open Carry Ban violates the Second Amendment. Although the Florida Supreme Court upheld the law in *Norman*, it did so under the two-step framework expressly rejected in *Bruen*. *See Bruen*, 597 U.S. at 17; *United States v. Rahimi*, 602 U.S. 681, 691 (2024). While decisions of our state supreme court ordinarily bind this court, the United States Supreme Court's interpretation of the federal Constitution is "the supreme Law of the Land," and we are bound to follow it. *See also Spencer v. State*, 389 So. 2d 652, 653 (Fla. 1st DCA 1980) ("The decisions of the United States Supreme Court on questions of federal constitutional law have direct and controlling effect on our decisions though the Florida Supreme Court has not yet had an opportunity to conform its previously expressed views, which were themselves in conformity with United States Supreme Court decisions as then understood by the Florida Supreme Court."). Accordingly, *Norman* does not provide controlling precedent, and this court must evaluate McDaniels's claim under the Supreme Court's text, history, and tradition standard.

### B. Florida's Open Carry Ban Under the Text, History, and Tradition Test

We therefore begin, as the Supreme Court has directed, by asking whether Florida's Open Carry Ban regulates conduct covered by the Second Amendment's plain text. If it does not, the law falls outside the Amendment's scope. If it does, however, the

conduct is presumptively protected. We must then ask whether the State has carried its burden to show that the ban is consistent with the Nation's historical tradition of firearm regulation. We address each question in turn.

### 1. Second Amendment's Text

The State does not dispute that Florida's Open Carry Ban targets conduct protected by the Second Amendment's plain text. Nor could it credibly contend otherwise.

The Second Amendment secures the right of "the people"—that is, "ordinary, law-abiding, adult citizens"—to "keep" and to "bear" arms. *Bruen*, 597 U.S. at 31–32. To "keep Arms" is to "have weapons," while to "bear arms" is to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *Heller*, 554 U.S. at 582–84 (internal quotation marks omitted). As *Bruen* confirmed, this definition encompasses "carrying handguns publicly for self-defense." 597 U.S. at 32.

And just as "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms," *id.*, neither does it distinguish between modes of carry. Open carry and concealed carry are both manners of carrying arms in public. As *Heller* made clear, the definition of "bear" arms extends both to carrying "*upon* the person" or to carrying "*in* the clothing or *in* a pocket." 554 U.S. at 584 (emphasis added); *see also Bruen*, 597 U.S. at 32. Florida's Open Carry Ban is therefore inconsistent with the plain text of the Second Amendment.

### 2. Nation's Historical Tradition of Firearm Regulation

Because the Second Amendment's plain text covers the open carry of firearms in public, Florida's Open Carry Ban is unconstitutional unless the State can affirmatively prove that the restriction is consistent with this Nation's historical tradition of firearm regulation.

11

To meet its burden, the State must establish that Florida's Open Carry Ban is "'relevantly similar' to laws that our tradition is understood to permit." *Rahimi*, 602 U.S. at 692 (citing *Bruen*, 597 U.S. at 29). That requires, at a minimum, demonstrating that the modern and historical laws impose a "comparable burden" on the right of armed self-defense and that the burden is "comparably justified." *Bruen*, 597 U.S. at 29 (identifying the "how" and the "why" as the relevant metrics of comparison). Both considerations must be satisfied. *Rahimi*, 602 U.S. at 750 (Thomas, J., dissenting). As the Court has cautioned, "[e]ven when a law regulates arms-bearing for a permissible reason," "it may not be compatible with the right if it does so to an extent beyond what was done at the founding." *Id.* at 692.

The historical inquiry is further constrained by two guiding considerations. First, because ours is an adversarial system, courts do not resolve historical questions "in the abstract," but instead adhere to the principle of party presentation. *Bruen*, 142 U.S. at 25 n.6. We therefore decide this case on the historical record the State has produced, as the party bearing the burden.

Second, in reviewing the State's historical record, we are mindful that "not all history is created equal." *Bruen*, 597 U.S. at 34. As the Supreme Court has emphasized, "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*" *Id.* (quoting *Heller*, 554 U.S. at 634–35). "The Second Amendment was ratified, and its meaning fixed, in 1791." *NRA v. Bondi*, 133 F.4th 1108, 1116 (11th Cir. 2025). Thus, "the Founding era is the primary period against which we compare the [challenged] law." *Id.* at 1115. At the same time, "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." *Bruen*, 597 U.S. at 38. Accordingly, evidence from those periods carry the greatest probative weight.

On this record, the State has failed to carry its burden. It identifies no Founding-era law that broadly prohibited the open carry of firearms in public. Nor does it cite any historical regulation imposing a burden or justification comparable to Florida's Open Carry Ban. At most, it has pointed to laws regulating the method or manner of carry, but those laws left

12

intact the ability to bear arms openly for peaceable purposes. By contrast, Florida's Open Carry Ban eliminates that option altogether and thus extends far beyond anything recognized in our historical tradition.

a.

Drawing on English tradition, the State identifies as historical analogues laws modeled after the 1328 Statute of Northampton, which on its face broadly prohibited individuals from "rid[ing]" or "go[ing] armed" in public. 2 Edw. 3, c. 3 (1328). But as *Bruen* explained, such evidence from that historical period "cannot be indiscriminately attributed to the Framers of our own Constitution." *Bruen*, 597 U.S. at 35. The Court further observed that the 1328 law targeted conduct that threatened terror or public disorder, not the ordinary carrying of common arms for lawful defense. *Id*. at 45. Indeed, the Court noted that "[the government] do[es] not offer any evidence showing that, in the early 18th century or after, the mere public carrying of a handgun would terrify people." *Id*.

Turning to the State's proffered historical analogues from the 18th and 19th centuries, five are irrelevant. First, it cites a Florida law that required vendors of weapons (including pistols) to pay an annual tax. 1838 Terr. of Fla. Laws ch. 24, § 1, at 36. Second, it cites a New Mexico law that *Bruen* disregarded as an outlier, concluding that "[i]ts value in discerning the original meaning of the Second Amendment is insubstantial." 1860 Terr. of N.M. Laws §§ 1–2, at 94; *Bruen*, 597 U.S. at 55 n.22. Third, it cites a North Carolina law that deals with taxing guns, harps, and pianos. 1866 N.C. Sess. Laws § 21, at 33–34. Fourth, it cites a political handbook discussing the rights of freed slaves in general. There is no mention of open or concealed carry, nor does the State show that this handbook was authoritative. Edward McPherson, *A Handbook for Politics for 1868*, at 36–37 (1872). And fifth, it cites a provision in Georgia's Constitution that does not address open or concealed carry. Ga. Const. art. I, § 14. At bottom, while these sources may reflect aspects of historical firearm regulation, they cannot seriously be regarded as "relevantly similar" to a categorical ban on open carry.

The remaining laws from the 18th and 19th centuries identified by the State as historical analogues fall into three categories. Nine prohibited carrying arms, whether openly or concealed, only when accompanied by criminal intent, such as to terrorize, assault, or injure.[1] Eight prohibited concealed carry outright, without reference to criminal intent.[2] And three were surety statutes, which required an individual to post a bond before carrying a firearm in public.[3]

The surety statutes are not relevantly similar or analogous to a ban on open carry because they first required a complaint from another person who could show a reasonable basis to fear that the targeted individual would cause injury or breach the peace. Even then, the individual remained free to carry a firearm in public upon posting a bond, which would be forfeited if he later caused harm or disturbed the peace. *Bruen*, 597 U.S. at 56–57. *Heller*, moreover, explained that modest sanctions of this kind, which would be "akin to modern penalties for minor public-safety infractions like speeding or jaywalking," are of limited value in defining the scope of the Second Amendment. *Heller*, 554 U.S. at 633–34.

The nine statutes that prohibited carrying arms, whether openly or concealed, only with criminal intent are not relevantly similar or analogous to a broad prohibition on open carry either. Those laws permitted individuals to carry firearms so long as they

---

[1] 1786 Va. Acts 35, ch. 49; 1795 Mass. Acts 436, ch. 2; 1801 Tenn. Pub. Acts 710, § 6; 1821 Me. Laws 285, ch. 76, § 1; 1849 Cal. Stat. 245, § 127; 1851 Minn. Laws 528, ch. 112, § 18; 1852 Del. Laws 333; Minersville, Pa., An Ordinance Prohibiting the Carrying of Concealed Weapons in Minersville § 1 (1858); 1859 Ind. Acts 129, ch. 78, § 1.

[2] 1813 Ky. Acts 100, ch. 89, § 1; 1813 La. Acts 172, § 1; 1819 Ind. Acts 39; 1821 Tenn. Pub. Acts 100, § 1; 1835 Laws of Fla. 423; 1838 Va. Acts 76, ch. 101, § 1; 1838 Ark. Rev. Stat. 280; 1839 Ala. Laws 67, § 1.

[3] 1836 Mass. Acts 750, ch. 134, § 16; 1838 Terr. of Wis. Stat. 381, § 16; 1853 Or. Laws 220, ch. 16, § 17.

14

did not intend to use them to assault or attack others. In that respect, they closely resemble the surety statutes that imposed restrictions only on individuals who posed a danger to others. Both sets of laws rested on the premise that the right to carry arms in public could be burdened only in narrow circumstances. Florida's statute, by contrast, begins with the opposite premise—that individuals have no right to open carry unless they fall within an enumerated exception. *See Bruen*, 597 U.S. at 56–57 (explaining how surety laws did not lend support for state laws requiring an individual to show a special need to carry a firearm, because those state laws turned the analogy on its head).

b.

Nor do the remaining eight statutes, which prohibited only concealed carry, provide substantially similar or analogous support for a broad prohibition on open carry. The State contends that laws regulating open carry and those regulating concealed carry are substantially similar because both govern the manner of bearing arms. But as explained below, even if a ban on concealed carry is constitutional, it does not follow that a ban on open carry is constitutional as well.

In *Bruen*, the Court emphasized that analogical reasoning requires a showing that modern and historical regulations are "relevantly similar." 597 U.S. at 29 (quoting C. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993)). But because "[e]verything is similar in infinite ways to everything else," the task is to determine "which similarities are important and which are not." *Id*. (quoting Sunstein at 774; F. Schauer & B. Spellman, *Analogy, Expertise, and Experience*, 84 U. Chi. L. Rev. 249, 254 (2017)). To illustrate, the Court observed that a green truck and a green hat are relevantly similar if the metric of comparison is "things that are green," but not if the metric is "things you can wear." *Id*. So too here: open carry and concealed carry regulations may appear alike if the metric is simply "manner of carry." But under the proper metric—whether the regulation preserves the ability to bear arms as historically understood—they are not relevantly similar.

15

The State has not shown that open carry and concealed carry were understood to be interchangeable. To the contrary, the historical record, including the very sources the State invokes, demonstrates that the two were regarded as distinct, and that open carry was the default mode of bearing arms that preserved the core of the Second Amendment right.

In *Aymette v. State*, the Tennessee Supreme Court upheld the state's statutory ban on carrying concealed weapons. 21 Tenn. 154, 161–62 (1840). It reasoned that "the [citizens'] right to bear arms in defence of themselves is coupled with the right to bear them in defence of the State," and that those arms "must necessarily be borne openly." *Id.* at 161. A prohibition on open carry, the court concluded, would amount to a denial of the right altogether. *Id.*

The Alabama Supreme Court reached a similar result in *State v. Reid*, holding that a prohibition on concealed weapons did not violate the state constitution. 1 Ala. 612, 622 (1840). But it also reasoned that a ban on open carry would be unconstitutional, explaining that "the Legislature cannot inhibit the citizen from bearing arms openly, because it authorizes him to bear them for the purposes of defending himself and the State, and it is only when carried openly, that they can be efficiently used for defence." *Id.* at 619. The court distinguished open from concealed carry in the context of self-defense, noting that "[i]f the emergency is pressing, there can be no necessity for concealing the weapon." *Id.* at 621. And it rejected the contention that the two forms of carry were indistinguishable in substance, or that it made no difference which was permitted and which was prohibited. *Id.* at 618.

Likewise, in *Nunn v. State*, the Georgia Supreme Court held that the state's categorical ban on carrying weapons, whether concealed or openly, was unconstitutional insofar as it banned open carry. 1 Ga. 243, 251 (1846). The court declined to treat open and concealed carry as equivalent. Emphasizing the difference between the two, it concluded that bans on carrying weapons "*secretly*" did "not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms," whereas "a prohibition against bearing arms *openly*, is in conflict with the Constitution, and void." *Id.*

And in *State v. Chandler*, the Louisiana Supreme Court upheld the state's statutory ban on carrying concealed weapons. 5 La. 489, 490 (1850). Distinguishing concealed carry from open carry, the court reasoned that the law was "absolutely necessary to counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent bloodshed and assassinations committed upon unsuspecting persons." *Id*. at 489–90.

*Chandler* further explained that open carry was the default that fully protected an individual's rights under the Second Amendment, unlike concealed carry that posed a danger to society from sneak attacks:

> [The law against concealed carry] "interfered with no man's right to carry arms (to use its words) 'in full open view,' which places men upon an equality. This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations."

*Id*. at 490.

We pause here to recall our earlier discussion of *Heller*, where we noted that these antebellum cases played a prominent role in the Court's understanding of the scope of the Second Amendment. *Bruen*, 597 U.S. at 52–53; *see also Norman*, 215 So. 3d at 44 (Canady, J., dissenting) (noting that *Heller*'s reliance on *Nunn* and *Chandler* was "critical" to its interpretation of the meaning of the Second Amendment and concluding that "both cases point strongly to the conclusion that the constitutional right is best understood historically as a specific right to carry arms openly").

Our own state supreme court explained why the Legislature and society treated open carry and concealed carry differently in *Sutton v. State*, 12 Fla. 135 (1867). Sutton was convicted under a statute that prohibited concealed carry of any weapon but expressly allowed open carry. *Id*. at 136. ("The statute under which this indictment was found provides, 'that hereafter it shall not be

17

lawful for any person in this State to carry arms of any kind secretly on or about their person. *Provided*, that this law shall not be so construed as to prevent any person from carrying arms openly outside of all their clothes.'"). The supreme court explained that the statute did not infringe the right to bear arms for self-defense. Rather, it was aimed at preventing individuals from carrying concealed weapons "for the purpose of committing some malicious crime, or of taking some undue advantage over an unsuspecting adversary." *Id.* Even where no such intent was present, the court reasoned, concealed carry created risks that open carry did not:

> [M]en in vexed assemblies or public meetings, conscious of their advantage in possessing a secret and deadly weapon, often become insulting and overbearing in their intercourse, provoking a retort or an assault, which may be considered as an excuse for using the weapon, and a deadly encounter results, which might be avoided where the parties stand on a perfect equality, and where no undue advantage is taken.

*Id.* at 137. The court further observed that the law had been enacted out of public policy concerns and the Legislature directed that it be strictly enforced "in view of the mischief it was intended to remedy." *Id.* Finally, it held that the law prohibited even a partially concealed weapon, authorizing only "arms to be carried openly outside of all the clothes." *Id.* Florida thus viewed concealed carry and open carry as fundamentally distinct.

In sum, the historical record from the relevant period shows that our Nation did not regard concealed carry and open carry as interchangeable. The right to keep and bear arms did not extend to the carrying of weapons in secret, which was regarded as the practice of the cowardly and the disreputable and as incompatible with the legitimate exercise of the right of self-defense. Open carry, by contrast, was understood to be the manner of bearing arms that gave full effect to the rights secured by the Second Amendment. *See Sinnissippi Rod & Gun Club, Inc. v. Raoul*, 253 N.E.3d 346, 360 (Ind. Ct. App. 2024) (Holdridge, J., dissenting) (concluding that Illinois's categorical ban on the open carry of firearms violates the Second Amendment and emphasizing that "it runs *directly*

18

*contrary* to the relevant historical precedents, which unequivocally hold that open carry is an indispensable and uniquely effective means of exercising the second amendment right to armed self-defense in public"); *see also* Jonathan Meltzer, Note, *Open Carry for All: Heller and Our Nineteenth-Century Second Amendment*, 123 Yale L.J. 1486, 1505 (2014) (examining early nineteenth-century sources and arguing that a faithful reading of *Heller* and *McDonald* "compels the conclusion that the Second Amendment protects the right to carry openly outside the home"); John Ordronaux, *Constitutional Legislation in the United States* 242–43 (1891) (explaining that "the carrying of concealed weapons may be absolutely prohibited without the infringement of any constitutional right, while a statute forbidding the bearing of arms openly would be such an infringement").

\* \* \*

Because the Second Amendment's plain text encompasses the open carrying of firearms in public, that conduct is presumptively protected by the Constitution. The State therefore bears the heavy burden of establishing a relevant historical tradition of firearms regulation that justifies its prohibition.

The State has not met that burden. It is not enough to rely on a generalized tradition of firearms regulation, for at that level of abstraction almost any law could be sustained. Nor can the State blur the distinction between open and concealed carry without disregarding both the Court's originalist framework and our Nation's historical tradition. The historical record makes clear that open carry was regarded as the lawful and preferred mode of bearing arms, while concealed carry was viewed as dangerous to public safety and ineffective for self-defense.

No historical tradition supports Florida's Open Carry Ban. To the contrary, history confirms that the right to bear arms in public necessarily includes the right to do so openly. That is not to say that open carry is absolute or immune from reasonable regulation. But what the State may not do is extinguish the right altogether for ordinary, law-abiding, adult citizens.

19

The Constitution protects the right to carry arms openly for self-defense. Florida's Open Carry Ban cannot be reconciled with that guarantee. Section 790.053, Florida Statutes, is therefore declared unconstitutional. We answer the certified question in the affirmative, reverse McDaniels's conviction, and vacate his sentence.

Judgment REVERSED. Sentencing order VACATED. REMANDED.

ROWE and M.K. THOMAS, JJ., concur.

_____

*Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.*

_____

Eric J. Friday of Kingry & Friday, Jacksonville, for Appellant.

James Uthmeier, Attorney General, Henry C. Whitaker, Solicitor General, Jeffrey Paul DeSousa, Chief Deputy Solicitor General, and Kevin A. Golembiewski, Deputy Solicitor General, Tallahassee, for Appellee.